## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**DALLAS COUNTY, TEXAS,**
  500 Elm Street, 7th Floor
  Dallas, Texas 75202;

  *Plaintiff*,

v.

**ROBERT F. KENNEDY, JR.,** in his official
capacity as Secretary of the United States
Department of Health and Human Services,
  200 Independence Avenue S.W.
  Washington, D.C. 20201;

**UNITED STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES**,
  200 Independence Avenue S.W.
  Washington, D.C. 20201;

**JIM O'NEIL,** in his official capacity as
Acting Director of the Centers for Disease
Control and Prevention,
  1600 Clifton Road
  Atlanta, Georgia 30329; and

**CENTERS FOR DISEASE CONTROL
AND PREVENTION**,
  1600 Clifton Road
  Atlanta, Georgia 30329;

*Defendants.*

Case No. _____

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Dallas County, Texas ("Dallas County" or "Plaintiff") brings this action against Robert F. Kennedy, Jr., in his official capacity as Secretary of the United States Department of Health and Human Services; the United States Department of Health and Human Services ("HHS"); Jim O'Neil, in his official capacity as Acting Director of the Centers for Disease Control and Prevention; and the Centers for Disease Control and Prevention ("CDC") (collectively, "Defendants"). Dallas County states and alleges as follows:

## INTRODUCTION

1.    In response to the COVID-19 pandemic, Congress appropriated billions of dollars for programs designed to remedy the effects of that pandemic and to prepare for similar threats to the public health from infectious diseases. Some of this money went to fund important public health programs around the country and prepare states and local governmental entities and other stakeholders to respond to other public health emergencies, especially those involving infectious diseases. Having seen the devastation of the COVID-19 pandemic, Congress understood that America needed to be better prepared for potential outbreaks of communicable disease.

2.    Local governmental entities, including counties, across the United States benefitted from this funding. The money has supported the important and cutting-edge public health work of identifying, monitoring, and addressing infectious diseases; ensuring access to necessary immunizations, including immunizations for children; and strengthening emergency preparedness to avoid future pandemics. Because local governments are often the first line of defense during a public health emergency, these programs allowed local governments to expand and improve their ability to identify and respond to public health crises like communicable disease outbreaks.

3.    When President Donald J. Trump took office for his second term, he made dismantling the federal government's approach to COVID-19 a priority. He issued a rescission of

executive orders issued by President Joseph Biden related to the COVID-19 pandemic, including orders designed to prevent future pandemics and build a sustainable public health workforce.[1]

4.      On March 24, 2025, President Trump's picks to lead the Department of Health and Human Services and the Centers for Disease Control unilaterally eliminated congressionally appropriated federal grants that provide approximately $4 million to Dallas County (as a subrecipient though the State of Texas's Department of State Health Services ("Texas DSHS")) for programs designed to address the effects of the pandemic and to prepare communities for future potential outbreaks. The funding, which Dallas County received through new grant programs during the COVID-19 pandemic, was not limited to the duration of the pandemic and was generally expected to address the effects of the pandemic and prepare Dallas County for future public health crises.

5.      Defendants' decision to terminate these "COVID-related" CDC grant programs *en masse* (the "Mass Termination Decision") was done in one fell swoop. Contravening Congress's decision to extend funding for pandemic preparedness, Defendants announced that they would "no longer waste billions of taxpayer dollars responding to a non-existent pandemic that Americans moved on from years ago." Brandy Zadrozny, *CDC is pulling back $11B in Covid funding sent to health departments across the U.S.*, NBC News (Mar. 25, 2025), https://perma.cc/35SS-V2WE. Needing cover for their obviously illegal actions, Defendants provided a cursory basis for termination of the programs: they had been terminated for "cause." Defendants explained their decision to summarily terminate the programs by stating threadbare variations of: "The end of the [COVID-19] pandemic provides cause to terminate COVID-related grants."

---

[1] *See* Exec. Order No. 13,996, 86 Fed. Reg. 7197 (Jan. 26, 2021); Exec. Order No. 13,997, 86 Fed. Reg. 7201 (Jan. 26, 2021); Exec. Order No. 14,002, 86 Fed. Reg. 7229 (Jan. 27, 2021).

6.      But Defendants' belief that the end of the COVID-19 pandemic justifies an end to all COVID-related expenditures cannot be a lawful basis to terminate the programs at issue "for cause."  If Defendants wanted to terminate any of Dallas County's funding "for cause," they were required to do so via individual determinations—determinations that ordinarily require some form of noncompliance with the U.S. Constitution, federal statutes, regulations, or terms and conditions of the federal award. *See* 45 C.F.R. §§ 75.371-75.375 ("Remedies for Noncompliance"). Dallas County did not receive a termination letter.  It instead received a notification from Texas DSHS that Texas DSHS was notified that the federal grant funding for the various programs in which Dallas County participated "is terminated as of March 24, 2025."  The letter notified Dallas County to pause all activities immediately and not to accrue any additional costs as of the date of the notice. The letter does not identify any failures to comply on Dallas County's part; nor could it, as Dallas County has complied with the terms of the respective grants, something which Defendants do not dispute.  The letter also does not indicate that the decision to terminate the funding was made by Texas DSHS.  Thus, the cut-off of funding to Dallas County was part of the Mass Termination Decision.

7.      Defendants' proffered reason for the Mass Termination Decision makes even less sense given the way in which Congress appropriated the funds. Congress did not limit this funding to the period of the COVID-19 emergency nor even to COVID-19-specific projects. Instead, motivated by the fact that public health departments were unprepared for the COVID-19 pandemic, Congress made wide-ranging investments in U.S. public health infrastructure designed to extend beyond the immediate public health emergency. Moreover, after the end of the COVID-19 public health emergency, Congress reviewed the COVID-19-related appropriations and rescinded certain funds but decided not to rescind any of the funds at issue.

8.     The Mass Termination Decision has been devastating to Dallas County and its employees. With the cessation of these grant programs, DCHHS has been forced to cease critical operations and to lay off staff. The Mass Termination Decision is also a massive blow to U.S. public health generally, at a time where state and local public health departments need to address burgeoning infectious diseases and chronic illnesses, like the measles, bird flu, and mpox.

9.     The Mass Termination Decision is unlawful for multiple reasons. First, unilaterally terminating funds as Defendants have done violates the U.S. Constitution. Nothing in the Constitution empowers agencies—or the President—to usurp Congress's exclusive power of the purse and refuse to spend appropriated funds for the purposes Congress specified.

10.     Second, Defendants' actions violate Congress's appropriation statutes, which make no mention of termination upon the conclusion of the COVID-19 public health emergency. Indeed, Congress's actions after the emergency was declared over indicate that Congress did not want the funding to end in the way Defendants terminated it.

11.     Third, Defendants' actions violate HHS's own regulations, which narrowly limit the grounds for terminating federal grants. The regulation certainly does not give Defendants authority to renege *en masse* on their grant obligations or to effectively impound appropriated funds in defiance of Congress.

12.     Finally, the Mass Termination Decision is arbitrary and capricious and lacks reasoned explanation. Among other things, the explanation given for the terminations—Defendants' uninformed conclusion that the grants are "no longer necessary" because the COVID-19 public health had emergency ended—is based on factors that Congress did not intend Defendants to consider and improperly assumes without support that the funds were only intended for pandemic-related use.

13.    Defendants' actions have caused Dallas County multiple ongoing harms. The terminations have lead to immediate cessation of grant-funded projects and positions and threaten to deprive Dallas County's residents of essential public health services—all in the midst of continuing dangers posed by COVID-19 and other diseases, including deadly measles outbreaks in Texas and other states across the country. The abrupt, retroactive termination of programs that provide millions of dollars in funding that Dallas County has relied upon for years threatens to halt necessary and lifesaving ongoing public health work, including work to keep deadly infectious diseases from spreading. Absent prompt relief from this Court, the consequences of Defendants' actions will be devastating.

14.    Accordingly, through this lawsuit, Dallas County brings this action against Defendants HHS, HHS Secretary Robert F. Kennedy, Jr., CDC, and CDC Acting Director Jim O'Neil seeking to: vacate and set aside the wholesale elimination of CDC's COVID-19-related grant programs; preliminarily and permanently enjoin Defendants to reinstate the eliminated grant programs and to continue to administer the grant programs to the same extent and in the same manner as prior to the unlawful terminations, as provided in the notices of award and HHS regulations; and to declare that the terminations violate the United States Constitution and the Administrative Procedure Act ("APA").

**JURISDICTION AND VENUE**

15.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under Article I and Article II of the Constitution and laws of the United States, including the APA, 5 U.S.C. §§ 701-706.

16.    The Court has authority to enter a declaratory judgment and to provide temporary, preliminary, and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure; the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the All Writs Act, 28

U.S.C. § 1651; and the Court's inherent equitable powers. The Administrative Procedure Act further authorizes the Court to grant temporary and permanent relief from agency action. 5 U.S.C. §§ 705-706.

17.      Venue is proper under 28 U.S.C. § 1391(b) and (e) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, Defendants are United States agencies and officers sued in their official capacities, and at least one Defendant resides in and has its principal place of business in this district.

## PARTIES

18.      Dallas County is a political subdivision of the State of Texas that is organized under the laws of the State of Texas. The County's governing body is the Dallas County Commissioners Court, which is responsible for "all county business," Tex. Const. art. V, § 18(b), including "protect[ing] the public health." Tex. Health & Safety Code § 121.003(a). The grants at issue in this action enable Dallas County to fulfill its duty to protect the health and welfare of its residents. Dallas County administers the projects funded by these grants through Dallas County Health & Human Services ("DCHHS"), a County agency. DCHHS provides a broad range of critical public health services to Dallas County residents.

19.      Defendant Robert F. Kennedy, Jr., is the Secretary of HHS and that agency's highest-ranking official. He is charged with the direction, supervision, and management of all decisions and actions of that agency and of HHS's subordinate agencies, including CDC. *See* 42 U.S.C. § 242c(b). Plaintiff sues him in his official capacity.

20.      Defendant HHS is an agency of the federal government headquartered in Washington, D.C.

21.      Defendant Jim O'Neil is Acting Director of CDC. Plaintiff sues him in her official capacity.

7

22.    Defendant CDC is an agency of the federal government and a subordinate agency of HHS. It is headquartered in Atlanta, Georgia.

## FACTUAL ALLEGATIONS

### I.    Congress appropriates billions of dollars in public health funding.

23.    Congress provided funding for grants-in-aid to local and state governments through the passage of several COVID-related appropriations acts, including:

- The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020);

- The Coronavirus Response and Relief Supplemental Appropriations Act, 2021 ("CRRSAA"), Pub. L. No. 116-260, 134 Stat. 1182 (2021) (Division M of a larger consolidated appropriations act);

- The American Rescue Plan Act of 2021 ("ARPA"), Pub. L. No. 117-2, 135 Stat. 4 (2021);

- The Coronavirus Preparedness and Response Supplemental Appropriations Act, Pub. L. No. 116-123, 134 Stat. 146 (2020); and

- The Paycheck Protection Program and Health Care Enhancement Act ("Paycheck Protection Act"), Pub. L. No. 116-139, 134 Stat. 620 (2020).

24.    These laws were a direct response to the outbreak and devastation of COVID-19. Congress sought to respond to the nationwide public health crisis and economic devastation, promote recovery, and ensure that the nation would be better prepared for future public health threats. In addition to directing funds toward ameliorating the immediate effects of the COVID-19 outbreak, Congress sought to address the longer-term challenges it knew the country would face in COVID-19's wake, including gaps in the public health system and the need for investment in critical public health infrastructure.

25.    In the CARES Act, Congress appropriated $4.3 billion to Defendants "to prevent, prepare for, and respond to coronavirus," requiring that: no less than $1.5 billion "shall be for

grants to or cooperative agreements with States, localities," and other entities, "including to carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities;" and that no less than $500 million "shall be for public health data surveillance and analytics infrastructure modernization." CARES Act, 134 Stat. at 554-55. The Act states that "the term 'coronavirus' means SARS-CoV-2 or another coronavirus with pandemic potential." 134 Stat. at 614.

26.    In the CRRSAA, Congress appropriated $8.75 billion to Defendants "to prevent, prepare for, and respond to coronavirus," providing that the appropriated amounts "shall be for activities to plan, prepare for, promote, distribute, administer, monitor, and track coronavirus vaccines to ensure broad-based distribution, access, and vaccine coverage." 134 Stat. at 1911. Congress instructed that no less than $4.5 billion of that amount should go to states, localities, and certain other designated entities, that at least $300 million be used "for high-risk and underserved populations, including racial and ethnic minority populations and rural communities," and specified that funding requirements could be satisfied "by making awards through other grant or cooperative agreement mechanisms." 134 Stat. at 1911-12. The CRRSAA provides that the term "coronavirus" "means SARS–CoV–2 or another coronavirus with pandemic potential." 134 Stat. at 1185.

27.    ARPA provided billions to HHS and CDC "to plan, prepare for, promote, distribute, administer, monitor, and track COVID-19 vaccines;" "strengthen vaccine confidence in the United States;" "improve rates of vaccination throughout the United States;" and "strengthen and expand activities and workforce related to genomic sequencing, analytics, and disease surveillance;" among other objectives. 135 Stat. at 37-41. Out of that amount, and to fulfill those objectives, Congress required that the CDC award grants or cooperative agreements to state and local public

health departments. *Id.* at 37, 40-42. Congress specifically appropriated funds so that HHS would "award grants to, or enter into cooperative agreements or contracts with, State, local, and territorial public health departments to establish, expand, and sustain a public health workforce." *Id.* at 41.

28.     The Coronavirus Preparedness and Response Supplemental Appropriations Act provided $2.2 billion to CDC "to prevent, prepare for, and respond to COVID-19 domestically and internationally." Not less than $950,000,000 of the amount was required to be used for grants to or cooperative agreements with states and localities so that they could "carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities." 134 Stat. at 147.

29.     The Paycheck Protection Act appropriated billions to be transferred to HHS and CDC for states and localities to "develop, purchase, administer, process, and analyze COVID–19 tests, including support for workforce, epidemiology, use by employers or in other settings, scale up of testing by public health, academic, commercial, and hospital laboratories, and community-based testing sites, health care facilities, and other entities engaged in COVID–19 testing, conduct surveillance, trace contacts, and other related activities related to COVID–19 testing." 134 Stat. at 624.

30.     Congress did not limit the expenditure of the funds appropriated by these provisions to the duration of COVID-19's status or designation as a "pandemic."

31.     In contrast, when Congress intended to tie the availability of funds to a declaration of a public health emergency, it did so expressly within the laws themselves, *e.g.*, American Rescue Plan Act of 2021, § 9402, 135 Stat. at 127 ("during the emergency period . . . and the 1-year period immediately following the end of such emergency period"); *id.* § 9811(hh), 135 Stat. at 211-12 ("ends on the last day of the first quarter that begins one year after the last day of the emergency

period"); CARES Act, § 1109(h), 134 Stat. at 306 ("until the date on which the national emergency

. . . expires").

## II.    HHS/CDC uses the money appropriated by Congress to fund the Infectious Disease Control Unit Grant that supports Plaintiff's critical public health projects.

32.    Consistent with the Congressional mandate, Defendants used the appropriated

funds to offer grant awards and cooperative agreements to states and localities, including Plaintiff.

33.    Dallas County received funding from Defendants for the Infectious Disease Control

Unit Grant (the "IDCU Grant"), through the Texas Department of State Health Services ("Texas

DSHS"). Texas DSHS acted as a pass-through entity for the funds pursuant to 42 U.S.C. § 247b.

The IDCU Grant's purpose was to: allow Dallas County to prevent the spread of communicable

diseases more effectively through epidemiology, disease surveillance, investigation, monitoring,

and reporting to both Texas DSHS and CDC; and to enhance Dallas County's laboratory testing,

reporting, and response capacities.

34.    Dallas County administered the projects funded by this grant award through its

department, Dallas County Health & Human Services ("DCHHS"). Under the grant, Dallas County

incurred expenses allowed by the terms and conditions of the grant award and contract with Texas

DSHS, submitted invoices each month to Texas DSHS, and received reimbursement.

35.    On September 15, 2020, Dallas County first accepted $3,981,303.00 in funding for

the IDCU Grant from HHS/CDC through the Texas DSHS. On November 2, 2021, the grant

budget was increased by $6,676, 947.00. On May 16, 2023, the grant budget was further increased

by $160,925.00. On October 17, 2023, the grant budget was further increased by $690,500.00.  On

September 3, 2024, the grant budget was further increased by $4,250,347.00. In all, the IDCU

Grant budget totaled $15,760,022.00, which is five percent (5%) of DCHHS's budget.

36.     The funding for the IDCU Grant initially came from the CARES Act, but supplemental funds came from CRRSAA.  The funding was distributed via CDC's Epidemiology and Laboratory Capacity ("ELC") program, which was established long before the COVID-19 outbreak and oversees an array of projects that strengthen the ability of public health agencies to respond to, prevent, and control known and emerging (or re-emerging) infectious diseases. CDC's ELC Cooperative Agreement is a mechanism that funds the nation's state and local health departments and has funded local responses to a variety of pathogens including H1N1 (swine flu), Zika, and Ebola. The program provides resources to strengthen epidemiologic capacity, enhance laboratory capacity, improve health information systems, and promote cooperation among various components of public health departments. When Defendants terminated the grant, over $2.9 million remained to be paid to Dallas County.

37.     The IDCU Grant period was initially set to begin on September 17, 2020, and end on April 30, 2022. On November 2, 2021, an amendment to the agreement between Dallas County and Texas DSHS extended the end date further to July 21, 2023. On April 19, 2022, an amendment to the agreement between Dallas County and Texas DSHS extended the end date further to July 31, 2024. Finally, on May 7, 2024, an amendment to the agreement between Dallas County and Texas DSHS extended the end date to July 31, 2026.

38.     The IDCU Grant funds infectious disease surveillance, case intake, and investigation (of COVID-19 and other notifiable conditions). The grant supports Dallas County in responding to the COVID-19 outbreak by enhancing case identification, improving disease surveillance, and strengthening specimen collection operations. This funding enables DCHHS to conduct infectious disease case intake and investigation, including COVID-19, to mitigate the spread of the virus and protect public health.

39.    DCHHS has used IDCU Grant funds to hire staff for the Dallas County Public Health Laboratory ("PHL") to develop and maintain an electronic Laboratory Information System ("LIS"). The LIS is a software system specifically designed to manage and streamline the workflow of the PHL. It tracks and organizes patient data, specimen details, and test results, helping ensure accuracy, efficiency, and regulatory compliance. By automating routine tasks and integrating with other health systems, an LIS improves turnaround times and supports better clinical decision-making.

40.    It was understood that the activities funded by the IDCU Grant would not be focused exclusively on COVID-19, and it was clear that the grant was intended to fund activities (both COVID- and non-COVID-related) even after the COVID-19 "public health emergency" declaration expired in May 2023. For example, the revised statement of work in the August 6, 2024, amendment provided that "COVID-funded laboratory, surveillance, epidemiology, and informatics personnel may work on other respiratory pathogens and syndromes more broadly, in addition to SARS-CoV-2 and COVID-19, as long as COVID-19 testing or surveillance is included in the effort." That same revised statement of work also stated that "where COVID-19 is referenced, it will now include other respiratory pathogens and syndromes."

41.    The IDCU Grant funded the work of two permanent employees and one temporary employee.

**III.    Congress and Defendants continue funding the grants, even after the COVID-19 "public health emergency" declaration expires in May 2023.**

42.    On May 11, 2023, the HHS Secretary's final extension of the public health emergency declaration pursuant to 42 U.S.C. § 247d expired. However, the effects of the COVID-19 pandemic continued, as did Congress's desire to promote public health measures

related to COVID and pandemics generally, as well as preparations for future public health outbreaks and crises.

43.    Subsequent Congressional action reaffirmed what was already clear: that the funding provided by the COVID-19-related appropriations laws was to remain available regardless of COVID-19's continuing status as a "pandemic" or as a declared "public health emergency." In early June 2023, shortly after the expiration of the public health emergency declaration, Congress canceled $27 billion in related appropriations through the Fiscal Responsibility Act of 2023, Pub. L. No. 118-5, Div. B, 137 Stat. 10, 23 (June 3, 2023). In that Act, Congress reviewed various COVID-related laws and rescinded those funds that it determined were no longer necessary. *Id.*, Div. B §§ 1-81. Congress chose not to rescind the funding for the grant at issue in this case.

44.    Defendants implicitly acknowledged that the funding for the grant remains available even after the COVID-19 public health emergency declaration expired in May 2023. Defendants never attempted to terminate the grants until March 2025 and continued to affirm their support of the programs funded by the grants. Defendants not only extended the end date for the IDCU Grant in May 2024 (after the COVID-19 public health emergency declaration expired in May 2023), but they also granted an additional $690,500.00 in funding in October 2023 and an additional $4.25 million in funding in September 2024.

## IV.    Defendants suddenly eliminate COVID-19-related grant programs and terminate grant funding.

### A.    Defendants eliminate public health funding through a mass purge of "COVID-related" CDC grants.

45.    On March 24, 2025, in connection with the Mass Termination Decision, Defendants terminated approximately $11.4 billion in CDC grants to states, localities, and other entities. Texas DSHS's funding of Dallas County's IDCU Grant was among those terminated.

46.     The terminations are nationwide in scope, have a massive financial impact, and were abruptly implemented. Defendants did not engage in any individualized consideration of the affected grants. Instead, Defendants apparently deemed the CDC grant programs to be "COVID-related" and designated them for immediate elimination based on one criterion: their funding derived from COVID-era appropriations acts passed by Congress.

47.     On March 25, 2025, HHS Director of Communications Andrew Nixon issued a public statement confirming that the terminations were all based on the single Mass Termination Decision. The statement read: "The COVID-19 pandemic is over, and HHS will no longer waste billions of taxpayer dollars responding to a non-existent pandemic that Americans moved on from years ago. HHS is prioritizing funding projects that will deliver on President Trump's mandate to address our chronic disease epidemic and Make America Healthy Again." Zadrozny, *CDC is pulling back $11B in Covid funding sent to health departments across the U.S.*, https://perma.cc/35SS-V2WE. The statement's reference to Defendants' "prioritizing funding [alternative] projects" suggests that Defendants intend to use the money that was appropriated for the terminated grants for other purposes, in contravention of Congress' appropriations.

48.     On March 29, 2025, a spreadsheet was uploaded to the HHS website titled "HHS_Grants_Terminated."[2] The document identifies over a thousand grants terminated by HHS, including those that were part of the mass termination of CDC grants on March 24. The spreadsheet lists detailed information for each grant. The last two columns are labeled "Presidential Action" and "For Cause (Put X if applicable)." Notably, only one of the grants listed is identified as having been terminated "For Cause," and it was not a CDC grant terminated in accordance with the Mass

---

[2] The government continues to update this list at
https://taggs.hhs.gov/Content/Data/HHS_Grants_Terminated.pdf.

Termination Decision. All of the CDC grants in the document list "N/A - Departmental Authority" under "Presidential Action." The government has continued to update this list through the date of filing this complaint. All of the CDC grants in the document continue to be designated "N/A – Departmental Authority" instead of "for cause."

49.     The Mass Termination Decision, and Defendants' implementation of that decision, inflicted massive disruption upon grant recipients and hampered critical public health work. The grant terminations were effective immediately, and Defendants gave no prior notice or advance warning to grantees of their decision, which deprived Dallas County and others of the opportunity to plan for a huge loss of funding.

50.     Defendants' Mass Termination Decision did not entail any particularized consideration of the targeted grants, let alone reasoned evaluation of the permissible grounds for terminating the grants. As already noted, none of the CDC grants that Defendants terminated are identified in the HHS spreadsheet as having been terminated "for cause." And, as demonstrated by the notices of termination received by Dallas County from Texas DSHS, and by public reporting, Defendants recited essentially the same boilerplate reason for terminating all the grants. "The CDC reviewed a list of HHS-provided Covid grants and cooperative agreements and identified the *programs* that were no longer needed." Zadrozny, *CDC is pulling back $11B in Covid funding sent to health departments across the U.S.*, https://perma.cc/35SS-V2WE.

**B.     Defendants implement the Mass Termination Decision and notify Dallas County of the termination of its grants.**

51.     Defendants' terminations of funding to Texas DSHS for the IDCU Grant resulted directly from the implementation of the Mass Termination Decision. Because Plaintiff's grant was funded by money appropriated by Congress in COVID-related appropriations laws, including the

CARES Act and CRRSAA, Defendants marked them for elimination, without any consideration of whether termination was permissible or warranted.

52.     On March 25, 2025, the Texas DSHS notified Dallas County that Defendants had terminated the IDCU Grant. Texas DSHS wrote that it was "issuing this notice to pause all activities immediately" because it had been "notified that the federal grant funding for Immunization/COVID Epidemiology Laboratory Capacity (ELC/COVID), and Health Disparities/COVID, is terminated as of March 24, 2025."

**C.     Defendants did not terminate the grants "for cause."**

53.     Defendants publicly stated that "the end of the [COVID-19] pandemic" constituted "cause." Defendants do not identify any authority in support of the Mass Termination Decision. 45 C.F.R. § 75.372(a)(2)[3] does permit for-cause termination, but Defendants did not cite this regulation as their basis for termination of the funding to Texas DSHS for the IDCU Grant. Nor could they: the end of the COVID-19 public health emergency does not satisfy it.

54.     Nothing in 5 C.F.R. § 75.372(a)(2)'s text, history, or interpretation supports an assertion that the "end of the [COVID-19] pandemic" supports a "for cause" termination. When HHS has examined what "for cause" means in the past, it has explained that it generally involves noncompliance of the grantee. Even though Plaintiff was in compliance with the IDCU Grant, Defendants' apparent classification of their grant terminations as being "for cause" likely triggers the requirement that "the HHS awarding agency must report the termination to the OMB-designated integrity and performance system" pursuant to 45 C.F.R. § 75.372(b). Grantees may also have requirements to report compliance to their respective states, which may make Dallas

---

[3] 45 C.F.R. § 75.372(a)(2) lists four grounds for terminating a grant: (1) if the grantee "fails to comply with the terms and conditions of the award"; (2) "for cause"; (3) "with the consent of" the grantee; and (4) by the grantee. 45 C.F.R. § 75.372(a). Defendants did not invoke any of the other grounds, and none applies to Dallas County.

County less competitive for future grant awards. Defendants' baseless and illegal Mass Termination Decision thus has serious potential consequences for future grant-funding opportunities.

55.     Defendants' stated reason for the Mass Termination Decision—the claim that the COVID-19 pandemic is "over" and that "COVID-related grants and cooperative agreements" are therefore "no longer necessary"—is a policy disagreement with Congress. That such a disagreement is not a "for cause" basis for terminating grants is underscored by Defendants' own grant termination spreadsheet, which indicates that these grants were terminated based on "Departmental Authority," and not "for cause."

**V.     Defendants' elimination of COVID-19-related grant programs—and the resultant terminations of grants—has caused, and will continue to cause, immediate and irreparable harm to Plaintiff.**

56.     Defendants' immediate and unlawful termination of millions of dollars in grant funding that provides critical support to Dallas County's vital public health programs is causing, and will continue to cause, significant and irreparable harm to Dallas County. For years, Dallas County has operated its programs expecting that as long as it complied with the terms and conditions of the IDCU grant, it would receive the promised funds for the time periods stated in the awards.

57.     The sudden loss of these funds creates immediate harm to Dallas County's crucial public health projects. It has resulted in the loss of positions.  It threatens Dallas County's ability to protect the health of its residents and makes Dallas County vulnerable to imminent public health threats like the ongoing measles outbreak in Texas and elsewhere across the country. *See Doe 1 v. Perkiomen Valley Sch. Dist.*, 585 F. Supp. 3d 668, 702 (E.D. Pa. 2022) ("An increased risk of contracting a life-threatening disease like COVID-19 easily constitutes an irreparable injury.").

58.     Any classification of Dallas County's grants as having been terminated "for cause" will likely have an adverse impact on consideration of Dallas County's applications for future federal funding opportunities.

59.     In addition, the terminations are imposing immediate and irreparable constitutional harms on Dallas County. *Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (recognizing irreparable harm in the form of constitutional injury due to violation of the separation of powers doctrine and deprivation of Tenth and Fifth Amendment rights).

60.     It is also unclear whether the appropriated funds will remain available. Defendants' public statements have indicated that the funds will be used for other purposes, likely making their recovery impossible.

61.     Dallas County is not a named plaintiff in *Colorado v. HHS*, No. 1:25-cv-00121 (D.R.I. complaint filed Apr. 1, 2025), and it has not received any relief from the injunctions entered in that case, *id.*; (TRO entered Apr. 5, 2025, ECF No. 54; preliminary injunction entered May 16, 2025, ECF No. 84).

62.     Defendants' termination of the funding to Texas DSHS for the IDCU Grant and the loss of positions reduces Plaintiff's ability to rapidly detect emerging diseases and outbreaks across Dallas County. This will lead to slower public health responses and interventions to prevent the spread of communicable diseases and ensure the safety of the county's residents.

63.     The terminations create severe and immediate budget uncertainty for Dallas County and interfere with the county's ability to budget and plan for the future and to properly serve residents. *Cnty. of Santa Clara*, 250 F. Supp.3d at 508, 537 (recognizing immediate, irreparable harm due to order that created "budget uncertainty by threatening to deprive the Counties of hundreds of millions of dollars in federal grants that support core services in their jurisdictions"

and explaining that this "uncertainty interferes with the Counties' ability to budget, plan for the future, and properly serve their residents" and that counties' need to "take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services . . . will cause the Counties irreparable harm").

64.     The terminations are requiring Dallas County to divert its limited resources to immediately respond to the chaos created by Defendants' actions; they have resulted in the loss of several grant-funded employees; and they threaten imminent and irreparable injury to Plaintiff's reputation and ability to secure future grant funding.

### CLAIMS FOR RELIEF

#### Count I

#### United States Constitution – Separation of Powers
#### (Against Defendants Kennedy and O'Neil)

65.     Dallas County re-alleges and incorporates by reference all preceding paragraphs.

66.     The federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).

67.     The Constitution separates the powers of the federal government "into three defined categories, Legislative, Executive, and Judicial." *Bowsher v. Synar*, 478 U.S. 714, 721 (1986) (quoting *INS v. Chadha*, 462 U.S. 919, 951 (1983)). The purpose of the constitutional separation of powers is to "diffus[e] power the better to secure liberty." *Id.* (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)).

68.     The Constitution vests "[a]ll legislative Powers" exclusively in Congress. U.S. Const., art. I, § 1. The Executive Branch has no power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998); *see also* U.S. Const., art. I, § 7, cl. 2 (Presentment Clause) (specifying the President's limited role in enacting laws).

69.     The Constitution also grants the "power of the purse"—the authority to raise and spend public money—exclusively to Congress. The Spending Clause gives to Congress alone the power to raise revenue and to "pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const., art. I, § 8, cl. 1. The Appropriations Clause reinforces Congress's exclusive control over the public fisc: it prohibits the payment of any money from the Treasury unless the specific funds in question have been "appropriated"—that is, authorized for expenditure for an identified purpose —by an act of Congress. *Id.* § 9, cl. 7. The "fundamental" purpose of the Appropriations Clause "is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents." *Off. of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990); *see also Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937) (observing that the Appropriations Clause "was intended as a restriction upon the disbursing authority of the Executive department").

70.     The separation of powers prohibits the Executive from usurping Congress's exclusive authority to legislate, to spend, and to appropriate public funds. *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) ("[The] Constitution exclusively grants the power of the purse to Congress, not the President."). The Executive can no more refuse to spend money that Congress has directed it to spend—in the amount and for the purpose that Congress has specified in an appropriations act—than it can spend money without Congressional approval. If it does so, the Executive violates the separation of powers and its own constitutionally mandated duty to "take Care that the Laws be faithfully executed." Art. II, § 3.

71.     As Executive Branch officers, Defendants Kennedy and O'Neil have no constitutional authority to unilaterally amend or repeal any appropriations laws, including the

CARES Act, the CRRSAA, and other acts passed during the height of the COVID-19 outbreak. Nor has Congress given Defendants any such power by statute. *Cf.* Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. § 682 *et seq.* (specifying procedures, not applicable here, by which the President may propose certain withholdings of budget authority, subject to Congressional review). Even if the Executive has "policy reasons" "for wanting to spend less than the full amount appropriated by Congress for a particular project or program," it "does not have unilateral authority to refuse to spend the funds." *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.) (noting that, even in circumstances where statute permits the President to "propose the rescission of funds," it remains with Congress to "decide whether to approve a rescission bill" (citing 2 U.S.C. § 683 and *Train v. City of N.Y.*, 420 U.S. 35 (1975))).

72.     Defendants' Mass Termination Decision, and its implementation, constitute a unilateral cancellation of Congressional appropriations by the Executive and therefore violates the constitutional separation of powers. By terminating grant programs *en masse* because Congress authorized the funding of those programs through "COVID-related" laws, Defendants have effectively repealed those laws, in contravention of Congress's exclusive power of the purse and the Executive's duties under the Take Care Clause.

73.     Accordingly, Dallas County is entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or otherwise enforcing the Mass Termination Decision. Dallas County is further entitled to a declaratory judgment that the Mass Termination Decision and its implementation are unlawful and violate the constitutional separation of powers.

### Count II
### United States Constitution – Spending Clause
### (Against Defendants Kennedy and O'Neil)

74.     Dallas County re-alleges and incorporates by reference all preceding paragraphs.

75. The federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong*, 575 U.S. at 326-27.

76. Congress's exercise of its Spending Clause power is limited. Congress may not place conditions on grants to state and local governments unless those conditions are expressly and unambiguously stated in advance. *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (explaining that there can be no voluntary and knowing acceptance if the recipient of federal funding "is unable to ascertain" the conditions). The conditions must also relate to the federal interest in the particular program. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

77. What the Spending Clause prevents Congress itself from doing, it also *a fortiori* prohibits Executive Branch officers—including Defendants Kennedy and O'Neil—from doing.

78. Defendants' Mass Termination Decision, and their implementation of it, violates the Spending Clause because it retroactively conditions the receipt of federal funds in a manner unrelated to the federal interest in the affected programs.

79. The Mass Termination Decision imposes a retroactive and ambiguous condition on the funding for the IDCU Grant: it unilaterally alters the terms of the grant program, requiring its immediate and total cancellation based on Defendants' sudden announcement of their opinion that the programs are no longer necessary because the COVID-19 pandemic has ended. This condition was not expressly or unambiguously stated in advance; indeed, it contravenes the relevant Congressional appropriations acts, which do not make funding contingent on COVID-19's status as a pandemic or authorize unilateral termination of funding based on Defendants' views about COVID-19. The condition also contradicts the federal government's reaffirmations of the affected programs after the COVID-19 public health emergency declaration expired in May of 2023.

80.     The condition imposed by the Mass Termination Decision is not reasonably related to the federal interest in the affected programs. No authority, including the applicable appropriations laws, makes COVID-19's status as a "pandemic" relevant to the accomplishment of the grant programs' purposes. In fact, that condition contradicts the federal interest in the affected programs, which are intended to support a range of public health initiatives, including long term investments in public health infrastructure.

81.     Accordingly, Dallas County is entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or otherwise enforcing the Mass Termination Decision. Dallas County is further entitled to a declaratory judgment that the Mass Termination Decision and its implementation are unlawful and violate the Constitution.

### Count III
### Equitable *Ultra Vires* Claim
### (Against Defendants Kennedy and O'Neil)

82.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

83.     The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong*, 575 U.S. at 326-27, includes cases in which a federal officer has acted unconstitutionally as well as cases in which the officer has acted "beyond th[e] limitations" set by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

84.     Defendants Kennedy and O'Neil lacked constitutional and statutory authority to issue or implement the Mass Termination Decision. As explained above, their actions violate the Constitution's separation of powers, exceed the limits of the Spending Clause, and have no basis in any federal statute.

85.     Accordingly, Dallas County is entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or otherwise enforcing the Mass Termination

Decision. Dallas County is further entitled to a declaratory judgment that Defendants' actions, including the issuance and implementation of the Mass Termination Decision, are unlawful and exceed Defendants' constitutional and statutory authority.

## Count IV

**APA – Defendants' Mass Termination Decision – Unconstitutional and Contrary to Statute (Against All Defendants)**

86.     Dallas County re-alleges and incorporates by reference all preceding paragraphs.

87.     Defendants' Mass Termination Decision, and its implementation, constitutes final agency action subject to APA review.

88.     The APA prohibits agency action that is "contrary to constitutional right, power, privilege, or immunity . . . in excess of statutory jurisdiction, authority, or limitations, or short of statutory right . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)-(C).

89.     The Executive Branch has no inherent constitutional authority to amend or repeal legislation, including by refusing to spend funds in contravention of Congressional appropriations. Defendants' Mass Termination Decision, and its implementation, does just that: it eliminates, wholesale, federal grant programs because they are funded through COVID-related appropriations laws. Defendants' assertion that the grant programs are no longer necessary is, at most, an ordinary policy disagreement and does not give Defendants "unilateral authority to refuse to spend the funds" that Congress has appropriated. *In re Aiken Cnty.*, 725 F.3d at 261 n.1.

90.     Defendants' Mass Termination Decision, and its implementation, violates the constitutional separation of powers, and limitations on the Spending Clause power, and is therefore "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

91.     Defendants' Mass Termination Decision and its implementation is also unauthorized by statute. It defies the relevant appropriations acts and is not permitted by any other statute, including the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. § 682

*et seq.* Defendants' nationwide termination of billions of dollars in critical public health funding also runs afoul of the major question doctrine, which requires Congress to "speak clearly" if it intends to authorize agencies to exercise powers of "vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021).

92.    Defendants' Mass Termination Decision, and its implementation, is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and contrary to law. 5 U.S.C. § 706(2)(A), (C).

93.    Accordingly, Dallas County is entitled to vacatur of the Mass Termination Decision, and of Defendants' actions implementing the Mass Termination Decision, pursuant to 5 U.S.C. § 706. Dallas County is also entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or otherwise enforcing the Mass Termination Decision, and from reinstituting those actions for the same or similar reasons and without the necessary constitutional or statutory authority. Plaintiff is further entitled to a declaratory judgment that the Mass Termination Decision is contrary to law, contrary to constitutional right and power, outside of Defendants' statutory authority, and violates the APA.

### Count V

**APA – Defendants' Mass Termination Decision – Violation of Agency Regulations**
**(Against All Defendants)**

94.    Dallas County re-alleges and incorporates by reference all preceding paragraphs.

95.    An agency violates the APA's bar on arbitrary and capricious action, 5 U.S.C. § 706(2)(A), "if it acts in a manner that is contrary to its own regulations." *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) (Jackson, J.). An agency "is not free to 'ignore or violate its regulations while they remain in effect.'" *Id.* (quoting *U.S. Lines, Inc. v. Fed. Mar. Comm'n*, 584 F.2d 519, 526 n.20 (D.C. Cir. 1978)); *accord United States*

*v. Nixon*, 418 U.S. 683, 693-96 (1974); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

96.     The sole authority that Defendants allude to in support of the Mass Termination Decision and its implementation is a regulation, issued by HHS, which states that a "Federal award may be terminated . . . for cause." 45 C.F.R. § 75.372(a)(2) (the "HHS For-Cause Regulation"). But nothing in that regulation's history or prior interpretation by HHS supports Defendants' use of it to terminate federal grant programs *en masse*, and in contravention of Congressional mandate, in order to advance their own policy views about COVID-19 or the continuing worth of critical public health programs.

97.     Because the HHS For-Cause Regulation does not authorize Defendants' Mass Termination Decision and its implementation, those agency actions are "arbitrary, capricious . . .or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

98.     Accordingly, Dallas County is entitled to vacatur of the Mass Termination Decision, and of Defendants' actions implementing the Mass Termination Decision, pursuant to 5 U.S.C. § 706. Dallas County is also entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or otherwise enforcing the Mass Termination Decision, and from reinstituting those actions for the same or similar reasons and without the necessary constitutional or statutory authority. Dallas County is further entitled to a declaratory judgment that the Mass Termination Decision is arbitrary, capricious, otherwise not in accordance with law, and violates the APA.

## **Count VI**

### **APA – Defendants' Mass Termination Decision – Arbitrary and Capricious**
### **(Against All Defendants)**

99.     Dallas County re-alleges and incorporates by reference all preceding paragraphs.

100.    "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). Agency action violates this requirement

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

101.    Defendants' Mass Termination Decision, and its implementation, is arbitrary and capricious for multiple reasons. For example, Defendants' reliance on the purported end of COVID-19's status as a "pandemic" for its decision to terminate the funding at issue is unexplained and inconsistent with appropriations laws and Congressional and agency actions following the expiration of the COVID-19 public health emergency declaration in May of 2023.

102.    Defendants' stated reason for the Mass Termination Decision is also unreasonable on its face. Defendants stated that the purpose of the terminated grant programs is to ameliorate the effects of COVID-19, and then asserted in conclusory fashion that the end of COVID-19's "pandemic" status negates that purpose, even though that status says nothing about the continuing *effects* of COVID-19 or the need to ameliorate those continuing effects.

103.    Congressional and agency actions have also made clear that the grant programs were intended to respond to the long-term effects of the COVID-19 outbreak and to advance broader public health purposes beyond COVID-19, including investment in public health infrastructure. Defendants failed to consider these important aspects of the problem when issuing and implementing the Mass Termination Decision.

104.    Accordingly, Dallas County is entitled to vacatur of the Mass Termination Decision, and of Defendants' actions implementing the Mass Termination Decision, pursuant to 5

U.S.C. § 706. Dallas County is also entitled to preliminary and permanent injunctive relief prohibiting Defendants from implementing or otherwise enforcing the Mass Termination Decision, and from reinstituting those actions for the same or similar reasons and without the necessary constitutional or statutory authority. Dallas County is further entitled to a declaratory judgment that the Mass Termination Decision is arbitrary, capricious, otherwise not in accordance with law, and violates the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Dallas County, Texas prays that this Court:

(A)    Declare unlawful and vacate Defendants' Mass Termination Decision;

(B)    Declare unlawful and vacate Defendants' terminations of funding to the State of Texas Department of State Health Services for Plaintiff's grants;

(C)    Enjoin Defendants to reinstate the eliminated grant programs and to spend the funding appropriated by the following laws for the purposes specified by Congress: The Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020); and the Coronavirus Response and Relief Supplemental Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182 (2021);

(D)    Enjoin Defendants to reinstate the funding for Plaintiff's grant for the awarded project periods and to continue to administer the grants to the same extent and in the same manner as prior to the unlawful terminations, in accordance with the governing statutes and regulations;

(E)    Award Plaintiff its costs and reasonable attorney fees; and

(F)    Grant such other and further relief as the Court may deem just and proper.

**Dated**: December 5, 2025

Respectfully submitted,

**JOHN CREUZOT**
Criminal District Attorney
Dallas County, Texas

*/s/ Barbara Nicholas*
**Barbara Nicholas***
Assistant Criminal District Attorney
Texas State Bar No. 24032785
Barbara.Nicholas@dallascounty.org

**Jason G. Schuette***
Assistant Criminal District Attorney
Texas State Bar No. 17827020
Jason.Schuette@dallascounty.org

**Todd Sellars***
Assistant Criminal District Attorney
Texas State Bar No. 00794619
Tsellars@dallascounty.org

**Cherie Batsel***
Assistant Criminal District Attorney
Texas State Bar No. 24011313
Cherie.Batsel@dallascounty.org

Dallas County Criminal District Attorney's Office
Civil Division
500 Elm Street, Suite 6300
Dallas, Texas 75202
Telephone:    (214) 653-7358
Telecopier:    (214) 653-6149

*Motion to appear *pro hac vice* forthcoming

/s/ *Rebecca S. LeGrand*
**Rebecca S. LeGrand**
DC Bar No. 493918
LeGrand Law PLLC
1100 H Street NW, Suite 1220
Washington, DC 20005
Phone: (202) 587-5725
rebecca@legrandpllc.com

COUNSEL FOR PLAINTIFF, DALLAS COUNTY, TEXAS