IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**DALLAS COUNTY, TEXAS**,

*Plaintiff*,

v.

**ROBERT F. KENNEDY, JR.**, in his official capacity as Secretary of the United States Department of Health and Human Services, et al,

*Defendants.*

Case No. 1:25-cv-04242-CRC

**PLAINTIFF DALLAS COUNTY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 3

    I.      Congress Appropriates Billions of Dollars in Public Health Funding. ................... 3

    II.     The Public Health Care Programming of Plaintiff Arising from
          Congressionally Appropriated COVID-19 Funding. ................................................ 6

    III.    Congress and CDC Continue Funding Programs with Plaintiff After
          the COVID-19 Public Health Emergency Ends. ...................................................... 8

    IV.    Defendants Unlawfully Terminate Their Grants with Dallas County. ..................... 9

    V.     Defendants' Termination of Funds is Causing Dallas County
          Substantial, Irreparable Harm. ............................................................................... 11

LEGAL STANDARD ......................................................................................................... 13

ARGUMENT ..................................................................................................................... 13

    I.      Dallas County is Likely to Succeed on the Merits. ............................................... 13

          A.     Dallas County is likely to succeed on its constitutional claims. ............... 14

          B.     Dallas County is likely to succeed on its APA claims. .............................. 16

                  1.     Defendants' decision to terminate the funding at issue is
                          final agency action. ...................................................................... 16

                  2.     Defendants' termination decision is unconstitutional. .................... 17

                  3.     Defendants lack statutory authority to withhold the
                          appropriated funds. ....................................................................... 17

                  4.     Defendants' actions are arbitrary and capricious. ........................... 18

    II.     This Court Has Jurisdiction Over Dallas County's Claims. ................................... 22

          A.     The Court has jurisdiction over the constitutional and ultra vires
               claims (Counts I-III). ................................................................................. 22

          B.     This Court has jurisdiction over the APA claims because this
               case does not seek to enforce any contract between the parties. ............... 23

    III.    Dallas County Faces Irreparable Harm. ................................................................ 26

IV.     The Balance of Equities and Public Interest Favor Granting Relief. .....................28

V.      The Court Should Not Require a Bond. ...................................................................29

VI.     Requested Relief. ...................................................................................................30

CONCLUSION...............................................................................................................................30

# TABLE OF AUTHORITIES

## Cases

*Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*,
  No. 25-cv-0400, 2025 WL 752378 (D.D.C. Mar. 10, 2025) ................................. 25

*Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*,
  770 F. Supp. 3d 822, 858-59 (D. Md. 2025) .......................................... 26

*Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*,
  703 F. Supp. 3d 126 (D.D.C. 2023) ................................................. 25, 26

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015) ................................................................ 16

*Bennett v. Spear*,
  520 U.S. 154 (1997) ................................................................ 16

*Bowen v. Massachusetts*,
  487 U.S. 879 (1988) ............................................................... 23, 25

*California v. U.S. Dep't of Educ.*,
  No. 25-cv-10548, 2025 WL 760825 (D. Mass. Mar. 10, 2025) ............................ 24

*Child Care Ass'n of Wichita/Sedgwick Cnty.*,
  DAB No. 308, 1982 WL 189587 (H.H.S. June 8, 1982) ................................. 19

*City & Cnty. of S.F. v. Trump*,
  897 F.3d 1225 (9th Cir. 2018) ..................................................... 14

*Climate United Fund v. Citibank, N.A.*,
  No. 25-cv-698, 2025 WL 1131412 (D.D.C. Apr. 16, 2025) ......................... 14, 25, 26

*Cmty. Legal Servs. in East Palo Alto v. HHS*,
  No. 25-cv-02847, 2025 WL 973318 (N.D. Cal. Apr. 1, 2025) .......................... 29

*Cnty. of Santa Clara v. Trump*,
  250 F. Supp. 3d 497 (N.D. Cal. 2017) .............................................. 27

*Colorado v. HHS*,
  2025 WL 1017775 (D.R.I. Apr. 5, 2025); ........................................... 29

*Dep't of Com. v. New York*,
  588 U.S. 752 (2019) ............................................................... 22

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020) ................................................................. 21

*DSE, Inc. v. United States*,
169 F.3d 21 (D.C. Cir. 1999)..................................................................................... 29

*FCC v. Prometheus Radio Project*,
592 U.S. 414 (2021) ................................................................................................... 20

*In re Aiken Cnty.*,
725 F.3d 255 (D.C. Cir. 2013) ............................................................................. 14, 15

*League of Women Voters of U.S. v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ................................................................................. 26, 28

*Maine Cmty. Health Options v. United States*,
590 U.S. 296 (2020)................................................................................................... 23

*Megapulse, Inc. v. Lewis*,
672 F.2d 959 (D.C. Cir. 1982)............................................................................... 23, 25

*Michigan v. EPA*,
576 U.S. 743 (2015) ................................................................................................... 21

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983)..................................................................................................... 20

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
25-cv-00239, 2025 WL 368852 (D.D.C. Feb. 3, 2025) .......................................... 26

*Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*,
No. 25-cv-00239, 2025 WL 597959 (D.D.C. Feb. 25, 2025) ...................... 13, 17, 29

*Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014)................................................................................... 18

*Nat'l Fed'n of Indep. Bus. v. OSHA*,
595 U.S. 109 (2022).................................................................................................. 17

*Navab-Safavi v. Broad. Bd. of Governors*,
650 F. Supp. 2d 40 (D.D.C. 2009)............................................................................. 24

*Nken v. Holder*,
556 U.S. 418 (2009)................................................................................................... 28

*Ohio v. EPA*,
603 U.S. 279 (2024)................................................................................................... 20

*P.J.E.S. ex rel. Escobar Francisco v. Wolf*,
502 F. Supp. 3d 492 (D.D.C. 2020)........................................................................... 29

*Pennhurst State Sch. & Hosp. v. Haldermann*,
    451 U.S. 1 (1981) ................................................................................................ 15

*Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*,
    313 F. Supp. 3d 62 (D.D.C. 2018) ................................................................ 18, 22

*Pollack v. Hogan*,
    703 F.3d 117 (D.C. Cir. 2012) .......................................................................... 22

*R.I. Substance Abuse Task Force Ass'n*,
    DAB No. 1642, 1998 WL 42538 (H.H.S. Jan. 15, 1998) .................................... 19

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) .................................................................... 28

*Res. Def. Council, Inc. v. Morton*,
    337 F. Supp. 167 (D.D.C. 1971) ....................................................................... 29

*RFE/RL, Inc. v. Lake*,
    No. 25-cv-00799 (D.D.C. Mar. 25, 2025) ......................................................... 29

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) .......................................................................... 28

*Sedita v. United States*,
    No. 24-cv-00900, 2025 WL 387962 (D.D.C. Feb. 4, 2025) ............................... 22

*Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*,
    841 F. Supp. 2d 349 (D.D.C. 2012) ................................................................. 27

*Smiley v. Citibank (South Dakota), N.A.*,
    517 U.S. 735 (1996) ......................................................................................... 21

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ......................................................................................... 15

*Spirit Airlines, Inc. v. Dep't of Transp.*,
    997 F.3d 1247 (D.C. Cir. 2021) ........................................................................ 22

*State of Fla. v. Dep't of Health & Hum. Servs.*,
    19 F.4th 1271 (11th Cir. 2021) ......................................................................... 28

*Train v. City of New York*,
    420 U.S. 35 (1975) ........................................................................................... 14

*U.S. Dep't of Educ. v. California*,
    145 S. Ct. 966 (2025) ....................................................................................... 24

*Vietnam Veterans v. Sec'y of the Navy,*
   843 F.2d 528 (D.C. Cir. 1988) ........................................................................ 25

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ........................................................................................ 18

*Widakuswara v. Lake,*
   No. 25-cv-1015, 2025 WL 1166400 (D.D.C. Apr. 22, 2025) ............................. 25

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................................ 13

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.,*
   No. 25-cv-00097, 2025 WL 1116157 (D.R.I. Apr. 15, 2025) ............................ 30

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ........................................................................................ 14

**Statutes**

10 C.F.R § 600.25 .................................................................................................. 19

2 U.S.C. § 681 ........................................................................................................ 14

2 U.S.C. § 683 ........................................................................................................ 15

28 U.S.C. § 1346(a)(2) ........................................................................................... 23

28 U.S.C. § 1491(a)(1) ........................................................................................... 23

42 U.S.C. § 247d ...................................................................................................... 8

42 U.S.C. § 300x-55(a) .......................................................................................... 19

45 C.F.R. § 75.372(a)(2) ........................................................................................ 19

45 C.F.R. § 75.391(a) ............................................................................................. 29

45 C.F.R. §§ 75.371-75.375 ................................................................................... 19

5 U.S.C. § 702 .................................................................................................. 22, 23

5 U.S.C. § 704 ........................................................................................................ 16

5 U.S.C. § 705 ........................................................................................................ 13

5 U.S.C. § 706(2) ......................................................................................... 16, 17, 18

Pub. L. No. 116-123, 134 Stat. 146 (2020) .............................................................. 5

Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act") ...................................... 3, 4, 6, 18, 21

Pub. L. No. 116-139, 134 Stat. 620 (2020) ................................................................................. 5

Pub. L. No. 116-260, div. M, 134 Stat. 1184 (2021) ......................................................... 4

Pub. L. No. 117-2, 135 Stat. 4 (2021) ..................................................................... 4, 5, 18, 20, 21

**Constitutional Provisions**

U.S. Const. art. I, § 8 ............................................................................................................. 14

U.S. Const. art. I, § 9 ............................................................................................................. 14

**Other Authorities**

*CDC is pulling back $11B in Covid funding sent to health departments across the
U.S.*, NBC News (Mar. 25, 2025) (Zadrozny, Brandy)............................................ 9

CDC, *COVID-19 Funding* (Apr. 23, 2024) ............................................................... 3

CDC, *Strengthening the Nation's Capacity to Respond to Domestic Infectious
Diseases* ................................................................................................................ 6

CDC, *The Epidemiology and Laboratory Capacity (ELC) Program* (Jan. 31, 2025) .................... 6

NAFSA: Ass'n of Int'l Educators, *COVID-19 Executive Declarations and
Determinations* (Apr. 18, 2023).............................................................................. 8

## INTRODUCTION

On March 24, 2025, the U.S. Department of Health and Human Services ("HHS") and the Centers for Disease Control and Prevention ("CDC") unilaterally determined that they would cancel public health funding for states, cities, and localities that Congress appropriated under several statutes enacted in response to the COVID-19 pandemic (hereinafter referred to as the "Mass Termination Decision"). Defendants then implemented this Mass Termination Decision by sending letters to states, cities, and localities abruptly terminating $11 billion worth of federal health care funding that was critical to their public health work of identifying, monitoring, and addressing infectious diseases; ensuring access to necessary immunizations, including immunizations for children; and strengthening emergency preparedness to avoid future pandemics.

The termination notices were sent without any meaningful basis for why the funding was ending so abruptly. Indeed, the termination notices did not list any failures by the grantees to follow the terms and conditions of the grants. Huang Decl. (attached hereto as Exhibit 1) ¶ 10; Exh. H to Huang Decl. The sole apparent basis for Defendants' decision to terminate the funding was that the funding for these grants or cooperative agreements was appropriated through one or more COVID-19 related laws, but the funding was no longer needed for those purposes since the pandemic was over. Huang Decl. ¶ 10.

Defendants' actions are blatant violations of the Spending Clause and the principle of separation of powers enshrined in the Constitution, as well as of federal statutes and regulations. Defendants had no authority to second-guess Congress's judgment as to whether funding for pandemic preparedness remains "necessary." Congress, which maintains exclusive power over the purse, never limited the funding at issue here to the duration of the COVID-19 pandemic. Instead, Congress made investments in research, outreach, education, and health care that extended beyond the COVID-19 emergency, in part, so that the grant recipients could strengthen their health

care infrastructures to help prevent the next pandemic from happening. Even after the declaration of the COVID-19 public health emergency was lifted, Congress reviewed the COVID-19 related laws, rescinded $27 billion in other funds, but determined not to rescind any of the funding at issue here. *See*, *e.g.*, Fiscal Responsibility of Act of 2023, Pub. L. No. 118-5, div. B, tit. I, 31 Stat. 10, 23 (2023). Defendants' actions are unconstitutional and violate statutory appropriations, are ultra vires, and are unlawful under the Administrative Procedure Act ("APA").

Defendants' actions also violate the APA because they are arbitrary and capricious. Defendants' unfounded belief that the funding was no longer necessary does not constitute the type of "cause" that would be needed to terminate this funding. Defendants do not contend that the fund recipients failed to comply with the applicable terms and conditions of the funding agreements and grants. Moreover, nothing in the history or interpretation of HHS's own "for cause" regulation in 45 C.F.R. § 75.372(a)(2) supports Defendants' *en masse* termination of the federal grant programs, in contravention of a congressional mandate. Defendants' unilateral decision to terminate the funding because of the purported end of the COVID-19 pandemic—the only reason Defendants provided for the termination—is also arbitrary and capricious because it is inconsistent with congressional action on the continuing need for these appropriations beyond the period of the COVID-19 public emergency. Defendants' reason for the termination thus is unfounded and relies on factors Congress never intended Defendants to consider.

As a result of the Mass Termination Decision, local governments suffered immediate harm, and many health departments, including Dallas County's, have already had to fire employees, terminate critical public health programs that could no longer be financially supported, and quickly determine how to continue to perform mission critical functions with far less. Absent injunctive relief, Dallas County and the constituents it represents and serves will continue to suffer serious

harm. The loss of these programs will lead to considerable public health risks, including decreased vaccination rates and increased occurrence of currently spreading infectious diseases such as measles and the bird flu, among other preventable diseases.

## BACKGROUND

### I.      Congress Appropriates Billions of Dollars in Public Health Funding.

During the COVID-19 pandemic, Congress appropriated funds to states, localities, and organizations to bolster the public health response to that pandemic, and to ensure that the nation would be better prepared for future public health threats. In addition to directing funds toward mitigating the immediate effects of the COVID-19 pandemic, Congress sought to address the longer-term challenges it knew the country would face in the pandemic's wake, including gaps in the public health system and the need for investment in critical public health infrastructure. This critical health infrastructure has been instrumental in the management of Covid, measles, bird flu, Mpox, and a plethora of other communicable diseases. Congress approved these funds for "state and local readiness"[1] through the following key appropriation acts:

a)  **The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act")**, Pub. L. No. 116-136, 134 Stat. 281 (2020), appropriated $4.3 billion "to prevent, prepare for, and respond to coronavirus," requiring that no less than $1.5 billion "shall be for grants to or cooperative agreements with States, localities," and other entities, "including to carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities"; and that no less than $500 million "shall be for public health data surveillance and analytics infrastructure

---

[1] *See* CDC, *COVID-19 Funding* (Apr. 23, 2024), https://www.cdc.gov/readiness/php/funding/covid-19-funding.html, *archived at* https://perma.cc/GU5H-RYGK.

modernization." 134 Stat. at 554-55. The Act states that "the term 'coronavirus' means SARS-CoV-2 or another coronavirus with pandemic potential." *Id*. at 614.

b) **The Coronavirus Response and Relief Supplemental Appropriations Act, 2021 ("CRRSAA")**, Pub. L. No. 116-260, div. M, 134 Stat. 1184 (2021), appropriated $8.75 billion to "to prevent, prepare for, and respond to coronavirus," providing that the appropriated amounts "shall be for activities to plan, prepare for, promote, distribute, administer, monitor, and track coronavirus vaccines to ensure broad- based distribution, access, and vaccine coverage." 134 Stat. at 1911. Congress instructed that at least $4.5 billion of that amount should go to states, localities, and similar entities, that at least $300 million be used "for high-risk and underserved populations, including racial and ethnic minority populations and rural communities," and specified that funding requirements could be satisfied "by making awards through other grant or cooperative agreement mechanisms." *Id.* at 1911-12. The CRRSAA provides that the term "coronavirus" "means SARS-CoV-2 or another coronavirus with pandemic potential." *Id.* at 1185.

c) **The American Rescue Plan Act of 2021 ("ARPA")**, Pub. L. No. 117-2, 135 Stat. 4 (2021), provided billions to HHS and CDC "to plan, prepare for, promote, distribute, administer, monitor, and track COVID–19 vaccines;" "strengthen vaccine confidence in the United States;" "improve rates of vaccination throughout the United States;" and "strengthen and expand activities and workforce related to genomic sequencing, analytics, and disease surveillance;" among other objectives. 135 Stat. at 37-41. Out of that amount, and to fulfill those objectives, Congress required that the CDC award grants or cooperative agreements to state and local public health departments. *Id.* at 37, 40-42. Congress specifically appropriated funds so that HHS would "award grants to, or enter into cooperative

4

agreements or contracts with, State, local, and territorial public health departments to establish, expand, and sustain a public health workforce." *Id.* at 41.

d) **The Coronavirus Preparedness and Response Supplemental Appropriations Act ("2020 Supplemental Act")**, Pub. L. No. 116-123, 134 Stat. 146 (2020), provided $2.2 billion to CDC "to prevent, prepare for, and respond to coronavirus, domestically or internationally." 134 Stat. at 147. Not less than $950 million of that amount was required to be used for grants to or cooperative agreements with states and localities so that they could "carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities." *Id.*

e) **The Paycheck Protection Program and Health Care Enhancement Act ("Paycheck Protection Act")**, Pub. L. No. 116-139, 134 Stat. 620 (2020), appropriated billions to be transferred to HHS and CDC for states and localities to "develop, purchase, administer, process, and analyze COVID-19 tests, including support for workforce, epidemiology, use by employers or in other settings, scale up of testing by public health, academic, commercial, and hospital laboratories, and community-based testing sites, health care facilities, and other entities engaged in COVID-19 testing, conduct surveillance, trace contacts, and other related activities related to COVID-19 testing." 134 Stat. at 624.

Importantly, none of this funding was limited to the duration of the COVID-19 public health emergency. When Congress intended to limit the duration of programs or appropriations in COVID-19 related laws, it did so expressly. *See*, *e.g.*, ARPA, 135 Stat. at 127 (appropriating funds to states to create "strike teams" of health care providers that could be deployed to nursing facilities with diagnosed or suspected cases of COVID-19 "during the emergency period . . . and the 1-year period immediately following the end of such emergency period"); *id.* at 210–12 (medical

assistance for vaccines "ends on the last day of the first quarter that begins one year after the last day of the emergency period"); CARES Act, 134 Stat. at 305 (provision of paycheck protection program to provide loans can be administered "until the date on which the national emergency... expires").

## II.    The Public Health Care Programming of Plaintiff Arising from Congressionally Appropriated COVID-19 Funding.

Many of the appropriations prompted by COVID-19 supplemented existing vaccine, infectious disease, and other programs that states and localities maintained with HHS and CDC prior to the COVID-19 outbreak. For example, long before the 2020 public health emergency, CDC established the Epidemiology and Laboratory Capacity for Prevention and Control of Emerging Infectious Diseases ("ELC") Cooperative Agreement as a mechanism to fund the nation's state and local health departments to detect, prevent, and respond to infectious disease outbreaks.[2] These agreements have funded local emergency responses to epidemics such as H1N1, Zika, and Ebola. *Id.* The program provides financial and technical resources to: (1) strengthen epidemiologic capacity; (2) enhance laboratory capacity; (3) improve health information systems; and (4) enhance collaboration among epidemiology, laboratory, and public health departments.[3] During COVID-19, CDC used the ELC agreements to provide additional support to local health jurisdictions, using funds Congress appropriated through the ARPA, CRRSAA, and CARES Act.

Consistent with Congress's mandates in the COVID-19-related appropriations, HHS and CDC used the appropriated funds to offer additional grant programs and cooperative agreements

---

[2] CDC, *The Epidemiology and Laboratory Capacity (ELC) Program* (Jan. 31, 2025), https://www.cdc.gov/epidemiology-laboratory-capacity/php/about/index.html, *archived at* https://perma.cc/46D9-7JMW.

[3] CDC, *Strengthening the Nation's Capacity to Respond to Domestic Infectious Diseases*, https://www.cdc.gov/epidemiology-laboratory-capacity/media/pdfs/2024/11/ELC-Fact- Sheet-2024-2025.pdf, *archived at* https://perma.cc/CY6F-TDWA.

to states and localities, including to Plaintiff. Texas DSHS awarded Dallas County the Infectious Disease Control Unit ("IDCU") grant. Texas DSHS acts as a pass-through entity for the funds. Huang Decl. ¶¶ 5,8. Dallas County is a federal grantee in that it receives the IDCU sub-grant from Texas DSHS as "pass-through funding" from the Department of Health and Human Services. *Id*. Dallas County administered the funding it received from these grant awards through its agency, Dallas County Health and Human Services ("DCHHS"). *Id*. ¶ 2. The IDCU Grant stems from the CARES Act and CRRSAA. Huang Decl. ¶ 6. The grant was terminated by Texas DSHS on March 25, 2025, based on termination of federal funding. *Id*. ¶ 10; Exh. I to Huang Decl.

Both Plaintiff and Defendants understood from the start that the activities funded through these HHS and CDC programs would not be limited to work during the COVID-19 pandemic. Huang Decl. ¶ 13. In the sixth amendment to the contract between Texas DSHS and Dallas County for the IDCU Grant, the first paragraph of the revised statement of work, which sets forth Dallas County's responsibilities as a grant recipient, provided that "COVID-funded laboratory, surveillance, epidemiology, and informatics personnel may work on other respiratory pathogens and syndromes more broadly, in addition to SARS-CoV-2 and COVID-19, as long as COVID-19 testing or surveillance is included in the effort." *See* Exh. E to Huang Decl. The next sentence in that same section of the revised statement of work also stated that, "where COVID-19 is referenced, it will now include other respiratory pathogens and syndromes." *Id*.

Dallas County was also using some of its federal funds to develop laboratory operational capacity to respond to a variety of infectious diseases besides COVID-19, including H1N1 (swine flu), Zika, Ebola, measles, and Mpox. Huang Decl. ¶ 15.

III.     **Congress and CDC Continue Funding Programs with Plaintiff After the COVID-19 Public Health Emergency Ends.**

On May 11, 2023, the HHS Secretary's final extension of the "public health emergency" declaration under 42 U.S.C. § 247d expired.[4] But the work that state and local governments were doing as a result of COVID-19 did not end.

Later Congressional action reaffirmed what was already clear: the funding provided by the COVID-19-related appropriations was to remain available regardless of COVID-19's continuing status as a "pandemic," or as a declared "public health emergency." In early June 2023, shortly after the expiration of the "public health emergency" declaration, Congress canceled $27 billion in related appropriations through the Fiscal Responsibility Act of 2023, 37 Stat. at 23. In that Act, Congress reviewed various COVID-related laws and rescinded those funds that it determined were no longer necessary. *Id.* at 23-30. But Congress chose not to rescind the funding for the grants at issue in this case.

Through its own actions, HHS/CDC has acknowledged that the funding for these grants remains available even after the COVID-19 "public health emergency" declaration expired in May 2023. For example, in May 2024, Plaintiff Dallas County's IDCU Grant's end date was extended to July 2026. Huang Decl. ¶¶ 7, 13; Exh. G to Huang Decl. And, in September 2024, an additional $4.25 million in funding was added to the grant period ending in July 2026. *Id.* ¶¶ 7, 13; Exh. E to Huang Decl.

---

[4] NAFSA: Ass'n of Int'l Educators, *COVID-19 Executive Declarations and Determinations* (Apr. 18, 2023), https://www.nafsa.org/regulatory-information/covid-19-executive-declarations-and-determinations, *archived at* https://perma.cc/Y85A-PLXS.

**IV.      Defendants Unlawfully Terminate Their Grants with Dallas County.**

Defendants settled upon their Mass Termination Decision nearly two years after the public health emergency expired. Contravening Congress's decision to extend funding for pandemic preparedness, Defendants announced that they would "no longer waste billions of taxpayer dollars responding to a non-existent pandemic that Americans moved on from years ago."[5] Between March 24 and March 25, 2025, Defendants implemented their Mass Termination Decision by cancelling $11 billion for public health programs funded by the COVID-19-related appropriations, effective March 24, 2025. Defendants gave no prior notice or advance warning to Plaintiff of these actions.

The terminations were nationwide in scope. Defendants did not engage in any individualized consideration of the affected grants. Instead, Defendants apparently deemed the CDC grant programs to be "COVID 19-related" and designated them for immediate elimination based on one criterion: their funding derived from COVID-era appropriations acts passed by Congress. Huang Decl. ¶ 10. As an example, Dallas County received funding directly from HHS/CDC for the Initiative by Dallas County to Address COVID-19 Health Disparities Among Populations at High Risk and Underserved, Including Racial & Ethnic Minority Populations and Rural Communities Grant ("Health Disparities Grant") through the CARES Act. *Id*. The Health Disparities Grant provided funding for a variety of purposes, including media campaigns related to COVID-19 vaccine availability, clinic locations, and mitigation measures, contact tracing and surveillance of cases, and increasing DCHHS laboratory capability. Even though HHS/CDC extended funding for the Health Disparities Grant in 2024 after the pandemic was declared to be

---

[5] Brandy Zadrozny, *CDC is pulling back $11B in Covid funding sent to health departments across the U.S.*, NBC News (Mar. 25, 2025), https://www.nbcnews.com/health/health-news/cdc-pulling-back-11b-covid-funding-sent-health-departments-us-rcna198006, *archived at* https://perma.cc/35SS-V2WE.

over, DCHHS received a notice in May of 2025 from HHS/CDC that the funding for the Health Disparities Grant was being closed out, effective March 24, 2025. *Id*.; Exh. H to Huang Decl. However, the termination notice from HHS/CDC for the Health Disparities Grant did not provide any information regarding the reason for the termination of funding or allege that Dallas County had not complied with the terms or conditions of the grant. Huang Decl. ¶ 10; Exh. H to Huang Decl. The apparent basis for the decision to terminate the Health Disparities Grant and other similar programs was that their funding came from one or more COVID-19 related laws, and that because the pandemic was over, the need for funding was over, making the termination of funding "for cause." Huang Decl. ¶ 10.[6]

Pass-through entities then, likewise, served notices of termination of the grants to recipients. On March 25, 2025, DCHHS received notice from Texas DSHS that HHS/CDC had terminated funding for the IDCU Grant as of March 24, 2025. Huang Decl. ¶ 11; Exh. I to Huang Decl. The Texas DSHS notice directed Plaintiff to pause all program activities immediately because grant funding had been terminated as of March 24, 2025. *Id*. The pass-through grantees received little information regarding the Mass Termination Decision. The notice sent to DCHHS from Texas DSHS did not provide a reason for termination of the grants, allege that Dallas County had not complied with any of the terms or conditions of the grants, or indicate that the decision to terminate the funding had been made by Texas DSHS. Huang Decl. ¶ 11; Exh. I to Huang Decl.

---

[6] Dallas County is not asserting claims arising from the termination of the Health Disparities Grant in this matter. It provides this Court with information related to the termination of the Health Disparities Grant solely as an example of a notice of grant termination received from Defendants that appeared to use the end of the pandemic as a basis for termination.

**V.     Defendants' Termination of Funds is Causing Dallas County Substantial, Irreparable Harm.**

Dallas County relied on the federal funding to provide critical aspects of their public health programs—programs that are used to detect and ameliorate all sorts of infectious disease, and not just COVID-19. With the terminated funds abruptly cut off, Dallas County was not able to find alternate funding to sustain many of its public health programs and services. This includes programs designed to detect and prevent the spread of communicable diseases. The primary purpose of the IDCU grant was to: allow Dallas County to prevent the spread of communicable diseases more effectively through epidemiology, disease surveillance, investigation, monitoring, and reporting to both Texas DSHS and CDC; and to enhance Dallas County's laboratory testing, reporting, and response capacities. Huang Decl. ¶ 6. Dallas County has used IDCU Grant funds to hire staff for the DCHHS Public Health Laboratory ("PHL") to develop and maintain an electronic Laboratory Information System ("LIS"). *Id*. ¶ 9. The LIS is a software system specifically designed to manage and streamline the workflow of the PHL that tracks and organizes patient data, specimen details, and test results, helping ensure accuracy, efficiency, and regulatory compliance. *Id*. By automating routine tasks and integrating with other health systems, LIS improves turnaround times and supports better clinical decision-making. *Id*. Dallas County has also used IDCU Grant funds to acquire equipment that increase the PHL's testing, reporting, and response capacities. *Id*.

The loss of the funding for the ICDU Grant has reduced DCHHS capacity to respond to other public health threats besides COVID-19, including H1N1 (swine flu), Zika, Ebola, measles, mpox, and other communicable diseases. Huang Decl. ¶ 15. The loss of funding of the IDCU Grant has directly impacted Dallas County's PHL operational capacity through loss of key staff and subsequent reductions in service. *Id*. The PHL lost five (5) positions due to funding cuts—three (3) microbiologists and two (2) data entry clerks. *Id*. These staffing cuts amount to a 50% reduction

11

in DCHHS's LIS program staff, forcing the remaining personnel to redirect their focus from critical LIS upgrades, the integration of DCHHS with Parkland Hospital through EPIC (a widely used electronic health record system that enables seamless data sharing between the laboratory and clinical teams, essential for improving patient care coordination and reducing diagnostic delays), and preparations for the laboratory relocation, to routine LIS maintenance. *Id*. This has delayed LIS modernization by several months and affected test code development and external collaborations. *Id*.  The loss of a Ph.D. level staff member who was to lead Dallas County's measles program has left the laboratory without dedicated scientific oversight for assay validation and outbreak response during a period of increased measles activity. *Id*. Many of these public health workers are highly trained individuals—community health care workers, nurses, and epidemiologists—who have devoted their careers to public health work, whose loss harms DCHHS public health services. *Id*. Additionally, the loss of staff has further limited DCHHS's ability to expand testing and maintain rapid turnaround times. *Id*. These cumulative losses have constrained laboratory innovation, delayed new test implementation, and reduced Dallas County's public health response capacity to threats of communicable diseases besides COVID-19, including H1N1 (swine flu), Zika, Ebola, measles, and Mpox. *Id*. ¶¶ 15, 17.

The result of Defendants' illegal actions will be that Dallas County's citizens will lose access to critical health care programs and services, and Dallas County will not be able to respond to these deadly health crises. That work served as an important impediment to the spread of COVID-19 and other diseases. This is especially concerning given the recent deadly outbreak of measles in Texas and other states.

Both in the near term and in the long run, the Mass Termination will have devastating effects on public health infrastructure, including that of Plaintiff. Plaintiff now lacks the funding

and workforce to continue its data modernization and COVID-19 reporting, including its disease surveillance and investigation system. Huang Decl. ¶ 15. Plaintiff has invested significant time and its own resources into these projects, with the idea that they would be completed with the remaining federal funds—funds to which they no longer have access. *Id*. ¶ 14.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

In addition to their authority to issue injunctions under Federal Rule of Civil Procedure 65, courts hearing APA cases "may 'issue all necessary and appropriate process to preserve status or rights pending conclusion of the review proceedings' when doing so is 'necessary to prevent irreparable injury.'" *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. 25-cv-00239, 2025 WL 597959, at *11 (D.D.C. Feb. 25, 2025) (quoting 5 U.S.C. § 705) (alteration omitted). Thus, "[b]oth provisions [Rule 65 and § 705] provide a mechanism for issuing injunctive relief and operate under the same four-factor test." *Id.*

## ARGUMENT

## I.    Dallas County is Likely to Succeed on the Merits.

Even though Congress has appropriated funds for Dallas County, and other State and local governments, to use to provide public health care services both during and beyond the COVID-19 pandemic, Defendants have terminated the funds on the pretextual ground that the pandemic is over. By terminating the funds in such an arbitrary and capricious manner, Defendants have violated their obligations under the Constitution, the APA, and the appropriation statutes.

A.    **Dallas County is likely to succeed on its constitutional claims.**

Dallas County is likely to succeed on the merits of its claims that the Defendants' actions contravene the principle of separation of powers as well as the Spending Clause and are ultra vires.

The Executive Branch may not usurp the power of the Legislative Branch. Inherent in this principle of separation of powers is the understanding that the Executive cannot withhold Congressionally appropriated funds in order to effectuate its own policy goals. *In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.); *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Indeed, the Constitution exclusively grants the power of the purse to Congress, and that spending power is directly linked to Congress's power to legislate. *City & Cnty. of S.F.*, 897 F.3d at 1231-32; *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); *id.* § 8, cl. 1 (Spending Clause). As the D.C. Circuit has explained, the Executive Branch does not have "unilateral authority" to refuse to spend the "full amount appropriated by Congress for a particular project or program." *In re Aiken Cnty.*, 725 F.3d at 261 n.1. *See also Climate United Fund v. Citibank, N.A.*, No. 25-cv-698, 2025 WL 1131412, at *16 (D.D.C. Apr. 16, 2025).

The Executive's actions here directly contravene Congress's appropriations for public health programming, and the statutory mandate to spend must prevail. *See Train v. City of New York*, 420 U.S. 35, 41, 47-49 (1975) (invalidating a Presidential directive to "withhold[]" funding because it could not be "squared with the statute"). When the Executive disregards mandatory appropriations, its actions "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 638 (1952) (Jackson, J., concurring).

Moreover, the Executive Branch can decline to spend duly appropriated funds only through the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. § 681 *et seq*. That Act, however, requires that the President "propose the rescission of funds [to Congress], and Congress

14

then may decide whether to approve a rescission bill." *In re Aiken Cnty.*, 725 F.3d at 261 n.1 (citing 2 U.S.C. § 683). Because Defendants have rescinded funds Congress has appropriated, without following the correct rescission procedures, Plaintiff is likely to succeed on its separation-of-powers claim.

Plaintiff is also likely to succeed on its claim that Defendants' decision to unilaterally terminate the funding on a retroactive and unfounded condition violates the Spending Clause of the Constitution. Just as Congress may not place conditions on grants to state and local governments unless those conditions are expressly and unambiguously stated in advance, *Pennhurst State Sch. & Hosp. v. Haldermann*, 451 U.S. 1, 17 (1981), so too, HHS and CDC may not impose such conditions on grant recipients. Thus, neither Congress, nor federal agencies, can "surpris[e]" grant recipients "with post acceptance or 'retroactive' conditions." *Id.* at 25. Any conditions imposed must be clear and defined at the outset, *id.* at 17, and such conditions must also relate to the federal interest in the particular program. *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

Defendants' Mass Termination Decision, and their implementation of it, violates the Spending Clause because it retroactively conditions the receipt of federal funds in a manner unrelated to the federal interest in the affected programs. Congress never expressly or otherwise conditioned the funding appropriations at issue to the duration of the COVID- 19 pandemic. *See supra* at 3-6. Rather, after the formal termination of the COVID-19 public health emergency, Congress and Defendants HHS and CDC reaffirmed that the funding should continue. *See supra* at 5-6, 8. Defendants' decision to change the terms of the funding retroactively—in a way that was not related to Congress's interests in the affected programs—failed to provide the clear notice that is required under the Spending Clause.

For similar reasons, Plaintiff is likely to succeed on its ultra vires claim against Defendants Kennedy and O'Neil. The equitable power of federal courts to enjoin "violations of federal law by federal officials," *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326-27 (2015), includes cases in which a federal officer has acted unconstitutionally as well as cases in which the officer has acted "beyond th[e] limitations" set by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949). Defendants Kennedy and O'Neil lacked constitutional and statutory authority to issue or implement the Mass Termination Decision. As explained above, their actions violate the Constitution's separation of powers, exceed the limits of the Spending Clause, and have no basis in any federal statute. *See supra* at 21-22.

**B.    Dallas County is likely to succeed on its APA claims.**

The APA permits judicial review of "final agency action," 5 U.S.C. § 704, and provides that a court "shall" "hold unlawful and set aside agency action" that is, among other things, "contrary to constitutional right, power, privilege, or immunity" "in excess of statutory …authority," or "arbitrary [and] capricious," *id.* § 706(2)(A)-(C). The Mass Termination Decision should be set aside under the APA because it is a final agency action that is contrary to Defendants' constitutional power, is in excess of statutory authority, and is arbitrary and capricious.

**1.    Defendants' decision to terminate the funding at issue is final agency action.**

The Administrative Procedure Act makes reviewable "final agency action." 5 U.S.C. § 704. Defendants' action to terminate all funding is a final agency action subject to the APA. Final agency actions "mark the consummation of the agency's decision- making process" and are those "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted). Here, the actions "mark[] the consummation" of Defendants' decision-making process because they announce

Defendants' final decision on the matter, and the actions have the legal consequence to Plaintiff of the loss of funding and other irreparable harm. *See, e.g.*, *Nat'l Council of Nonprofits*, 2025 WL 597959, at *13 (holding that pause on funding constituted final agency action).

### 2. Defendants' termination decision is unconstitutional.

The APA prohibits agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(A)-(C). As discussed above, *supra* at 13-14, Defendants' Mass Termination Decision, which unilaterally eliminated COVID-19-related federal funding in one fell swoop,  resulted in local pass-through grants losing funding, violated the separation of powers principle as well as the Spending Clause of the Constitution, and was ultra vires. Because the Executive Branch lacks the constitutional authority to amend or repeal congressional appropriations in this manner, *see supra* at 21-23, its unconstitutional action also violates the APA.

### 3. Defendants lack statutory authority to withhold the appropriated funds.

Under the APA, courts must hold unlawful final agency action taken "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). "Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022).

HHS has not pointed to any statutory authority allowing the agency to terminate $11 billion in critical public health funding simply because the COVID-19 pandemic is over. That is because Congress specifically appropriated the funds for use during and beyond the COVID-19 pandemic. Congress expressly identified funds and programs in the COVID-19 appropriations laws that would no longer be available after the end of the public health emergency, and, after the public health emergency ended, it reviewed all of the COVID-19 appropriations laws. Through that process, Congress rescinded $27 billions of funds that it determined were no longer necessary,

but, significantly, it left in place all of the programs and funding at issue here. *See supra* at 5-6, 8. Where Congress sought to tie programs and funding in these laws to the end of the pandemic, it did so expressly. *See, e.g.*, ARPA, 135 Stat. at 127 ("during the emergency period . . . and the 1-year period immediately following the end of such emergency period"); 135 Stat. at 210-11 ("ends on the last day of the first quarter that begins one year after the last day of the emergency period"); CARES Act, 134 Stat. at 306 ("until the date on which the national emergency . . . expires"). One would expect Congress to speak clearly if it intended to delegate to the Defendants the authority to terminate billions of dollars of public health funding based on a finding that the public health emergency is over. As this history makes clear, however, Congress instead reserved that decision for itself, rescinding some funds but preserving the funding at issue here to respond to ongoing threats to the public health. *See West Virginia v. EPA*, 597 U.S. 697, 724-25 (2022) (considering history of congressional action on a subject in discerning the scope of delegated authority).

Defendants' Mass Termination Decision has no basis in statute, and Plaintiff is therefore likely to succeed on its claim that Defendants' actions are therefore unlawful per 5 U.S.C. § 706(2).

### 4. Defendants' actions are arbitrary and capricious.

Dallas County is also likely to succeed on its claim that the Mass Termination Decision was arbitrary and capricious. Under the APA, a court must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

Defendants' decision is arbitrary and capricious because it violates HHS's own regulations. An agency is "bound by its own regulations," *Nat'l Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (internal quotation marks and citation omitted). When the agency does not act in accordance with those regulations, it acts arbitrarily and capriciously. *Pol'y & Rsch., LLC v. U.S. Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 72 (D.D.C. 2018) (Jackson,

J.). Defendants have sent no termination notices directly to Dallas County for the IDCU Grant, and the notice that Dallas County received from Texas DSHS that federal funding had been terminated cited no authority for that decision or alleged that Dallas County had not complied with the terms and conditions for the IDCU Grant. Huang Decl. ¶ 11; Exh. I to Huang Decl. Presumably, the decision to terminate pass-through funding to Dallas County was meant to rely on the HHS regulation in 45 C.F.R. § 75.372(a)(2), which permits termination of a federal grant "for cause." Huang Decl. ¶ 10. But Defendants have not demonstrated any of the requisite preconditions for a "for cause" termination.

When HHS has examined what "for cause" means in the past, it has explained that it generally involves a failure to comply with the terms and conditions of the grant instrument. *R.I. Substance Abuse Task Force Ass'n*, DAB No. 1642, 1998 WL 42538, at *1 (H.H.S. Jan. 15, 1998) ("When a grantee has materially failed to comply with the terms and conditions of the grant, [the Public Health Service] may. . .terminate the grant for cause."); *Child Care Ass'n of Wichita/ Sedgwick Cnty.*, DAB No. 308, 1982 WL 189587, at *2 (H.H.S. June 8, 1982) ("'For cause' means a grantee has materially failed to comply with the terms of the grant."); *see* 45 C.F.R. §§ 75.371-75.375 ("Remedies for *Noncompliance*") (emphasis added). This is consistent with the standard application of "for cause" terminations in statute and regulation. *See, e.g.*, 42 U.S.C. § 300x-55(a); 10 C.F.R § 600.25 (allowing "for cause" award termination on the basis of noncompliance or debarment). Defendants can point to no failure by Plaintiff to comply with the terms of the grants, and the end of the public health emergency two years ago certainly is not "cause" now. Nor does that regulation permit Defendants' mass termination of all federal grants that relate to COVID-19; rather, it indicates that Defendants were required to assess the funding on a recipient-by-recipient basis.

Defendants' action is also arbitrary and capricious because Defendants relied on factors Congress never intended them to consider, and they failed to provide a rational explanation for their Mass Termination Decision. Under arbitrary and capricious review, courts must hold as unlawful agency action that is "**not 'reasonable and reasonably explained**.'" *Ohio v. EPA*, 603 U.S. 279, 292 (2024) (emphasis added) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). Agency action is reasonable and reasonably explained where the agency has provided "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted). An agency action is arbitrary and capricious, on the other hand, if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

The minimal explanation that Defendants offered improperly assumed that all appropriations in the laws at issue were only intended for use during the pandemic— something Congress never intended to affect the duration of *these* appropriations. Congress instead directed many of the appropriations, including the ones at issue here, beyond the pandemic to future emergencies, for example, to expand and sustain a public health workforce, for communicable disease surveillance, and for data modernization and forecasting. ARPA, 135 Stat. at 41-42; *see also supra* at 3-5. And, Congress continued to operate these programs even after the public health emergency concluded. As described above, *supra* at 5-6, 8, when Congress wanted to limit funding in the COVID-19-related laws to the duration of the pandemic, it did so expressly. *See*, *e.g.*, ARPA, 135 Stat. at 127 ("during the emergency period . . . and the 1-year period immediately following

the end of such emergency period"); 135 Stat. at 212 ("ends on the last day of the first quarter that

begins one year after the last day of the emergency period"); CARES Act, 134 Stat. at 306 ("until

the date on which the national emergency ... expires"). After the end of the pandemic, Congress

also specifically rescinded $27 billion for certain COVID-19 appropriations it found no longer

necessary. *See* Fiscal Responsibility of Act of 2023, Pub. L. No. 118-5, div. B, tit. I, 31 Stat. 10,

23. But, importantly, it did not rescind the appropriations at issue. Defendants did not provide any

explanation, reasonable or otherwise, for these inconsistencies. There was thus no rational

connection between the facts and Defendants' decision.

 Defendants acted arbitrarily and capriciously when they failed to account for the "legitimate

reliance on prior interpretation" of the COVID-19-related appropriations. *Smiley v. Citibank (South

Dakota), N.A.*, 517 U.S. 735, 742 (1996). "When an agency changes course, ... it must be cognizant

that longstanding policies may have engendered serious reliance interests that must be taken into

account." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (internal

quotation marks and citation omitted); *cf. Michigan v. EPA*, 576 U.S. 743, 753 (2015)

("[R]easonable regulation ordinarily requires paying attention to the advantages and the

disadvantages of agency decisions."). Defendants never considered the substantial reliance

interests of Plaintiff of the Texas DSHS pass-through grants.

 For example, Dallas County relied on its understanding that Defendants would fulfill their

commitments under the grants by hiring employees and expanding its technology, laboratory,

surveillance, reporting, and monitoring capacities. Huang Decl. ¶¶ 9, 14-15.

 Defendants also violated the fundamental administrative law requirement that an agency

must "consider responsible alternatives to its chosen policy and to give a reasoned explanation for

its rejection of such alternatives." *Spirit Airlines, Inc. v. Dep't of Transp.*, 997 F.3d 1247, 1255

(D.C. Cir. 2021). "This principle goes to the heart of reasoned decision making." *Id.* Here, Defendants made no effort to consider alternatives, including whether to review the grants and agreements at issue to understand whether they had continued utility beyond the COVID-19 pandemic. At bottom, Defendants have failed to engage in reasoned decision making, and Dallas County is likely to succeed on its APA claims.[7]

## II.     This Court Has Jurisdiction Over Dallas County's Claims.

### A.     The Court has jurisdiction over the constitutional and ultra vires claims (Counts I-III).

Dallas County anticipates that Defendants will contend that this case falls outside the APA's waiver of sovereign immunity for suits seeking relief "other than money damages." 5 U.S.C. § 702. As explained in more detail below, Dallas County seeks only equitable relief, not money damages, and this case falls squarely within Section 702's waiver of immunity. In any event, Dallas County's claims center around their argument that Defendants violated the Spending Clause and separation of powers principle, and have acted ultra vires, by disregarding the congressional judgment that funding should remain available for state and local governments for pandemic preparedness. This Court may hear these constitutional and ultra vires claims even if the APA's waiver of immunity were unavailable. *See Pollack v. Hogan*, 703 F.3d 117, 121 (D.C. Cir. 2012); *see also Sedita v. United States*, No. 24-cv-00900, 2025 WL 387962, at *5 & n.4 (D.D.C. Feb. 4, 2025) (the *Larson* exception "continues to operate despite the APA," so "even if the APA waiver is inapplicable, the Federal Officers are stripped of official immunity").

---

[7] Defendants' actions are not of the type that are committed to agency discretion by law. There are statutory or regulatory standards that cabin Defendants' discretion here and provide "meaningful standard[s] by which to judge [their] action." *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). Defendants claim to have applied a "for cause" standard based in statute and regulation. Evaluating "for cause" terminations "involve[s] the type of legal analysis that courts routinely perform," not unreviewable agency discretion. *Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 83.

**B.    This Court has jurisdiction over the APA claims because this case does not seek to enforce any contract between the parties.**

The Administrative Procedure Act waives the federal government's sovereign immunity from actions seeking relief "other than money damages." 5 U.S.C. § 702. Dallas County does not seek money damages here, but instead bring an action in equity to compel Defendants to comply with a statutory mandate. *Bowen v. Massachusetts*, 487 U.S. 879, 900 (1988). Moreover, Dallas County does not seek to enforce any provision of individual grant agreements for past due sums. Congress has appropriated the funding at issue, and Dallas County instead seeks to enforce its prospective rights under those appropriations. Such an action is available in equity and belongs in federal district court. *Id.* at 905; *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 326-27 (2020) (federal district court jurisdiction appropriate where plaintiffs seek "prospective declaratory and injunctive relief to clarify the extent of the Government's ongoing obligations").

Where, as here, Dallas County seeks prospective relief and challenges the statutory and regulatory basis for Defendants' decision to override Congress's judgment to devote funding to pandemic preparedness, federal district courts have jurisdiction. *Bowen*, 487 U.S. at 905, 911. Dallas County expects that Defendants will assert that Dallas County's claims should be brought under the Tucker Act, which waives sovereign immunity for claims brought against the United States founded "upon any express or implied contract." 28 U.S.C. § 1491(a)(1). For such claims, the United States Court of Federal Claims has exclusive jurisdiction when the amount sought is greater than $10,000. 28 U.S.C. § 1346(a)(2). Importantly, however, the fact that claims involve a contract is not enough to make them "contract claims"; instead, the inquiry turns on "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). The Tucker Act applies if the issue in a case is "at its essence" a contract claim. *Id.* at 967.

But here, Dallas County's claims are not contractual claims. Dallas County's claims do not arise from the individual pass-through grant that was awarded to Dallas County. Dallas County instead challenges Defendants' categorical decision to terminate all grants that had been funded under congressional appropriations for pandemic preparedness. That challenge does not turn on individualized assessments of particular grant terms and conditions, any agreements between Defendants and Texas DSHS, or the agreements between Texas DSHS and Dallas County. Instead, Defendants improperly terminated the funding wholesale—for the unsupported reason that the COVID-19 pandemic had concluded. *See supra* at 8-10. Dallas County's claims arise from the Defendants' violations of the Constitution, Congress's statutory appropriations, and the procedural protections of the APA. Where, as here, it is not possible "to conceive of this dispute as entirely contained within the terms of the contract," because there is a constitutional question as to the lawfulness of the agency action, that claim is not a "contract action." *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 68 (D.D.C. 2009) (discussing contractor's First Amendment claim against Broadcasting Board of Governors (citation and internal quotation marks omitted)). For these reasons, this case is unlike the challenge to the Department of Education's termination of grants in *U.S. Department of Education v. California*, where the Supreme Court held—after a request for an immediate administrative stay—that the Government was likely to succeed in showing that the district court lacked jurisdiction to order the payment of money under the APA. 145 S. Ct. 966 (2025). There, the plaintiffs did not allege that the termination of their grants violated any statute. *See California v. U.S. Dep't of Educ.*, No. 25-cv-10548, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025). Instead, the plaintiffs in that case contended that the "terms and conditions of [their] grant awards d[id] not permit termination on the grounds" the government had invoked. Mem. Supp. Mot. for TRO, *California*, No. 25-cv-10548 (D. Mass. Mar. 6, 2025), ECF No. 7.

"It was true before *California*, and it remains true now, that whether a claim is at its essence contractual for the Tucker Act depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)." *Widakuswara v. Lake*, No. 25-cv-1015, 2025 WL 1166400, at \*9 (D.D.C. Apr. 22, 2025) (cleaned up). As another judge in this Court recently held, grant termination cases involving challenges to the government's "attempts to dismantle the entirety of a congressionally created program" to recover "expenses that [the government] should have paid all along" belong in federal district court.[8] *Climate United Fund*, 2025 WL 1131412, at \*11 (quoting *Bowen*, 487 U.S. at 894). Because Dallas County's claims are "ultimately based, not on breach of contract, but on an alleged ... violation" of federal law, this Court has jurisdiction over the claims. *Megapulse*, 672 F.2d at 969. The fact that the judicial remedy for Dallas County's harm may lead to the payment of money does not transform this case into a contractual case that must be heard in the Court of Federal Claims. *Vietnam Veterans v. Sec'y of the Navy*, 843 F.2d 528, 534 (D.C. Cir. 1988); *see also Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. 25-cv-0400, 2025 WL 752378 (D.D.C. Mar. 10, 2025).

In any event, the grants to which Dallas County's claims relate are not contracts. As this Court has held, "[f]or the Court of Federal Claims to have jurisdiction, a contract must contain the four required elements of offer, acceptance, consideration, and proper government authority." *Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 132 (D.D.C. 2023) (citation and internal quotation marks omitted). The consideration must benefit the government in a "direct,

---

[8] The United States itself recently informed the Supreme Court in another case that proper "APA suits do not 'claim a breach of contract' ... such claims instead rest on statutory or constitutional theories independent of the contract terms." Appl. to Vacate Order Issued by U.S. Dist. Ct., *U.S. Dep't of Educ. v. California*, No. 24A910, 2025 WL 945313, at \*14 (U.S. filed Mar. 26, 2025) ("categorically reject[ing] the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims.").

tangible" way. *Id.* at 133. Grants and cooperative agreements like the public health ones at issue in this case do not confer direct and tangible benefits on the government—any benefit the agreements might have, such as less demand on federal public health benefits, for example, is attenuated. *See id.* at 134 ("[I]f benefits as amorphous as the advancement of U.S. foreign policy interests could constitute consideration, then every cooperative agreement would transform into a contract."). "And since the Claims Court lacks jurisdiction, the Tucker Act does not deprive this Court of jurisdiction." *Id.*

## III.    Dallas County Faces Irreparable Harm.

Dallas County can establish irreparable harm by demonstrating that Defendants' actions "unquestionably make it more difficult for the [Plaintiff] to accomplish [its] primary mission." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). In the grant context, irreparable harm can be established where the immediate termination of grants would affect the existence of programs and the livelihoods of individuals within those programs. *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, 25-cv-00239, 2025 WL 368852, at *13 (D.D.C. Feb. 3, 2025) (finding irreparable harm to plaintiffs where programs "may simply disappear" and others would have been forced to shutter programs just to make payroll as a result of funding freeze) (citation and internal quotation marks omitted); *see also Am. Ass'n of Colls. for Tchr. Educ. v. McMahon*, 770 F. Supp. 3d 822, 858-59 (D. Md. 2025) (finding irreparable harm where plaintiffs will be forced to terminate staff, who "rely on such funding for their livelihoods").

That is certainly the case here, where the loss of funding "will have devastating effects" on Dallas County's projects and programs and "imminent harm is unavoidable." *Climate United Fund*, 2025 WL 1131412, at *12, *17. Dallas County has had to resort to ending entire portions of its public health programming, and Dallas County has had to lay off personnel already. Huang Decl. ¶ 15. Defendants' Mass Termination Decision has resulted in the termination of grant-funded

positions and reduced staffing levels, as well as deferment or delay of improvements to its laboratory and reporting capacity. Huang Decl. ¶¶ 15, 17. The termination of the IDCU Grant will significantly reduce the Dallas County's disease surveillance capacity and undermine its rapid detection of emerging disease outbreaks, including measles. *Id*. As a result of the termination, Dallas County has also lost the ability to provide critical health care to serve its constituents. *Id*.

Because the appropriations were designed, in part, to prevent the spread of ongoing and emerging infections, without the funding, Dallas County's constituents are at imminent increased risk of being exposed to infectious diseases that are currently circulating. *See supra* at 10-12. The grant terminations limit Dallas County's ability to prepare for public health emergencies, including the ongoing dangers of measles, H1N1, COVID variants, tuberculosis, and Mpox. Huang Decl. ¶¶ 15, 17. These threats to public health establish irreparable harm. *See Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*, 841 F. Supp. 2d 349, 358 (D.D.C. 2012).

Defendants' Mass Termination Decision is also causing Dallas County irreparable harm by creating severe budget uncertainty and forcing it to redirect limited resources to respond to the resulting chaos. The grant terminations have created immense budget uncertainty and administrative burdens on DCHHS and its staff. Huang Decl. ¶ 16. *See Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017) (recognizing immediate, irreparable harm due to order that created "budget uncertainty by threatening to deprive the Counties of hundreds of millions of dollars in federal grants that support core services in their jurisdictions" and explaining that this "uncertainty interferes with the Counties' ability to budget, plan for the future, and properly serve their residents" and that counties' need to "take steps to mitigate the risk of losing millions of dollars in federal funding, which will include placing funds in reserve and making cuts to services ... will cause the Counties irreparable harm").

**IV.      The Balance of Equities and Public Interest Favor Granting Relief.**

The balance of equities and public interest prongs merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). As the D.C. Circuit has held, "[t]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Newby*, 838 F.3d at 12 (citation omitted). Dallas County also has a substantial interest in minimizing health risks and preventing infection. *See State of Fla. v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1293 (11th Cir. 2021) ("public interest in slowing the spread of COVID-19").

As described above, *supra* at 10-12, Dallas County does not have the financial means of keeping its programs running, and it has been forced to terminate programs that benefit the public— programs that have a critical value in preventing the spread diseases such as measles and Mpox. Huang Decl. ¶¶ 14-15. Given the real and immediate harm that the public faces as a result of Defendants' actions, the equities and public interest strongly favor preliminary relief. This is even more true given that Dallas County has demonstrated its likelihood of success on the merits. The "extremely high likelihood of success on the merits" shows that preliminary relief "would serve the public interest." *Newby*, 838 F.3d at 12.

Defendants, on the other hand, face no harm from an injury that merely ends an unlawful practice. *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)). Moreover, HHS regulations specifically provide that "[a]ny funds paid to the non–Federal entity in excess of the amount to which the non–Federal entity is finally determined to be entitled under the terms of the Federal award constitute a debt to the Federal

Government." 45 C.F.R. § 75.391(a).[9] To recoup that debt, HHS can make "an administrative offset against other requests for reimbursements." 45 C.F.R. § 75.391(a)(1). Outside of the funding at issue, HHS provides significant amounts in aid to Dallas County every year from which they could offset in the event they ultimately prevail. As such, it is unclear how Defendants could claim irreparable harm.

## V.    The Court Should Not Require a Bond.

Federal Rule of Civil Procedure 65(c) "vest[s] broad discretion in the district court" to require bonds, *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), including "to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020). A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases).

In enjoining government interference with congressional appropriations, courts in this district and across the country have declined to require plaintiffs to post bond. *See*, *e.g.*, Order Granting Mot. for TRO, *RFE/RL, Inc. v. Lake*, No. 25-cv-00799 (D.D.C. Mar. 25, 2025), ECF No. 14; *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19; *Colorado v. HHS*, 2025 WL 1017775, at *6 (D.R.I. Apr. 5, 2025); *Cmty. Legal Servs. in East Palo Alto v. HHS*, 2025 WL 973318, at *4 (N.D. Cal. Apr. 1, 2025). As one such court recently held, "[i]n a case where the Government is alleged to have unlawfully withheld [large sums] of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion—to hold Plaintiffs hostage for the resulting harm." *Nat'l Council of Nonprofits*, 2025 WL 597959, at *19; *see also*

---

[9] *See also* HHS Grants Policy Statement (Apr. 16, 2025), https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-october-2024.pdf, archived at https://perma.cc/82TZ-SJED.

*Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 25-cv-00097, 2025 WL 1116157, at *24 (D.R.I. Apr. 15, 2025).

**VI.     Requested Relief.**

Dallas County respectfully requests that the Court enter a preliminary injunction that: Enjoins Defendants from implementing or enforcing the Mass Termination Decision; Enjoins Defendants from reinstating the Mass Termination Decision for the same or similar reasons; Requires Defendants to resume the implementation of the grants to Dallas County that were affected by the Mass Termination Decision; Requires Defendants to provide written notice of the order within 24 hours to all Defendants and agencies, and their employees, contractors, and grantees; and requires Defendants to provide a status report within 24 hours, documenting the actions that they have taken to comply with this order, including a copy of the notice and an explanation as to whom the notice was sent.

**CONCLUSION**

For these reasons, Dallas County respectfully requests a preliminary injunction and any other relief to which it is entitled.


Dated: December 8, 2025.

Respectfully submitted,

**JOHN CREUZOT**
Criminal District Attorney
Dallas County, Texas

*/s/ Barbara Nicholas*
**Barbara Nicholas***
Assistant Criminal District Attorney
Texas State Bar No. 24032785
Barbara.Nicholas@dallascounty.org

**Jason G. Schuette***
Assistant Criminal District Attorney
Texas State Bar No. 17827020
Jason.Schuette@dallascounty.org

**Todd Sellars***
Assistant Criminal District Attorney
Texas State Bar No. 00794619
tsellars@dallascounty.org

**Cherie Batsel***
Assistant Criminal District Attorney
Texas State Bar No. 24011313
Cherie.Batsel@dallascounty.org

Dallas County Criminal District Attorney's Office,
Civil Division
500 Elm Street, Suite 6300
Dallas, Texas 75202
Telephone:  (214) 653-7358

*Motion to appear *pro hac vice* forthcoming

*/s/ Rebecca S. LeGrand*
**Rebecca S. LeGrand**
DC Bar No. 493918
LeGrand Law PLLC
1100 H Street NW, Suite 1220
Washington, DC 20005
Phone: (202) 587-5725
rebecca@legrandpllc.com

COUNSEL FOR PLAINTIFF, DALLAS COUNTY, TEXAS

31