**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

<table>
<tr>
<td>

**DALLAS COUNTY, TEXAS,**

        *Plaintiff*,

v.

**ROBERT F. KENNEDY, JR.**, in his official capacity as Secretary of the United States Department of Health and Human Services, et al.,

        *Defendants.*

</td>
<td>

Case No. 1:25-cv-4242 (CRC)

</td>
</tr>
</table>

**PLAINTIFF DALLAS COUNTY, TEXAS'S REPLY IN SUPPORT OF ITS
MOTION FOR A PRELIMINARY INJUNCTION
AND RESPONSE  TO DEFENDANTS'  MOTION  TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................. 3

    I.    Dallas County has standing........................................................................3

        A.    The County's injuries are fairly traceable to Defendants' actions. ............................................................................... 3

        B.    Dallas County's injuries are redressable. ....................................... 7

    II.    The Tucker Acts does not divest this Court of jurisdiction over Dallas County's claims under the Administrative Procedures Act...................................13

        A.    The Tucker Act does not control this dispute............................................. 13

        B.    The source of Dallas County's APA rights is not contractual. ................. 14

        C.    The remedies sought by Dallas County are not contractual. .................. 19

        D.    The Court of Federal Claims lacks jurisdiction over Dallas County's claims............................................................... 23

        E.    Dallas County's claims do not seek money damages. ............................. 25

    III.    Dallas County's Constitutional and *Ultra Vires* Claims Do Not Fail as a Matter of Law. ...............................................................28

        A.    Dallas County's constitutional claims are proper...................................... 28

        B.    Dallas County's *Ultra Vires* claims are proper.......................................... 31

    IV.    Dallas County Has Established Irreparable Harm. .................................................31

        A.    Dallas County has established irreparable harm, even if it is economic. ................................................................ 32

        B.    Dallas County's delay in seeking injunctive relief is not dispositive. ............................................................... 35

        C.    The balance of the equities favors Dallas County..................................... 36

    V.    Dallas County Is Likely to Succeed on the Merits of Its Claims...........................37

        A.    Dallas County has standing........................................................................ 37

        B.    The Court has jurisdiction over Dallas County's claims. ......................... 38

        C.    Dallas County is likely to succeed on the merits of its claims.................. 39

    VI.    The Court Should Neither Require a Bond Nor Stay its Decision on Appeal. ................................................................40

CONCLUSION................................................................................................. 41

# TABLE OF AUTHORITIES

## Cases

*AIDS Vaccine Advocacy Coal. v. U.S. Dep't of State*,
    770 F. Supp. 3d 121 (D.C. Cir. 2025) ...................................................... 15, 16, 20

*Am. Ass'n of Physics Teachers v. Nat'l Sc. Found.*,
    __ F. Supp. 3d __, 2025 WL 2615054 (D.D.C. Sep. 10, 2025) .............................. 21

*Am. Bar Ass'n v. U.S. Dep't of Justice*,
    783 F. Supp. 3d 236 (D.D.C. 2025) ...................................................... 37

*Am. Nat'l Ins. Co. v. FDIC*,
    642 F.3d 1137 (D.C. Cir. 2011) ...................................................... 3

*Amica Ctr. for Immigrant Rights v. U.S. Dep't of Justice*,
    No. 25-0298-RM, 2025 WL 1852762 (D.D.C. July 6, 2025) .......................... 18, 19

*Appalachian Voices v. U.S. Envt'l Prot. Agency*,
    No. 25-1982, 2025 WL 2732746 (D.C. Cir. Sep. 25, 2025) .................................. 17

*Appalachian Voices v. U.S. Envt'l Prot. Agency*,
    No. 25-1982, 2025 WL 2732746 (D.D.C. Aug. 29, 2025) .................................. 17

*Appalachian Voices v. U.S. Envt'l Prot. Agency*,
    No. 25-5333, 2025 WL 2494905 (D.C. Cir. Sep. 19, 2025) .................................. 17

*Bennett v. Spear*,
    520 U.S. 154 (1997) ...................................................... 5, 6

*Block v. Meese*,
    793 F.2d 1303 (D.C. Cir. 1986) ...................................................... 3

*Bowen v. Massachusetts*,
    487 U.S. 879 (1988) ...................................................... 22, 25, 26

*California v. Dep't of Educ.*,
    769 F. Supp. 3d 72 (D. Mass. 2025) ...................................................... 16, 28

*Changji Esquel Textile Co. v. Raimondo*,
    40 F.4th 716 (D.C. Cir. 2022) ...................................................... 31

*Church v. Biden*,
    573 F. Supp. 3d 118 (D.D.C. 2021) ...................................................... 38

*Cienega Gardens v. United States*,
    194 F.3d 1231 (Fed. Cir. 1998) ...................................................... 23, 24, 39

*Climate United Fund v. Citibank, N.A.*,
    154 F.4th 809 (D.C. Cir. 2025) ..................................................................... 17, 21

*Climate United Fund v. Citibank, N.A.*,
    No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025)................................... 17

*Cmty. Legal Servs. in East Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
    137 F.4th 932 (9th Cir. 2025)....................................................................... 23, 24

*Cmty. Legal Servs. in East Palo Alto v. U.S. Dep't of Health & Hum. Servs.*,
    155 F.4th 1099 (9th Cir. 2025)............................................................................ 24

*Cmty. of Creative Non-Violence v. Pierce*,
    814 F.2d 663 (D.C. Cir. 1987)................................................................................ 4

*Colorado v. U.S. Dep't of Health & Hum. Servs.*,
    788 F. Supp. 3d 277 (D.R.I. 2025) ...................................................................... 27

*Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*,
    38 F.4th 1099 (D.C. Cir. 2022) .................................... 14, 15, 19, 20, 21, 22, 23, 39

*Dalton v. Specter*,
    511 U.S. 462 (1994)........................................................................... 29, 30, 40

*Dep't of Army v. Blue Fox, Inc.*,
    525 U.S. 255 (1999)................................................................................. 25

*Dep't of Educ. v. California*,
    604 U.S. 650 (2025)........................................... 14, 16, 17, 20, 25, 27, 28, 36

*Florida Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996)........................................................................ 4, 7

*Franklin-Mason v. Mabus*,
    742 F.3d 1051 (D.C. Cir. 2014)........................................................................ 13

*Global Health Council v. Trump*,
    153 F.4th 1 (D.C. Cir. 2025) ......................................................................... 31

*Great-West Life & Annuity Ins. Co. v. Knudson*,
    534 U.S. 204 (2002)........................................................................ 14, 16, 26, 27

*Green v. U.S. Dep't of Justice*,
    54 F.4th 738 (D.C. Cir. 2022) ......................................................................... 37

*Harris Cnty., Tex. v. Kennedy*,
    786 F. Supp. 3d 194 (D.D.C. June 17, 2025).............................11, 12, 18, 19, 22, 27, 34

*Ingersoll-Rand Corp. v. United States,*
    780 F.2d 74 (D.C. Cir. 1985)................................................................. 20

*John Doe Co. v. CFPB,*
    849 F.3d 1129 (D.C. Cir. 2017)........................................................... 32

*Johnson v. Becerra,*
    111 F.4th 123 (D.C. Cir. 2024)....................................................... 4, 5, 6

*Kidwell v. Dep't of Army,*
    56 F.3d 279 (D.C. Cir. 1995).............................................................. 15

*Klamath Water Users Ass'n v. Fed. Energy Reg. Comm'n,*
    534 F.3d 735 (D.C. Cir. 2008)............................................................... 7

*Larson v. Domestic & Foreign Commerce Corp.,*
    337 U.S. 682 (1949)............................................................... 31, 38, 40

*League of Women Voters of U.S. v. Newby,*
    838 F.3d 1 (D.C. Cir. 2016)................................................................ 35

*LeBlanc v. United States,*
    50 F.3d 1025 (Fed. Cir. 1995)............................................................ 24

*Local 3677, Fed'n of Gov't Emps. v. Phillips,*
    358 F. Supp. 60 (D.D.C. 1973)........................................................... 38

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992)......................................................... 3, 7, 13, 37

*Massachusetts v. Entv'l Prot. Agency,*
    549 U.S. 497 (2007)............................................................................. 4

*Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.,*
    763 F.2d 1441 (D.C. Cir. 1985).......................................................... 25

*Me. Cmty. Health Options v. United States,*
    590 U.S. 296 (2020)..................................................................... 24, 39

*Megapulse, Inc. v. Lewis,*
    672 F.2d 959 (D.C. Cir. 1982)................................ 14, 15, 19, 22, 23, 39

*Mideast Sys. & China Civ. Const. Saipan Joint Venture, Inc. v. Hodel,*
    792 F.2d 1172 (D.C. Cir 1986) ............................................................ 5

*Munaf v. Geren,*
    553 U.S. 674 (2008)........................................................................... 31

*Murthy v. Missouri,*
    603 U.S. 43 (2024).................................................................................. 7, 12

*Mylan Pharms., Inc. v. Shalala,*
    81 F. Supp. 2d 30 (D.D.C. 2000) ........................................................... 35

*N. Tex. Equal Access Fund v. Am. First Legal Found.,*
    699 F. Supp. 3d 67 (D.D.C. Oct. 24, 2023).............................................. 4

*Nat. Res. Def. Council, Inc. v. Morton,*
    337 F. Supp. 167 (D.D.C. 1971) ............................................................ 40

*Nat'l Council of Nonprofits v. Office of Mgmt. & Budget,*
    775 F. Supp. 3d 100 (D.D.C. 2025) ....................................................... 40

*Nat'l Inst. of Health v. Am. Pub. Health Ass'n,*
    145 S. Ct. 2658 (2025)....................................................... 16, 17, 21, 22

*Nat'l Parks Conserv. Ass'n v. Manson,*
    414 F.3d 1 (D.C. Cir. 2006)..................................................................... 9

*Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.,*
    366 F.3d 930 (D.C. Cir. 2004)......................................................... 4, 7, 9

*Nken v. Holder,*
    556 U.S. 418 (2009)......................................................................... 27, 32

*P.J.E.S. ex rel Escobar Francisco v. Wolf,*
    502 F. Supp. 492 (D.D.C. 2020) ........................................................... 40

*Perkins Coie LLP v. U.S. Dep't of Justice,*
    783 F. Supp. 3d 105 (D.D.C. 2025) ....................................................... 32

*Perry Capital LLC v. Mnuchin,*
    864 F.3d 591 (D.C. Cir. 2017).................................................................. 4

*Petroleum Jobbers Ass'n v. Fed. Power Comm'n,*
    259 F.2d 921 (D.C. Cir. 1958)............................................................... 32

*Pollack v. Hagen,*
    703 F.3d 117 (D.C. Cir. 2012)............................................................... 38

*Sierra Club v. U.S. Dep't of Agric.,*
    841 F. Supp. 2d 349 (D.D.C. 2012) ....................................................... 35

*Spectrum Leasing Corp. v. United States,*
    764 F.2d 891 (D.C. Cir. 1985)............................................................... 20

*Stephens v. United States*,
    165 Fed. Cl. 341 (Fed. Cl. 2023) ............................................................... 24

*Tootle v. Sec'y of Navy*,
    446 F.3d 167 (D.C. Cir. 2006) ............................................................ 23, 24

*Tozzi v. U.S. Dep't of Health & Human Servs.*,
    271 F.3d 301 (D.C. Cir. 2001) .................................................................... 4

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
    967 F.2d 598 (D.C. Cir. 1992) ............................................................ 14, 39

*U.S. Ecology, Inc. v. U.S. Dep't of Interior*,
    231 F.3d 20 (D.C. Cir. 2000) ................................................................. 3, 7

*Utah v. Evans*,
    536 U.S. 452 (2002) .............................................................................. 7, 13

*Widakuswara v. Lake*,
    No. 25-5144, 2025 WL 1288817 (D.C. Cir. May 3, 2025) ...................... 18

*Widakuswara v. Lake*,
    No. 25-5144, 2025 WL 1521355 (D.C. Cir. May 28, 2025) .................... 18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7, 20 (2008) .......................................................................... 32, 35

**Statutes**

28 U.S.C. § 1491(a)(1) ........................................................................... 14, 16

45 C.F.R. § 75.391 ...................................................................................... 37

5 U.S.C. § 702 ............................................................................................. 25

5 U.S.C. § 702(a) ........................................................................................ 14

5 U.S.C. § 704 ....................................................................................... 13, 14

5 U.S.C. § 706(2)(A) .................................................................................. 13

Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act") ................... 6, 10

Pub. L. No. 116-260, div. M, 134 Stat. 1184 (2021) ("CRRSAA") .......... 6, 10

**Rules**

Fed. R. Civ. P. 12(b)(6) ............................................................................... 31

## INTRODUCTION

After the onset of the COVID-19 pandemic in March of 2020, Congress appropriated funds to states and local governmental entities that were used to prevent harm to their citizens and to develop capacity that would enable them to monitor and help prevent future threats to public health.  Dallas County was an indirect recipient of such funds through a contract with the State of Texas. Huang Decl. (ECF No. 5-3) ¶ 10. However, in 2025, the U.S. Department of Health and Human Services ("HHS") and the Centers for Disease Control and Prevention ("CDC") unilaterally terminated most funds (hereinafter referred to as the "Mass Termination Decision"). See Compl., ECF No. 1 at ¶¶ 4-5. Dallas County subsequently received notice from the State of Texas that Defendants had terminated funding to the State. Huang Decl. ¶ 11. The sole apparent basis for Defendants' decision to terminate the funding was that the funding was no longer needed for those purposes since the pandemic was over. *Id*. ¶ 10. Defendants' Mass Termination Decision violates statutory commands, is unconstitutional, and will cause Dallas County irreparable harm.  Dallas County thus seeks to enjoin Defendants from further violations.

Defendants incorrectly argue that Dallas County lacks standing, claiming the injuries of which Dallas County complain are not fairly traceable to Defendants, and that any orders that the Court may issue will not redress any injuries of Dallas County. On the contrary, there is no doubt that the Mass Termination Decision by Defendants actions was the precipitating factor in Dallas County's loss of funding from the State of Texas. Dallas County had a grant with the Texas Department of State Health Services ("TDSHS") with over a year left on the grant, and $2.941 million remaining, when TDSHS notified the County of that federal funding had ceased, which in effect terminated the grant with Dallas County. Huang Decl. ¶¶ 11-12. As to traceability, a straighter line could not be drawn. In addition, an order from the Court requiring the resumption of funding from Defendants to the State of Texas would redress Dallas County's harms.

Defendants further argue that this Court lacks subject matter jurisdiction, first because Defendants enjoy sovereign immunity, and second because Dallas County's claims are in essence contractual, and thus Dallas County's claims should be brought in the Court of Federal Claims ("CFC"). However, Dallas County does not seek money damages but instead prospective equitable relief, and Dallas County has no privity of contract with Defendants.

Defendants further argue that Dallas County's constitutional claims fail as a matter of law because Dallas County alleges only statutory violations. However, there is no statute that authorizes the actions taken by Defendants. Rather, Defendants' actions presuppose a system of government wherein Congressional power of the purse is rendered meaningless.

Defendants also argue that Dallas County's *ultra vires* claims are improper because Dallas County can point to no statutes violated that would render the Defendant-officials' actions *ultra vires*. However, the individual Defendants acted contrary to explicit congressional commands and, therefore, those Defendants are not protected by sovereign immunity.

Further, Dallas County is likely to succeed on the merits of its claims against Defendants. Defendants had no authority to unilaterally terminate funding that had been obligated by Congress. Defendants' unilateral decision to terminate funding cannot be reconciled with the Constitution, the appropriating statutes, or Congress's decision to keep funding in place even after the COVID-19 pandemic ended. Furthermore, Defendants' termination decision and the implementation of that decision are unlawful and violate the Administrative Procedures Act.

Finally, without the Court's intervention, Dallas County will face irreparable harm. The Defendants' termination decisions threaten not only Dallas County's public health staffing, but also Dallas County's ability to monitor and respond to threats of infectious disease. Dallas County

also loses $2.941 million based on the Mass Termination Decision. Huang Decl. ¶¶ 11-12. The balance of the equities and the public interest therefore weigh in favor of granting injunctive relief.

## ARGUMENT

## I.      Dallas County has standing.

### A.      The County's injuries are fairly traceable to Defendants' actions.

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff must establish the predicates to jurisdiction, including standing, by a preponderance of the evidence. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). When ruling on this motion, the Court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged." *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up). "To establish the 'irreducible constitutional minimum' for Article III standing, a party must show that it has suffered an injury in fact, that there exists a causal link between that injury and the conduct complained of, and that a favorable decision on the merits will likely redress the injury." *U.S. Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000) (quoting *Lujan*, 504 U.S. at 560-61). In this case, Defendants challenge Dallas County's standing, but they only challenge the second and third prongs of standing. *See* Defendants' Combined Motion to Dismiss and Opposition to Preliminary Injunction. ECF No. 11-1 ("Defs.' Resp.") at 14-17.

For the second prong of standing, a plaintiff must show a causal connection between the asserted injury and the challenged governmental conduct and show that the injury is fairly traceable to the governmental action and not the result of independent action by a third party not before the court. *Lujan*, 504 U.S. at 560.  "It is impossible to maintain, of course, that there is no standing to sue regarding action of a defendant which harms the plaintiff only through the reaction of third persons." *Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986). Thus, "[w]hen plaintiffs sue the

government in order to change third-party behavior, they bear the burden of showing that 'agency action is at least a substantial factor motivating the third parties' actions.'" *Johnson v. Becerra*, 111 F.4th 1237, 1244 (D.C. Cir. 2024) (quoting *Tozzi v. U.S. Dep't of Health & Human Servs.*, 271 F.3d 301, 308 (D.C. Cir. 2001)). A defendant need not be the "but for" cause of the plaintiff's injuries at the hands of a third party. *N. Tex. Equal Access Fund v. Am. First Legal Found.*, 699 F. Supp. 3d 67, 78 (D.D.C. 2023) (citing *Massachusetts v. Envt'l Prot. Agency*, 549 U.S. 497, 524 (2007); *Cmty. of Creative Non-Violence v. Pierce*, 814 F.2d 663, 669 (D.C. Cir. 1987)). But, it must be "substantially probable that the challenged acts of the defendant, not of some absent third party," have led to a plaintiff's injury. *N. Tex. Equal Access Fund*, 699 F. Supp. 3d at 78 (quoting *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (internal citations omitted)).

Examples of cases where governmental actions were not determined to be fairly traceable to a plaintiff's injuries include: *Johnson*, 111 F.4th at 1244 (claims of patients of home health agencies, whose providers stopped providing in-home services altogether or without payment out-of-pocket, against HHS Secretary for failure to enforce Medicare conditions of participation were not fairly traceable to HHS Secretary, when providers were not parties to suit and applicable regulations did not require all providers to provide in-home services); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930 (D.C. Cir. 2004), abrogated on other grounds, *Perry Capital LLC v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) (holding that claims of organizations representing interests of college wrestling athletes and coaches against Department of Education for interpretation of Title IX were not fairly traceable to Department, when universities that made individual decisions to eliminate or reduce men's wrestling programs were not parties to the suit, and Department policy interpretations emphasized that universities were not required to take such actions); *Mideast Sys. & China Civ. Const. Saipan Joint Venture, Inc. v. Hodel*, 792 F.2d 1172

(D.C. Cir 1986) (holding claims of unsuccessful bidder against Department of Interior for releasing grant funds to territorial government of Northern Mariana Islands without requiring compliance with grant terms requiring territorial government to maintain conflict of interest standards in making contractual awards were not traceable to Department, when territorial government that was not party to the suit made decision not to accept bid based upon recommendation of its contractor who oversaw bidding process). In each case, there were independent intervening actions by third parties, and the governmental agency action complained of was not "at least a substantial factor motivating the third parties' actions." *Johnson*, 111 F.4th at 1244.

The existence of an intervening action by a third party is not, however, always sufficient to break the requisite of chain of causation required for traceability. For example, in *Bennett v. Spear*, 520 U.S. 154 (1997), the Fish and Wildlife Service issued a biological opinion as required by the Endangered Species Act, that determined that the operation of the Klamath Irrigation Project by the Bureau of Reclamation would impact two varieties of endangered fish. As a result of the opinion, the Bureau of Reclamation determined that it should alter its operations to protect the habitat for the fish. Two reclamation districts and the operators of two ranches within the district challenged the biological opinion without joining the Bureau of Reclamation in the suit, but the district court dismissed the case due to lack of standing. On appeal, the Supreme Court held that the petitioners had standing. *Bennett*, 520 U.S. at 168. With regard to the required second prong for standing, the Supreme Court held that the injuries suffered were fairly traceable to the "determinative or coercive effect" of the biological opinion. *Id.* at 169. The Supreme Court reasoned that the biological opinion was not merely advisory, but that it "altered the legal regime" to which the Bureau of Reclamation had to follow or be subject to criminal or civil penalties. *Id.* at 170.

In this case, Dallas County was an indirect recipient of funds appropriated by Congress under the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES Act") and Coronavirus Response and Relief Supplemental Appropriations Act of 2021 Pub. L. No. 116-260, div. M, 134 Stat. 1184 (2021) ("CRRSAA") through a contract with TDSHS. Huang Decl. ¶¶ 5-8. The first contract between Dallas County and TDSHS took effect on August 1, 2020, but, after multiple extensions, funding was supposed to end on July 31, 2026. Huang Decl. ¶ 7.

The terms and conditions incorporated into the last extension of the contract between TDSHS and Dallas County provide that the grant agreement is subject to termination or cancellation without penalty to the State of Texas, subject to the availability and actual receipt of federal funds, and that if the lack of funds makes delivery or performance impossible or unnecessary, the agreement will be terminated or cancelled without liability to the State. Exh. G to Huang Decl., Section 3.1. After federal funding was terminated via the Mass Termination Decision on March 24, 2025, Dallas County immediately received notice from the TDSHS on March 25, 2025, to take no further action under the grant agreement. Exh. I to Huang Decl. At the time the Mass Termination Decision was issued, $2.941 million remained on the pass-through grant with TDSHS, which Dallas County did not receive and was not able to utilize for the Congressionally intended purposes. Huang Decl. ¶12. Thus, while Defendants are not parties to the contract between Dallas County and TDSHS, any claim that TDSHS's actions were independent intervening actions that are not "at least a substantial factor motivating" TDSHS's actions is hollow. *Johnson*, 111 F.4th at 1244 (holding that independent decisions of third parties were not traceable where they were not shown to be motivated by government actions). Dallas County's injuries alleged in this case are fairly traceable to the "determinative or coercive effect" of Defendants' termination of grant funding. *Bennett*, 520 U.S.

at 168-69. Accordingly, Dallas County meets the second prong necessary to establish Article III standing. *Lujan*, 504 U.S. at 560-61.

### B. Dallas County's injuries are redressable.

To satisfy the third prong of standing, redressability, a plaintiff must demonstrate "that it is likely as opposed to merely speculative that the injury will be redressed by a favorable decision of the court." *Klamath Water Users Ass'n v. Fed. Energy Reg. Comm'n*, 534 F.3d 735, 738 (D.C. Cir. 2008); *Fla. Audubon Soc'y*, 94 F.3d at 663-64. When redress depends on the cooperation of a third party, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to … permit redressability of injury." *U.S. Ecology*, 231 F.3d at 24-25 (quoting *Lujan*, 504 U.S. at 562). When the relief sought depends on actions by a third party not before the court, the plaintiff must demonstrate that a favorable decision would create "a significant increase in the likelihood that [it]  would obtain relief that directly redresses the injury suffered." *Klamath Water*, 534 F.3d at 739 (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)). It is "substantially more difficult" for a plaintiff to establish redressability where the alleged injury arises from the government's actions towards a third party not before the court. *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 933 (quoting *Lujan*, 504 U.S. at 562). "[S]tanding theories that require guesswork as to how independent decision-makers will exercise their judgment" do not suffice; "[r]ather than guesswork, [ ] plaintiffs must show that the third-party will likely react in predictable ways to the defendants' conduct." *Murthy v. Missouri*, 603 U.S. 43, 57-58 (2024) (internal quotation marks omitted).

The existence of a third party who arguably may have caused the injury complained of by the plaintiff is not, however, always an impediment to redressability. For example, in *National Parks Conservation Association v. Manson*, 414 F.3d 1 (D.C. Cir. 2005), a power company applied for a permit from the State of Montana to construct a coal-fired electric generating plant near

Yellowstone National Park. The Department of the Interior initially determined that the plant would adversely affect visibility in the protected lands, but after reconsideration, the Assistant Secretary for the Department changed its position over objections from the National Park Service and Fish and Wildlife Service. The state issued the permit after receiving a final letter from the Department setting forth its changed position. Several environmental organizations sued in federal and state court, claiming that the Interior Department's actions violated the Administrative Procedures Act. The Montana state courts reversed the decision to issue the permit and remanded the case back to the state agency that issued the permit. The federal district court dismissed the federal case for lack of standing, but the D.C. Circuit reversed and remanded. *Id.* at 6. With regard to the redressability prong of standing, the Court of Appeals held that while a ruling in favor the plaintiffs that set aside the letter from the Department of the Interior would not directly determine whether the power company would get a permit for its plant, "the effect of such a ruling would not be far removed." *Id.* The Court of Appeals reasoned that the power company's application remained pending before the licensing state agency, and an order setting aside the letter withdrawing the adverse impact determination would significantly affect the permit proceedings, which was "enough to satisfy redressability," as it significantly increased the likelihood that the plaintiffs would obtain relief redressing their injuries. *Id.* at 6-7.

In a typical case where redressability is not found, there are intervening actions by third parties which have broken any sort of causation by governmental action or inaction. For example, in *National Wrestling Coaches Association*, the D.C. Circuit determined that organizations seeking greater opportunities for male college wrestlers by requesting the rescission of the Department of Education's interpretation of Title IX did not have a redressable injury because the plaintiffs did not show beyond speculation that an order invalidating the policy interpretation would alter any

8

decisions to eliminate or reduce funding for men's wrestling programs; the court noted that the universities made discretionary decisions regarding the allocation of funding between their men's and women's athletic programs. *Nat'l Wrestling Coaches Ass'n*, 366 F.3d at 939-40. That particular case is distinguishable because the Department of Education's policy interpretations for Title IX did not require universities to give fewer resources to men's programs; rather, the policy interpretation required that universities give men's and women's programs participation opportunities substantially proportionate to the enrollment numbers of each at each institution. *Id*. By contrast, the Defendants in this case terminated all pass-through funding to the State of Texas, which was a direction to eliminate the funding to Dallas County. Huang Decl. ¶¶ 11-12. Dallas County was in full compliance with the terms of the grant award at the time of the Mass Termination Decision, and TDSHS had no other choice but to terminate the grant. *Id*. ¶¶ 11-12; Exh. G to Huang Decl., Section 3.1. Unlike *National Wrestling Coaches Association*, Dallas County's injuries could not remotely be attributed to any decision of TDSHS, and an order from the Court invalidating the Mass Termination Action would redress Dallas County's injuries.

In that regard, this case is factually closer to *Manson*, 414 F.3d 1, where the plaintiffs sought to set aside a Department of Interior letter withdrawing an adverse impact finding, and the district court held that the requested relief was redressable. As in this case, the action of the government (the withdrawal of a report that the state agency was required to consider in making permitting decisions) caused a state agency to take action that harmed the plaintiff (the issuance of a development permit). And, as in *Manson*, the effect of a ruling invalidating the government's actions would "significantly affect" the state agency's future actions and increase the likelihood that the plaintiff would obtain relief from the state agency that addresses the injury suffered. *Manson*, 414 F.3d at 6.

In this case, Dallas County was an indirect recipient of funds appropriated by Congress through a contract with TDSHS for funding from the CARES Act and CRRSAA. Huang Decl. ¶¶ 5-6. In the CARES Act, Congress appropriated $4.3 billion to Defendants "to prevent, prepare for, and respond to coronavirus," requiring that: no less than $1.5 billion "shall be for grants to or cooperative agreements with States, localities," and other entities, "including to carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities;" and that no less than $500 million "shall be for public health data surveillance and analytics infrastructure modernization." CARES Act, 134 Stat. at 554-55. In the CRRSAA, Congress appropriated $8.75 billion to Defendants "to prevent, prepare for, and respond to coronavirus," providing that the appropriated amounts "shall be for activities to plan, prepare for, promote, distribute, administer, monitor, and track coronavirus vaccines to ensure broad-based distribution, access, and vaccine coverage." 134 Stat. at 1911.

Congress instructed that no less than $4.5 billion of that amount should go to states, localities, and certain other designated entities. 134 Stat. at 1911-12. The terms and conditions incorporated into the last extension of the contract between TDSHS and Dallas County provide that the grant agreement is subject to termination or cancellation without penalty to the State of Texas, subject to the availability and actual receipt of federal funds, and that if the lack of funds makes delivery or performance impossible or unnecessary, the agreement will be terminated or cancelled without liability to the State. Exh. G to Huang Decl., Section 3.1. When federal funding was terminated via the nationwide blanket Mass Termination Decision for pandemic-related grants, Dallas County immediately received the following notice from the TDSHS:

> March 25, 2025
>
> Dear Grantee:
>
> DSHS was notified that the federal grant funding for Immunization/COVID, Epidemiology Laboratory Capacity (ELC/COVID), and Health Disparities/COVID, is terminated as of March 24, 2025. The Texas Department of State Health Services (DSHS or System Agency) is issuing this notice to pause all activities immediately.
>
> Please do not accrue any additional costs as of the date of this notice.
>
> DSHS will be sending future communication as additional updates occur.

Exh. I to Huang Decl. This action was unequivocal. TDSHS's actions regarding Dallas County's funding were not made without regard to the Mass Termination Decision or based upon other considerations. There was no other possible motivation for TDSHS to eliminate grant funding.[1]

The fact remains that prior to the Termination Decision: 1) over a year remained on the grant: 2) over $2.941 million remained on the grant; and 3) TDSHS had neither raised nor expressed any intent or plan to terminate the grant. Huang Decl. ¶¶ 11-12.  While we cannot state with exact certainty how TDSHS would respond to an order from this Court vacating Defendants' termination of funding to TDSHS for the benefit of Dallas County, the facts before the nationwide mass grant cancelation are instructive.

Further, a preliminary injunction ruling made by this Court in *Harris County, Texas v. Kennedy*, 786 F. Supp. 3d 194, 203 (D.D.C. June 17, 2025) also provides some insight. In *Harris County*, this Court determined that all five local governmental body plaintiffs had standing because

---

[1] TDSHS cannot be joined as a necessary party to this matter because is not liable to Dallas County for any damages associated with grant termination. Exh. G to Huang Decl., Section 3.1.  TDSHS also enjoys sovereign immunity for breach of contract claims, and so is not subject to suit by Dallas County.

Defendants' termination of the grants deprived the jurisdictions of funding. *Id.* With regards to redressability, the Court stated: "That injury could be redressed by an injunction vacating the termination decisions." *Id.* While the government did not raise redressability at that stage of the case, *id.*, it did so subsequently. *See* Case No. 25-cv-1275, ECF No. 56, Defendants' Motion to Dismiss or for Summary Judgment (filed December 23, 2025), at 27-30. In support of their argument that the local governmental entities could not satisfy redressability with regards to pass-through grant awards, Defendants attached correspondence between CDC and TDSHS related to the reinstatement of funding to Harris County for its subawards. *See Id.* at ECF No. 56-5 to 8, Exhibits A-D to Defendants' Motion to Dismiss or for Summary Judgment.[2] In that correspondence, TDSHS raises potential practical objections to different proposals advanced by CDC to the mechanics of implementing the Court's award that the subrecipient funding for Harris County be resumed, such as who will pay for its operational costs, and it points out that it is not a party to those proceedings before the Court. *Id.* But, TDSHS does not indicate that it will not otherwise abide by the Court's order.

There may well be differences between Harris County's subawards with TDSHS and Dallas County's regarding the expiration dates of the awards, the sources of the funding, or the purposes for which the funds may be used by Harris County, but the only grant for which Dallas County seeks redress in this case has yet to expire. Huang Decl. ¶ 7; Exh. G to Huang Decl. If the Court were to vacate the termination of Dallas County's pass-through funding to TDSHS, TDSHS "will likely react in predictable ways" to any actions taken by Defendants' to comply with the order; there is no logical reason TDSHS would respond any differently to an order related to pass-through funding to Dallas County. *Murthy*, 603 U.S. at 57-58. Presuming that TDSHS will respond in a manner

---

[2] Dallas County requests the Court to take judicial notice of those exhibits.

similar to the manner it has responded to CDC after the Court vacated the termination of Harris County's pass-through funding, a favorable decision from the Court would create "a significant increase in the likelihood" that Dallas County "would obtain relief that directly redresses the injury suffered," in that Dallas County would be able reach agreements necessary to overcome any concerns raised by TDSHS regarding the resumption of pass-through funding. *Utah*, 536 U.S. at 464. Accordingly, Dallas County meets the redressability prong to establish Article III standing. *Lujan*, 504 U.S. at 560-61.

## II. The Tucker Acts does not divest this Court of jurisdiction over Dallas County's claims under the Administrative Procedures Act.

### A. The Tucker Act does not control this dispute.

Defendants argue that this Court lacks subject-matter jurisdiction over Dallas County's claims under the Administrative Procedures Act ("APA"). Defendants allege that, because Dallas County seeks to enforce contractual rights against the government and obtain contractual remedies for monetary damages, Dallas County's claims should be asserted in the Court of Federal Claims under the Tucker Act. *See* Defs.' Resp. at 17.

A plaintiff requesting relief from the government generally "must identify an unequivocal waiver of sovereign immunity." *Franklin-Mason v. Mabus*, 742 F.3d 1051, 1054 (D.C. Cir. 2014). The APA permits judicial review of a "final agency action," and requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A). It waives sovereign immunity as follows:

An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party.

5 U.S.C. § 702(a).

Final agency action is subject to APA review only where "there is no adequate remedy in a court." *Id.* § 704. However, the APA's waiver of immunity does not extend to "orders to enforce a contractual obligation to pay money." *Dep't of Educ. v. California*, 604 U.S. 650, 651 (2025) (per curiam). In such cases, the Tucker Act applies. *Id.* (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). The Tucker Act grants the Court of Federal Claims exclusive jurisdiction over certain suits against the Government, including those "founded...upon" any "express or implied contract with the United States." 28 U.S.C. § 1491(a)(1); *see also Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 609 (D.C. Cir. 1992) ("[T]his Court and others have interpreted the Tucker Act as providing the *exclusive* remedy for contract claims against the government.").

## B.    The source of Dallas County's APA rights is not contractual.

Determining whether a dispute is "at its essence" contractual is generally determined by two factors: the source of the rights upon which the plaintiff bases its claims, and the type of relief sought. *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982). Courts look to the substance of the pleadings to circumvent "creative drafting of complaints…to avoid the jurisdictional consequences of the Tucker Act." *Crowley Gov't Servs., Inc. v. Gen. Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022). Courts have "explicitly rejected the 'broad' notion 'that any case requiring some reference to or incorporation of a contract is necessarily on the contract and therefore directly within the Tucker Act' because to do so would 'deny a court jurisdiction to consider a claim that

is validly based on grounds other than a contractual relationship with the government.'" *Id.* (quoting *Megapulse*, 672 F.2d at 967-68). "Exclusive jurisdiction in Claims Court under the Tucker Act does not lie 'merely because [a plaintiff] hints at some interest in a monetary reward from the federal government or because success on the merits may obligate the United States to pay the complainant.'" *Crowley Gov't Servs.*, 38 F.4th at 1108 (alteration in original) (quoting *Kidwell v. Dep't of Army*, 56 F.3d 279, 284 (D.C. Cir. 1995)).

In looking at the source of the rights upon which the plaintiff bases its claims, courts make "rational distinctions between actions sounding genuinely in contract and those based upon truly independent legal grounds." *Id.* at 1107 (quoting *Megapulse*, 672 F.2d at 969-70). This involves a consideration of "whether, among other factors, the plaintiff's asserted rights and the government's purported authority arise from statute, whether the plaintiff's rights exist prior to and apart from rights created under the contract, and whether the plaintiff seeks to enforce any duty imposed upon the government by the relevant contracts to which the government is a party." *Id.* (quoting *Megapulse*, 672 F.2d at 969-70) (cleaned up).

When litigation resulted early in the spring of last year after the federal government began terminating grants and other forms of funding on a significant scale, several courts determined that claims brought by aggrieved parties were not subject to the Tucker Act under the *Megapulse* factors. For example, in *AIDS Vaccine Advocacy Coalition v. United States Department of State*, 770 F. Supp. 3d 121, 135-37 (D.C. Cir. 2025), the court determined that it had jurisdiction over APA claims challenging agency actions and asking that they be set aside, because the plaintiff did not seek compensatory monetary damages for past losses, even though the invalidation of the challenged policies would prevent further withholding of money; rather, the plaintiffs sought the vacatur of what they believed was improper agency action. Additionally, in looking at the first

*Megapulse* factor, the Court noted that the sources of the plaintiffs' claims were statutory (including the APA, the Impoundment Control Act, and the statutes appropriating the funding at issue) and resolution did not depend on an examination of any of the terms of the specific grant agreements. *Id.* at 137.

After several courts entered injunctive orders requiring the government to resume grant funding on the basis of the APA, *see California v. Dep't of Educ.*, 769 F. Supp. 3d 72, 77-80 (D. Mass. 2025) (holding *en masse* termination of grants was arbitrary and capricious under the APA and ordering defendants to restore plaintiffs to the pre-existing status quo prior to the termination), the Supreme Court issued a pair of opinions that have limited the authority of district courts in such decisions. In the first opinion, *Department of Education v. California*, the Supreme Court stayed the previously-referenced order because "the Government is likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." 604 U.S. at 651. The Supreme Court reasoned that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered here." *Id.* (quoting *Knudson*, 534 U.S. at 212). "Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on 'any express or implied contract with the United States.'" *Id.* (quoting 28 U.S.C. § 1491(a)(1)).

In the second Supreme Court opinion, *National Institutes of Health v. American Public Health Association*, 145 S. Ct. 2658 (2025), the Supreme Court held that district courts do not have jurisdiction under the APA to adjudicate suits "based on" the termination of grant funding or to order relief designed to enforce any "obligation to pay money" pursuant to the grants. There, the National Institutes of Health ("NIH") changed its funding to align with changed police priorities mandated by several executive orders. *Id.* at 2660-61 (Barrett, J., concurring in part). In so doing,

NIH issued internal guidance documents describing those priorities and terminating numerous grants. *Id.* The district court declared unlawful and vacated both the guidance and the individual grant terminations under the APA. *Id*. The Supreme Court subsequently stayed the district court's judgment vacating the Government's termination of the individual grants. *Id.* The Supreme Court reasoned that the APA's "limited waiver of [sovereign] immunity" does not provide courts with jurisdiction "to order relief designed to enforce any 'obligation to pay money' pursuant to those grants." *Id.* (quoting *Dep't of Educ. v. Cal.*, 604 U.S. at 651).

As Defendants note, in the wake of these decisions, several courts have determined that district courts do not have jurisdiction over APA claims asserted by grant recipients seeking to require federal governmental defendants to resume grant funding that has been terminated. These courts have asserted that such claims should be brought in the Court of Federal Claims under the Tucker Act, in part because the source of the plaintiff's claims arose from their grant contracts, and the statutes giving rise to the appropriations did not entitle them to relief independent of the contract. *See Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 822-24 (D.C. Cir. 2025) (holding source of grantee's rights for their APA and other claims arose from contracts and did not exist independently of the agreements), reh'g en banc granted and vacated, No. 25-5122, 2025 WL 3663661 (D.C. Cir. Dec. 17, 2025); *Appalachian Voices v. United States Envt'l Prot. Agency*, No. 25-1982, 2025 WL 2732746, at *7 (D.D.C. Aug. 29, 2025) (determining district court had no jurisdiction to enter a preliminary injunction on APA and other claims because Clean Air Act did not entitle grantees to receipt of funds in absence of contract), appeal filed, No. 25-5333, 2025 WL 2494905 (D.C. Cir. Sep. 19, 2025), denying injunction pending appeal, 2025 WL 2732746 (D.D.C. Sept. 25, 2025).

In *Harris County v. Kennedy*, this Court likewise noted that uncertainty regarding "the jurisdictional line between the APA and the Tucker Act" existed prior to the Supreme Court's *Department of Education* decision. *Harris Cnty.*, 786 F. Supp. 3d at 217. The Court ultimately decided not to issue injunctive relief for the contrary-to-statute and contrary-to-regulation APA claims asserted because they were duplicative of other claims asserted by the plaintiffs, and were "potentially foreclosed by *Department of Education*," but it also determined that the plaintiffs likely had not shown a sufficient likelihood that the Court had jurisdiction over their arbitrary-and-capricious APA claims.  *Id.* at 218. But, the Court noted that its decision was only preliminary, and it left open the possibility that "further development of the issues" might or might not improve the plaintiffs' chances. *Id.* at 219.

Reading these cases broadly, as Defendants' do, suggests that anytime a claimant seeks to bring any form of claim against the federal government when the genesis of the claim has a basis in contract, the claimant should assert its claims in the Court of Federal Claims under the Tucker Act. However, a decision issued last summer held that subcontractors' APA claims alleging the improper termination of the program giving rise to a contract between the government and the prime contractor was not, in essence contractual. *Amica Ctr. for Immigrant Rights v. U.S. Dep't of Justice*, No. 25-0298-RM, 2025 WL 1852762, at *13 (D.D.C. July 6, 2025), appeal filed 25-5254 (D.C. Cir.). The court reasoned that the subcontractors' claims depended on interpretations of statutes and regulations rather than the terms of an agreement negotiated by the parties. *Id.* (quoting *Widakuswara v. Lake*, No. 25-5144, 2025 WL 1288817, at *12 (D.C. Cir. May 3, 2025) (Pillard, J., dissenting from grant of stay pending appeal), *stay pending appeal vacated* 2025 WL 1521355, at *1 (D.C. Cir. May 28, 2025) (en banc) (adopting Judge Pillard's reasoning in substantial part)). Similarly, in *Crowley*, a plaintiff with a military contract challenged the authority of the GSA to

audit and unilaterally reduce future payments under the contract. *Crowley Gov't Servs.*, 38 F.4th at 1103 & n.4. Though GSA's independent audits and payment offsets affected the plaintiff's ability to get paid under the contract, the plaintiff had no contractual relationship with GSA itself, so the resolution of the plaintiff's claims primarily required an examination of the statutes that the plaintiffs claimed that the defendants violated, rather than the plaintiff's contract. *Id.* at 1110. In that regard, the plaintiff's claims were not in essence contractual.

Dallas County's constitutional claims in this case are identical to those asserted by the plaintiffs in *Harris County*, which the Court determined are not contractual, because the claims assert that the Defendant must "follow the law – not the law of contracts, but the law of the Constitution." *Harris County*, 786 F. Supp. at 205-06. Dallas County seeks to vindicate its right to be free from unlawful agency action, its procedural rights under HHS regulations, and the right to be free from unlawful and arbitrary action under the APA. Dallas County also seeks a better understanding of Defendants' procedures, which would assist Dallas County in future decisions to seek funding (direct and indirect) by allowing it to understand how Defendants will evaluate future proposals. These have value separate and apart from any potential monetary gain to be derived from the reinstatement of any grant funding. *Crowley Gov't Servs.*, 38 F.4th at 112-13.  Resolution of Dallas County's claims requires the Court to review the applicable appropriations made by Congress, HHS regulations governing the procedures to be followed by Defendants, and the provisions of the APA, rather than the provisions of Dallas County's subrecipient grant contract with TDSHS. *Amica Ctr.*, 2025 WL 1852762, at *13. Dallas County's APA claims are not in essence contractual and subject to the Tucker Act. *Megapulse*, 672 F.2d at 969-70.

### C.    The remedies sought by Dallas County are not contractual.

Determining whether a dispute is "at its essence" contractual is also determined by the type of relief sought by the plaintiff.  *Megapulse,* 672 F.2d at 968.  Generally, the courts look to whether

the plaintiff seeks contractual remedies, such as specific performance or damages that generally sound in contract; if the plaintiff is not in effect seeking money damages, the claims are not in essence contractual. *Crowley Gov't Servs.*, 38 F.4th at 1107. A party's request for injunctive relief that is essentially a remedy for a breach of contract indicates that jurisdiction over the dispute lies in the Court of Claims. *See, e.g., Ingersoll-Rand Corp. v. United States*, 780 F.2d 74, 75 (D.C. Cir. 1985) (holding that district court lacked jurisdiction when complaint alleged that Air Force's termination of contract was arbitrary and capricious and sought declaration that termination was unlawful, but plaintiff sought injunction requiring Air Force to undo the termination); *Spectrum Leasing Corp. v. United States*, 764 F.2d 891, 892 (D.C. Cir. 1985) (holding that district court lacked jurisdiction where contractor wax seeking an injunction compelling General Services Administration to cease withholding payments due under the contract, which was a "typical contractual remedy").

In a grant termination challenge brought last year, one court determined that it had jurisdiction over APA claims challenging agency actions and asking that they be set aside, because the plaintiff did not seek compensatory monetary damages for past losses, even though the invalidation of the challenged policies would prevent further withholding of money; rather, the plaintiffs sought the vacatur of what they believed was improper agency action. *AIDS Vaccine Advocacy Coalition*, 770 F. Supp. 3d at 135-37. However, as previously noted, after several courts entered injunctive orders requiring the government to resume grant funding on the basis of the APA, the Supreme Court limited the authority of district courts in those cases. *See Dep't of Educ. v. Cal.*, 604 U.S. at 651 (staying the previously-referenced order because the APA's limited waiver of immunity does not extend to orders to enforce a contractual obligation to pay money); *Nat'l*

*Inst. Health*, 145 S. Ct. at 2658 (holding district courts do not have jurisdiction under the APA to order relief designed to enforce any "obligation to pay money" pursuant to the grants).

In the wake of these decisions, several courts have determined that they do not have jurisdiction over claims asserted by grant recipients seeking to require federal governmental defendants to resume grant funding that has been terminated and that such claims should be brought in the Court of Federal Claims under the Tucker Act, even when the plaintiffs have not expressly plead breach of contract claims or sought retrospective monetary relief but have instead requested prospective equitable or injunctive relief under the APA. *Climate United Fund*, 154 F.4th at 823 (order prohibiting agency from terminating grant was for specific performance and contractual in nature); *Am. Ass'n of Physics Teachers v. Nat'l Sc. Found.*, __ F. Supp. 3d __, 2025 WL 2615054, at *11 (D.D.C. Sep. 10, 2025) (holding APA claims did not meet second *Megapulse* factor because they sought order to require agency to pay cancelled grant money).

However, in *Crowley*, the D.C. Circuit determined that the remedies sought by a contractor against an agency with which it did not have a contract were not essentially contractual. *Crowley Gov't Servs.*, 38 F.4th at 1111-12, 1113. The D.C. Circuit noted that the contractor's petition sought no monetary relief; it also noted that a ruling in its favor would help it obtain significant monetary benefits, including the ability to direct its resources to fulfilling its contract, rather than analyzing and challenging disputed billing items with GSA, the certainty of knowing which dispute resolutions would apply, the certainty of knowing whether GSA has authority to audit its invoices, and the ability to provide services to the Department of Defense without interference from GSA. *Id.* at 1111. Critically, the plaintiff had no contractual relationship with GSA itself, so any remedy afforded against GSA could neither be construed as damages nor specific performance. *Id.* at 1110. And, because the contractor did not seek in essence monetary relief from the government, the

declaratory and injunctive relief sought was not negligible in comparison to any potential recovery it might obtain in other proceedings. *Id.*

Just as in *Crowley*, 38 F.4th at 1107, Dallas County has no contract with Defendants. Huang Decl. ¶¶ 5-6. Dallas County is not seeking any monetary damages or retroactive payments. Complaint, ECF No. 1, at 29. Dallas County seeks declaratory relief and vactur of the unlawful decision to terminate funding. *Id.* This Court has determined that these equitable remedies are ones that "[c]courts have long granted" to address "violations of federal law by federal officials." *Harris County*, 786 F. Supp. 3d at 206. A plaintiff's request for vacatur of the agency action is not equivalent to seeking the payment of grants. *Nat'l Inst. Health*, 145 S. Ct. at 2660-61 (Barrett, J., concurring in part). And, undoing agency action is not the same as seeking money damages. *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988). This is true even if vacatur results in equitable relief in the form of an order preventing an agency from giving effect to a policy decision. *Nat'l Inst. Health*, 145 S. Ct. at 2660-61 n.1 (Barrett, J., concurring in part) ("if a district court decides that agency guidance violates the APA, it may vacate the guidance, preventing the agency from using it going forward."); *see also Megapulse*, 672 F.2d at 971 (holding that "the mere fact that an injunction would require the same government restraint that specific (non)performance might require in a contract setting is an insufficient basis to deny a district court the jurisdiction otherwise available and the remedial powers otherwise appropriate."). Furthermore, the requested relief has value independent of any future potential for monetary relief because it affects the future relationship between Dallas County and Defendants and clarifies their legal obligations. *Crowley*, 38 F.4th at 1107-08. "The fact that a judicial remedy may require one party to pay another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen,* 487 U.S. at 893.

Because Dallas County does not seek contractual remedies, its APA claims are not in essence contractual and subject to the Tucker Act. *Megapulse*, 672 F.2d at 969-70.

### D.  The Court of Federal Claims lacks jurisdiction over Dallas County's claims.

The Ninth Circuit recently rejected the argument that claims asserted by subcontractors who brought claims under the APA (among others) against HHS and other agencies from withdrawing government-provided funding for counsel to represent unaccompanied children in immigration proceedings were subject to the Tucker Act. *Cmty. Legal Servs. in East Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 137 F.4th 932 (9th Cir. 2025). After the district court granted a preliminary injunction, the government appealed and moved to stay the injunction, but the Ninth Circuit rejected the stay. *Id.* at 936. The Ninth Circuit reasoned that "to maintain a cause of action pursuant to the Tucker Act that is based upon a contract, the contract must be between the plaintiff and the government." *Id.* at 938 (quoting *Cienega Gardens v. United States*, 194 F.3d 1231, 1239 (Fed. Cir. 1998)). Because subcontractors generally have no right to sue under the Tucker Act without having entered into contracts with the government, the Ninth Circuit noted that the Court of Federal Claims has no jurisdiction to hear their suits. *Id.* (citing *Cienega Gardens*, 194 F.3d at 1239). The Ninth Circuit likewise rejected the government's argument that even though subcontractors do not have standing to sue the government under the Tucker Act, the Tucker Act "impliedly forbids" the plaintiffs' claims being brought in district court because subcontractors have fewer legal rights than prime contractors. *Id.* at 939. The Ninth Circuit reasoned that the Tucker Act's exclusive jurisdiction "impliedly forbid" contract claims from being brought in district court under the waiver of sovereign immunity in the APA (citing *Crowley*, 38 F.4th at 1099), but it pointed out that there can be no "exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act." *Id.* at 939 (quoting *Tootle v. Sec'y of Navy*, 446 F.3d 167, 177 (D.C. Cir. 2006)).

The Ninth Circuit subsequently denied a motion to have the case reheard en banc. *Cmty. Legal Servs. in East Palo Alto v. U.S. Dep't of Health & Hum. Servs.*, 155 F.4th 1099 (9th Cir. 2025). In that opinion, the Ninth Circuit considered the first *Megapulse* prong and held that the subcontractors' claims were not dependent upon the terms of the government's contract with the prime contractor, but rather arose from statutes requiring the government to fund legal representation for unaccompanied children, as well as the APA. *Id.* at 1104. The Ninth Circuit likewise considered the second *Megapulse* prong and held that the subcontractors were not seeking money damages; even though the subcontractors requested that the government be enjoined from ceasing to fund counsel to fund counsel for unaccompanied minors as required by statute, the subcontractors did not ask the court to reinstate the cancelled contract with the prime contractor and were not seeking any remedies arising from their cancelled contract. *Id.* at 1105.

Like the plaintiffs in *Community Legal Services*, Dallas County does not have privity of contract with Defendants. Huang Decl. ¶¶ 5-6. The Court of Federal Claims thus has no jurisdiction to hear Dallas County's claims. *Cmty. Legal Servs.*, 137 F.4th at 939; *Cienega Gardens*, 194 F.3d at 1239. As in *Community Legal Services* and *Tootle*, if Defendants' argument that Dallas County's claims are subject to the Tucker Act were adopted, there would be no court with jurisdiction for Dallas County to assert such claims. *Cmty. Legal Servs.*, 137 F.4th at 939; *Tootle*, 446 F.3d at 177.[3] This Court should reject that position.

---

[3] In addition, the Court of Federal Claims cannot provide prospective relief or other equitable remedies, including injunctions. *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020). And, the Court of Federal Claims has no jurisdiction over Dallas County's claims for constitutional violations of the separation of powers and the Spending Clause, neither of which mandate money damages against the government. *Stephens v. United States*, 165 Fed. Cl. 341, 348 (2023); *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995).

### E.    Dallas County's claims do not seek money damages.

Defendants further argue that Dallas County's claims do not fall within the limited waiver of sovereign immunity of the APA because the APA does not waive claims seeking money damages.  ECF No. 11-1, at 16-19; *see Dep't of Educ v. Cal.*, 604 U.S. at 651 (quoting 5 U.S.C. § 702). The Supreme Court has explained that the phrase "money damages," under section 702, refers to "compensatory, or substitute, relief," as opposed to "specific relief," which the APA does allow. *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261 (1999).  The specific definition employed by the Supreme Court in *Bowen* was as follows:

> We begin with the ordinary meaning of the words Congress employed. The term "money damages," 5 U.S.C. § 702, we think, normally refers to a sum of money used as compensatory relief. Damages are given to the plaintiff *to substitute* for a suffered loss, whereas specific remedies "are not substitute remedies at all, but attempt to give the plaintiff the very thing to which he was entitled."

*Bowen*, 487 U.S. at 895 (quoting *Md. Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (Bork, J.) (emphasis in original)). In *Bowen v. Massachusetts*, the Supreme Court considered whether a federal district court had jurisdiction under the APA to review a final order by the Secretary of HHS that refused to reimburse Massachusetts for a category of expenditures under its Medicaid program. The Secretary of HHS claimed that the case should have been brought in the Court of Federal Claims. The Supreme Court held that Massachusetts could challenge the "disallowance" of a category of Medicaid expenditures under the APA in federal district court. *Bowen*, 487 U.S. at 907, 912. The Supreme Court explained that Massachusetts had requested declaratory and equitable relief, and thus it was bringing an action "seeking relief other than money damages" under § 702 of the APA, and "even the monetary aspects of the relief that [Massachusetts] sought [were] not 'money damages' as that term is used in the law." *Id.* at 892-93. The Supreme Court held that although the district court's orders ultimately would lead to the disbursement of funds by the federal government, that "outcome is a

mere by-product of that court's primary function of reviewing the Secretary's interpretation of federal law" and did not negate the district court's jurisdiction. *Id.* at 910.

Several years later, the Supreme Court considered *Knudson*, 534 U.S. at 204. That case was not an APA case, but it involved an insurer's attempts to collect funds that had been paid to the spouse of an employee following an automobile accident; the employee and his spouse were covered by a health plan under ERISA. After the spouse received a settlement arising from the accident, her attorney sent a check to the insurer that was significantly less than the amount of medical costs that it paid on behalf of the spouse. The insurer sought reimbursement through an injunctive and declaratory action filed in federal district court under section 502(a)(3) of ERISA, which allows a civil action to be filed to enjoin any acts violating the plan, or to obtain "other appropriate equitable relief" to enforce the terms of the plan. The Ninth Circuit held that the insurer's attempts to collect reimbursement were not equitable relief and was not authorized by section 502(a)(3) of ERISA, but the Supreme Court granted certiorari and affirmed. *Knudson*, 534 U.S. at 204. The Supreme Court cited Justice Scalia's dissenting opinion in *Bowen* for the proposition that "suits seeking (whether by judgment, injunction, or declaration) to compel the defendant to pay a sum of money to the plaintiff are suits for 'money damages,' … since they seek no more than compensation for loss resulting from the defendant's breach of legal duty." *Knudson*, 534 U.S. at 210 (citing *Bowen*, 487 U.S. at 918-19 (Scalia, J. dissenting)). The insurer argued that section 502(a)(3) allowed it to enjoin respondent's failure to reimburse the plan, but the Supreme Court held that an action to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation was not usually available in equity. *Id.* at 210-11. The Supreme Court distinguished *Bowen* on the grounds that the APA did not bar a state from seeking specific relief to obtain reimbursement for funds to which it was entitled under the

Medicaid statute and was not a case for "specific performance of a *contractual* obligation to pay *past* due sums," and also that the state sought an "injunction to correct the method of calculating payments going forward." *Id.* at 212 (emphasis in original).

In *Department of Education v. California*, the Supreme Court issued an order staying a restraining order that enjoined the government from terminating several grants and requiring it to pay out past due grant obligations and to continue paying obligations as they accrue. 604 U.S. at 650. The Supreme Court cited *Knudson* in support of the proposition that "the APA's limited waiver of immunity did not extend to orders 'to enforce a contractual obligation along the lines of what the District Court ordered here." *Id.* (quoting *Knudson*, 534 U.S. at 212).

Until recently, *Bowen* was used by some courts to support a finding of a waiver of sovereign immunity under the APA in grant termination cases. *See Colorado v. U.S. Dep't of Health & Hum. Servs.*, 788 F. Supp. 3d 277 (D.R.I. 2025). Defendants' motion to dismiss argues that in light of the holdings of *Knudson* and *Department of Education* as set forth above, *Bowen's* holding has been limited to prevent the Court from ordering defendants to pay any sum of money to a plaintiff under the APA. ECF No. 11-1, at 25-26. This Court likewise determined that the plaintiffs in *Harris County* had not shown a sufficient likelihood that the Court had jurisdiction over their arbitrary and capricious claims asserted under the APA, and it stated that the other APA claims asserted by the plaintiffs in that case (contrary to statute and contrary to regulation) were "potentially foreclosed" by *Department of Education v. California*. *Harris County*, 786 F. Supp. 3d at 218-19.

Other than the case law discussed above, there is no indication that *Bowen* has been overruled or otherwise limited in its application. And, the issuance of stay depends on the facts and circumstances of a particular case. *Nken v. Holder*, 556 U.S. 418, 434 (2009). While the Court is not free to ignore *Department of Education*, *see Harris County*, 786 F. Supp. 3d at 218-19,

*Department of Education* is distinguishable. The plaintiffs in that case were all states who (unlike Dallas County) received grant funds directly from the government. *Cal. v. Dep't of Educ.*, 769 F. Supp. 3d at 75. Dallas County is not seeking an order from the Court to "enforce a contractual obligation to pay money." *Dep't of Educ. v. Cal.*, 604 U.S. at 651.  The plaintiffs there also did not allege that the termination of their grants violated any statute or allege any constitutional violations. *Cal. v. Dep't of Educ.*, 769 F. Supp. 3d at 75.  Instead, the plaintiffs in that case contended that the "terms and conditions of [their] grant awards d[id] not permit termination on the grounds" the government had invoked. Mem. Supp. Mot. for TRO, *California v. U.S. Dep't of Educ.*, No. 25-cv-10548 (D. Mass. Mar. 6, 2025), ECF No. 7. While these facts may not seem material, the Supreme Court's decision to stay the case appears to have centered on the availability of relief under the Tucker Act for the plaintiffs in that case. *Dep't of Educ. v. Cal.*, 604 U.S. at 651. And, as pointed out above, the Court of Federal Claims has no jurisdiction over any claims that might be asserted by Dallas County. *See* pp. 23-24, *supra*.

Thus, Dallas County respectfully asserts that the Court has jurisdiction over its APA claims.

## III.  Dallas County's Constitutional and *Ultra Vires* Claims Do Not Fail as a Matter of Law.

### A.  Dallas County's constitutional claims are proper.

Defendants' Motion to Dismiss argues that Dallas County's constitutional claims, asserted in Counts I and II of its Complaint, alleging separation of powers and Spending Clause violations, fail as a matter of law. ECF No. 11-1 at 25-26. Defendants argue that the claims are barred because they are purely statutory. *Id.* Defendants thus argue that the separation of powers claims should be dismissed, and that the Spending Clause claims cannot serve as the basis for a preliminary

injunction. *Id.* at 27.[4]

A complaint may be dismissed where a plaintiff fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). However, a complaint should not be dismissed under Rule 12(b)(6) if it contains sufficient factual matter, accepted as true, that states a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Defendants' argument is based upon *Dalton v. Specter*, 511 U.S. 462, 473 (1994). In that case, the plaintiffs sought to enjoin the closing of a navy shipyard. Under the statute governing decisions to close military bases, the Secretary of Defense was to prepare closure and realignment recommendations based upon selection criteria he established after notice and an opportunity for public comment; the Secretary was then required to submit his recommendations to Congress and the Defense Base Closure and Realignment Commission, which would hold public meetings and prepare a report that not only assessed the recommendations provided by the Secretary but also contained the Commissions' recommendations, which would be provided to the President. After the President received the report, by statute, he was required to either approve or disapprove the recommendations. The Commission was required to prepare a new report to submit to the President, and if he disapproved the second report, no bases would be closed; but if the President approved the report, the President was to submit the recommendations and his certification of approval to Congress. Upon receiving the President's certification, Congress could enact a joint resolution of disapproval, which would prohibit the Secretary from closing any bases, but if

---

[4] Defendants' Motion to Dismiss invokes Rule 12(b)(6), but except for a paragraph setting forth the standards governing that rule and a single reference to the rule in a paragraph that asserts that the Court has no jurisdiction over Dallas County's claim or that Dallas County's claims fail and should be dismissed, Defendants make no specific argument that Rule 12(b)(6)'s factual pleading requirements have not been satisfied. ECF No. 11-1 at 11, 14. Because Defendants' argument appears to invoke Rule 12(b)(6), Dallas County will respond to the argument under Rule 12(b)(6) standards.

Congress did not pass a joint resolution of disapproval, the Secretary was required to close all bases as recommended by the Commission. Before the President submitted a certification of approval to Congress, the plaintiffs field an APA suit alleging that the Secretary and Commission violated substantive and procedural requirements of the statute and used improper criteria in recommending the closure of a shipyard. The Supreme Court held that the submission to the President of base closure recommendations by the Secretary and the Commission was not "final agency action," because the recommendations were in not binding on the President, who had absolute discretion to accept or reject them. *Dalton*, 511 U.S. at 469-71. The Supreme Court rejected the proposition that the President's actions in excess of his statutory authority violated the separation of powers doctrine under the Constitution. *Id.* at 471-72. The Supreme Court distinguished between claims for constitutional violations and claims that an official acted in excess of his statutory authority. *Id.* at 472.

In this case, Dallas County's separation of powers and Spending Clause claims are based upon the Constitution, rather than any violation of a statute giving any powers to the President. ECF No. 1, Complaint, at 20-24.  Dallas County alleges that the Mass Termination Decision was made despite the appropriation of funds to states and local governments under the CARES Act and CRRSAA, and that there is an express absence of authority to repeal legislation by refusing to spend funds or to impose additional retroactive conditions on the receipt of funds in a manner that is unrelated to the federal interest in the affected programs. *Id.*  Dallas County does not allege that the President or either of the individual defendants have exceeded their statutory authority. *Id.*

Construing Dallas County's pleadings broadly and accepting all facts as true, *Dalton* is distinguishable and inapplicable, and Dallas County's constitutional claims should not dismissed and otherwise do not fail. *Id.*; Fed. R. Civ. P. 12(b)(6).

30

### B.    Dallas County's *Ultra Vires* claims are proper.

Defendants' Motion to Dismiss argues that Dallas County's *ultra vires* claims, asserted in Count III of its Complaint, fail because Dallas County can point to no mandatory statutory provision that Defendants have violated. ECF No. 11-1 at 27-28. This argument likewise appears to invoke Rule 12(b)(6).

A plaintiff asserting an *ultra vires* claim generally must establish that: (1) review is not expressly precluded by statute; (2) there is no alternative procedure for review of the statutory claim; and (3) the challenged action is plainly in excess of the agency's delegated powers and contrary to a specific prohibition in the statute that is clear and mandatory. *Global Health Council v. Trump*, 153 F.4th 1, 20 (D.C. Cir. 2025) (citing and quoting *Changji Esquel Textile Co. v. Raimondo*, 40 F.4th 716, 722 (D.C. Cir. 2022)) (cleaned up). However, *ultra vires* claims may also be asserted when a federal official has acted unconstitutionally. *See Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949). Dallas County's *ultra vires* claims in this case assert that the individual Defendants had no statutory or constitutional authority to issue or implement the Mass Termination Decision. ECF No. 1 ¶¶ 82-85. While Dallas County's complaint does not assert that Defendants violated any specific statutory prohibition (other than the APA), Dallas County alleges that these actions "violate the Constitution's separation of powers, exceed the limits of the Spending Clause, and have no basis in any federal statute." *Id.* ¶ 84.

Reading Dallas County's pleadings broadly and accepting all facts as true, *Larson* is applicable, and Dallas County's *ultra vires* claims should not be dismissed. *Larson*, 337 U.S. at 689; Fed. R. Civ. P. 12(b)(6).

## IV.    Dallas County Has Established Irreparable Harm.

A preliminary injunction is "an extraordinary and drastic remedy" that is "never awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (cleaned up). The movant faces a high

bar for success, as it must demonstrate four elements by a clear showing: (1) that it is likely to succeed on the merits; (2) that it likely suffer irreparable harm in the absence of injunctive relief; (3) that the balance of equities weighs in favor of granting the relief; and (4) that the public interest favors the injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where, as here, the Government is the party opposing injunctive relief, the latter two factors "merge." *Nken*, 556 U.S. at 435. Defendants' response to Dallas County's request for a preliminary injunction asserts that Dallas County has not established the element of irreparable harm. ECF No. 11-1 at 29.

### A.    Dallas County has established irreparable harm, even if it is economic.

Defendants' first argument is that irreparable harm cannot be shown because Dallas County asserts diminishment of funding resulting from the termination of a grant as a harm. ECF No. 11-1 at 29. As previously noted, the facts establish that prior to the nationwide Mass Termination Decision: 1) over a year remained on the grant with TDSHS and Dallas County: 2) almost three million dollars remained on the grant; and 3) TDSHS had neither raised nor expressed any intent or plan to terminate the grant. Huang Decl. ¶¶ 11-12. The cases cited by Defendants establish that economic loss, in and of itself, is not irreparable harm, because such losses may be compensated later through damages awards or other corrective relief. *See John Doe Co. v. CFPB*, 849 F.3d 1129, 1134 (D.C. Cir. 2017); *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958). However, the characterization of a harm as monetary does not per se render that harm irreparable. For example, a plaintiff who is limited to seeking nonmonetary equitable relief due to sovereign immunity that limits monetary recovery may suffer irreparable harm. *Perkins Coie LLP v. U.S. Dep't of Justice*, 783 F. Supp. 3d 105, 178-79 (D.D.C. 2025) (citing cases). Unrecoverable economic harms must be severe in order to be irreparable. *Id.* (citing cases).

It is clear that Dallas County cannot assert claims against Defendants for monetary damages that would not be barred by sovereign immunity. As established, Dallas County has no

claims that it may assert against Defendants under the Tucker Act. *See* pp. 3-28, *supra*. The loss of funding has been significant in that at the time of the termination of the funding by Defendants, the balance of funds was close to three million dollars. Huang Decl. ¶ 6. But, the loss of the funding has inhibited Dallas County's ability to carry out the purposes of the IDCU grant, which was to: allow Dallas County to prevent the spread of communicable diseases more effectively through epidemiology, disease surveillance, investigation, monitoring, and reporting to both Texas DSHS and CDC; and to enhance Dallas County's laboratory testing, reporting, and response capacities. Huang Decl. ¶ 6.

The United States' pending loss of its measles elimination status demonstrates one of the many threats to public health. Likewise, in the face of recent epidemics, the monitoring, testing, reporting of communicable disease is crucial. Notably, in September 2014, Dallas was "ground zero" for the first Ebola outbreak in the United States, with Dallas County Health and Human Services being deeply involved in containment efforts. The irreparable harm is the loss of the communicable disease epidemiology, disease surveillance, investigation, monitoring, and reporting services supported by the grants, putting the public health and wellbeing of Dallas County at risk. Huang Decl. ¶ 17. This harm is greater than any reputation, real property, or intellectual property harm. It is fairly oxymoronic for the government to argue that the defunding of public health communicable disease services does not give rise to irreparable harm when we are just six years out from an epidemic wherein the world basically came to a standstill, not just the United States: businesses closed, civil life came to a sudden halt, travel ceased. Virtually every facet of public life was adversely affected. If the reduction or loss of public health services to test, monitor, report, and track communicable diseases, and the resulting society-wide impact is not irreparable harm, one wonders what would qualify.

Here, the IDCU Grant funds are used by Dallas to hire staff for the Dallas County Health & Human Services' ("DCHHS") Public Health Laboratory ("PHL") to develop and maintain an electronic Laboratory Information System ("LIS"). Huang Decl. ¶ 9. The LIS tracks and organizes patient data, specimen details, and test results, which helps ensure that PHL information is accurate up to date. *Id.* This, like the purchase of equipment to increase testing, reporting, and response capacities, is critical in reporting and taking steps to stop the unrestrained spread of communicable diseases. *Id.*

The loss of the funding for the ICDU Grant has reduced DCHHS capacity to respond to other public health threats besides COVID-19, including H1N1 (swine flu), Zika, Ebola, measles, mpox, and other communicable diseases. Huang Decl. ¶ 15. The loss of funding of the IDCU Grant has loss of effectively reduced DCHHS's LIS program staff in half. *Id.* The County has been forced to defer critical LIS upgrades and improvements to other systems that allow DCHHS to share patient data and diagnostic information to be shared with Parkland Hospital. *Id.* Staffing cuts resulted in the loss of an employee with a Ph.D. who was to lead Dallas County's measles program and has left DCHHS's laboratory without scientific oversight for outbreak response, which has been particularly difficult and concerning for public health during a period of increased measles activity. *Id.* And, staff losses have left DCHHS unable to expand its capacity to test for a variety of diseases with the rapid turnaround time needed to detect and contain threats to public health in short windows of time, which is critical for the containment of threats to public health posed by communicable diseases besides COVID-19, including H1N1 (swine flu), Zika, Ebola, measles, and Mpox. Huang Decl. ¶¶ 15, 18.

Economic harm in the form of loss of federal funding may also constitute a loss of harm if it threatens the existence of the recipient's operations. *Harris County*, 786 F. Supp. 3d at 219 (citing

cases). And, government action may constitute irreparable harm if it perceptibly impairs the plaintiff's programs. *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016). Dallas County has established that the loss of pass-through grant funding due to the Mass Termination Decision has caused it irreparable harm by hampering its ability to protect its citizens from disease. *Id.*; *Winter*, 555 U.S. at 20. Further threats to public health will continue without the issuance of a preliminary injunction. *See Sierra Club v. U.S. Dep't of Agric.*, 841 F. Supp. 2d 349, 358 (D.D.C. 2012).

B.     **Dallas County's delay in seeking injunctive relief is not dispositive.**

Defendants' response to Dallas County's request for a preliminary injunction asserts that Dallas County cannot assert irreparable harm due to the time that passed between the termination of grant funding and the filing of this suit and. ECF No. 11-1 at 29-30.

While a delay of eight months in seeking action may militate against a finding of irreparable harm, that factor alone is not dispositive. *Mylan Pharmaceuticals, Inc. v. Shalala*, 81 F. Supp. 2d 30, 43-44 (D.D.C. 2000). Dallas County became aware of the Harris County case before this Court in June of 2025. At that time, Dallas County's in-house counsel (the Civil Division of the Dallas County Criminal District Attorney's Office) began researching and reviewing the applicable law to formulate its arguments. Further, since Dallas County is a governmental entity, its actions are subject to the Texas Open Meetings Act and its Commissioners Court meets only twice monthly, unless a special called meeting. The decision to seek permission to file the suit was delayed for over one month because the Commissioners Court of Dallas County, Dallas County's governing board did not meet during the month of July of 2025. After receiving the go ahead to file suit, pleadings were drafted and contract documents gathered for the affected grant. Teleconferences took place to go over the relevant documents. During this time, the Civil Division had identified an attorney with the Harris County District Attorneys Office who agreed

to sponsor Dallas County in the D.C. Circuit. However, when the Civil Division was planning to file the documents in October of 2025, Dallas County learned that the attorney could not sponsor it.  Thus, local counsel would have to be retained. It took several weeks to locate a D.C. attorney who was able to provide local representation. After local attorney was found it had to be placed on the Dallas County Commissioners Court agenda for approval (they meet twice a month, the first and third Tuesday). Once the contract for local counsel was approved, counsel for Dallas County, sought admission on a *pro hac vice* basis for one if its attorneys, and the suit was filed.

Further, the complexity of this matter and the time to research and brief same, the time spent investigating the specific Dallas County grants, and the infrequency of the meetings of the local government body, all mitigate against finding for Defendant on this issue.

### C.    The balance of the equities favors Dallas County.

Defendants' response to Dallas County's request for a preliminary injunction asserts that the third and fourth factors favor the Defendants. ECF No. 11-1, at 30-31.  Specifically, Defendants assert that a preliminary injunction would disrupt their administration of their grants, and that the public has an interest in allowing Defendants to take decisive action to safeguard against wasteful spending.  *Id.*  Defendants further assert that Dallas County has not "promised to return withdrawn funds should its grant termination be reinstated." *Id.* (quoting *Dep't of Educ. v. Cal.*, 604 U.S. at 652).

Defendants' position ignores the severe harms that their actions have caused, and will continue to cause, the citizens of Dallas County and the general public without an injunctive order from the Court. Defendants do not contend that Dallas County's use of the grant funds was wasteful or not in the public interest. Defendants did not take into account the effect that the Mass Termination Decision would have on Dallas County, which reasonably relied upon the EDCU Grant in hiring employees and making plans for investments in its laboratory and computer

reporting systems and expected that Defendants would abide by the terms of their appropriation statutes and devote the full range of appropriated funds to pandemic and disease prevention preparedness. Huang Decl. ¶¶ 15, 18. Furthermore, Dallas County contract with TDSHS was set to expire on July 31, 2026, before the Mass Termination Decision was made, and, without a preliminary injunction, none of the nearly $3 million in remaining funding may be used by Dallas County to achieve the goals of the grant. *Id.* ¶¶ 7, 12.

Moreover, it is simply not true that Defendants will be left with no recourse to recoup any funds that might be made available to Dallas County by a preliminary injunction, if, on the final merits, Defendants prevail. Defendants' own regulations allow them to make administrative offsets or to withhold payments in order to recoup any money that a grantee may owe the federal government. 45 C.F.R. § 75.391.

**V.      Dallas County Is Likely to Succeed on the Merits of Its Claims.**

Dallas County has a strong likelihood to succeed on the merits. Although it brings six claims, it "need only show a likelihood of success on one to obtain preliminary relief, provided the other preliminary injunction factors are satisfied." *Am. Bar Ass'n v. U.S. Dep't of Justice*, 783 F. Supp. 3d 236, 242 (D.D.C. 2025).

**A.      Dallas County has standing.**

Dallas County is likely to succeed in establishing a substantial likelihood of standing. *Green v. U.S. Dep't of Justice*, 54 F.4th 738, 744 (D.C. Cir. 2022). To establish standing, Dallas County must show that that it has suffered an injury in fact, that there exists a causal link between that injury and the conduct complained of, and that a favorable decision on the merits will likely redress the injury. *Lujan*, 504 U.S. at 560-61.

The Mass Termination Decision caused Dallas County concrete, particularized, and actual and imminent harm, including layoffs of staff and termination of acquisition of equipment and

investments in technology. *See* pp. 32-35 *supra*; see also ECF No. 5-1, pp. 18-20. As set forth herein, at 3-7 *supra*, these injuries are traceable to the Mass Termination Decision and Defendants' actions, without which Dallas County would still have funding to maintain its public health programs. And, an injunction against that decision would likely provide redress to Plaintiffs. *See* pp. 7-13 *supra*.

**B.    The Court has jurisdiction over Dallas County's claims.**

There is a substantial likelihood that the Court has jurisdiction to hear Dallas County's claims. *Church v. Biden*, 573 F. Supp. 3d 118, 133 (D.D.C. 2021).

Dallas County has asserted three claims for constitutional violations against the individual defendants, namely separation of powers (Count I), the Spending Clause (Count II), and equitable *ultra vires* (Count III). ECF No. 1, at 20-25. None of these claims hinge upon any waiver of sovereign immunity. *Pollack v. Hagen*, 703 F.3d 117, 121 (D.C. Cir. 2012). When an officer is "not doing the business which the sovereign has empowered him to do … there is no sovereign immunity to waive – it never attached in the first place." *Larson*, 337 U.S. at 689. This principle applies here because the Mass Termination Decision conflicts with the congressional appropriations which designated funds for states and local governments for pandemic surveillance, expansion of public health workforce, and the development of other disease preparedness and response activities. *See* ECF No. 5-1, at 3-8. The Mass Termination Decision unilaterally terminated those funds, was made without authority from Congress, and contradicts Congressional action that extended the funding after the public health emergency of COVID-19 ended. Unconstitutional actions like these are not protected by sovereign immunity. *Local 3677, Fed'n of Gov't Emps. v. Phillips*, 358 F. Supp. 60, 68 (D.D.C. 1973).

Dallas County has also asserted claims under the APA for unconstitutional and contrary to statute actions (Count IV), violation of agency regulations (Count V), and arbitrary and capricious

actions (Count VI). ECF No. 1, at 25-28. As set forth above, *see* pp. 13-29, *supra*, the Court also has jurisdiction over these claims. Specifically, the Tucker Act does not require that Dallas County's claims be asserted in the Court of Federal Claims. *Id.* None of Dallas County's APA claims are contractual under because Dallas County's claims against Defendants are based upon the violations of the Defendants of Constitutional provisions, statutes appropriating funding, agency regulations, and the APA, not the terms of Dallas County's subgrant agreement with TDSHS. *See Transohio Sav. Bank*, 967 F.2d at 609. Furthermore, Dallas County does not seek any contractual remedies, such as losses suffered from the termination of funding, but it seeks prospective, equitable relief, including the vacatur of the unlawful decision to terminate funding. ECF No. 1 at 29. The relief Dallas County seeks has value apart from any monetary recovery. *Crowley*, 38 F.th at 1113. This is not the equivalent to damages arising from a breach of contract. *Megapulse*, 672 F.2d at 971. And, the Court of Federal Claims has no jurisdiction over Dallas County's claims, because Dallas County has no privity of contract with the government, and it cannot provide Dallas County with prospective relief. *Me. Cmty. Health*, 590 U.S. at 327; *Cienega Gardens*, 194 F.3d at 1239. The Court likewise has jurisdiction even though Dallas County seeks injunctive relief that may ultimately require the resumption of funding, because *Department of Education* and other case law appearing to prohibit that relief is distinguishable. *See* pp. 25-29 *supra*.

    **C.**    **Dallas County is likely to succeed on the merits of its claims.**

In addition to arguing that Dallas County is unlikely to succeed on the merits of its claims due to lack of standing and jurisdiction, Defendants argue that Dallas County's constitutional claims for separation of powers and Spending Clause violations fail because they are simply claims that Defendants exceeded their statutory authority. ECF No. 11-1, pp. 26-27. However, as argued previously, *see* pp. 29-31, *supra*, Dallas County does not contend that Defendants did not act

contrary to a statute or in excess of their statutory authority. Instead, Dallas County contends that Defendants acted in the absence of any statutory authority and in violation of the Constitution; such actions do not evade judicial review. *Dalton*, 511 U.S. at 471-72.

Defendants likewise argue that Dallas County's *ultra vires* claims fail because Dallas County has not identified any specific statutory prohibition that governed Defendants which was violated. ECF No. 11-1, at 26-28. But, *ultra vires* actions may be based upon violations of the Constitution. *Larson*, 337 U.S. at 689. And, the Court should reject Defendants' argument that Dallas County's *ultra vires* claims fail for the same reason as its APA claims (which Defendants identify as lack of jurisdiction under the Tucker Act because they are essentially contractual) because Dallas County's APA claims are not contractual or subject to the jurisdiction of the Court of Federal Claims. *See* pp. 13-28, 30-31, *supra*.

**VI.    The Court Should Neither Require a Bond Nor Stay its Decision on Appeal.**

The Court should not require a bond. It has discretion not to require a bond at all. *P.J.E.S. ex rel Escobar Francisco v. Wolf*, 502 F. Supp. 492, 520 (D.D.C. 2020). Because Defendants are unlawfully holding previously committed funds, they will suffer no monetary injury from an injunction; a bond would hold Dallas County "hostage" for the harm caused by Defendants' actions, no bond should be required. *Nat'l Council of Nonprofits v. Office of Mgmt. and Budget*, 775 F. Supp. 3d 100, 130 (D.D.C. 2025). Dallas County seeks a preliminary injunction to remedy the irreparable harm that they would suffer otherwise from the loss of grant funding; requiring Dallas County to pay this back in the form of a bond would afford no relief at all. The imposition of a bond under such circumstances would be tantamount to the denial of a preliminary injunction and the denial of Dallas County's judicial review of Defendants' actions. *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases).

## CONCLUSION

For these reasons, Dallas County respectfully requests that the Court set its preliminary injunction for hearing; that the Court grant Dallas County a preliminary injunction; that the Court deny Defendants Motion to Dismiss; and any other relief to which it is entitled.

Dated: February 6, 2026.

Respectfully submitted,

**JOHN CREUZOT**
Criminal District Attorney
Dallas County, Texas

*/s/ Barbara Nicholas*
**Barbara Nicholas***
Assistant Criminal District Attorney
Texas State Bar No. 24032785
Barbara.Nicholas@dallascounty.org

**Jason G. Schuette***
Assistant Criminal District Attorney
Texas State Bar No. 17827020
Jason.Schuette@dallascounty.org

**Todd Sellars****
Assistant Criminal District Attorney
Texas State Bar No. 00794619
tsellars@dallascounty.org

Dallas County Criminal District Attorney's
Office, Civil Division
500 Elm Street, Suite 6300
Dallas, Texas 75202
Telephone:     214.653.7358
Facsimile:     214.653.6149

*/s/ Rebecca S. LeGrand*
Rebecca S. LeGrand
DC Bar No. 493918
LeGrand Law PLLC
1100 H Street NW, Suite 1220
Washington, DC 20005
Phone: (202) 587-5725
rebecca@legrandpllc.com

*Counsel for Plaintiff, Dallas County, Texas*


*Motion to appear *pro hac vice* forthcoming

**Motion to appear *pro hac vice* pending