**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

**DALLAS COUNTY, TEXAS**,

          Plaintiff,

          v.

**ROBERT F. KENNEDY, JR.**, in his official capacity as Secretary of Health and Human Services, *et al.*,

          Defendants.

Case No. 25-cv-4242 (CRC)

---

**OPINION**

Over a year ago, the Centers for Disease Control ("CDC") unilaterally canceled over $11 billion dollars in COVID-19-era public health grant funding to state and local governments, citing the end of the pandemic. Dallas County, Texas was a sub-recipient of one such canceled grant. At least two separate groups of government plaintiffs challenged the mass termination decision last spring and obtained preliminary injunctions that partially restored the status quo that existed before the rescission. See generally Harris County v. Kennedy, 786 F. Supp. 3d 194 (D.D.C. 2025); Colorado v. HHS, 788 F. Supp. 3d 277 (D.R.I. 2025). Roughly nine months later, Dallas County filed its own suit in this Court, raising largely identical constitutional, *ultra vires*, and Administrative Procedure Act ("APA") claims to its peers.

The County moved for a preliminary injunction; the government opposed that motion and cross-moved to dismiss the complaint. Then, in the middle of the combined briefing process, the government moved to stay the case pending the resolution of Climate United Fund v. Citibank, D.C. Cir. No. 25-5122, an *en banc* D.C. Circuit grant termination case that may clarify jurisdictional and merits issues presented in this case.

For the reasons enumerated below, the Court will deny the motion for preliminary injunction; deny the motion to dismiss in part and strike it in part without prejudice; and grant the government's motion to temporarily stay dispositive motion briefing.

## I.    Background

During the height of the COVID-19 pandemic, Congress passed a series of statutes by an overwhelming bipartisan majority, resulting in the appropriation of billions of dollars "to prevent, prepare for, and respond to coronavirus." Harris County, 786 F. Supp. 3d at 201 (citing numerous COVID-19-era statutes with same language). One such law was the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020); another was the Coronavirus Response and Relief Supplemental Appropriations Act ("CRRSAA"), Pub. L. No. 116-260, div. M., 134 Stat. 1182 (2020). Both statutes "define[d] coronavirus as 'SARS-CoV-2,' which is the virus that causes COVID-19, or another coronavirus with pandemic potential." Harris County, 786 F. Supp. 3d at 201–02 (cleaned up).

On this and other spending authority, the CDC and U.S. Department of Health and Human Services ("HHS") "issued billions [in] grants to state and local governments to fund public-health projects." Id. at 202. Although Congress tied the availability of certain relief funds to the duration of the COVID-19 emergency period, see, e.g., American Rescue Plan Act of 2021, § 9402, Pub. L. No. 117-2, 135 Stat. 4, 127 (2021) (funds to support "strike teams" of health care providers at nursing homes tied to length of national emergency); CARES Act, § 1109(h), 134 Stat. at 306 (end of paycheck protection program tied to expiration of emergency), it did not so limit the public health grants at issue in this and related cases, see Harris County, 786 F. Supp. 3d at 209. After the Secretary of HHS allowed the COVID-19 public health emergency declaration to expire in May 2023, Congress rescinded some

unobligated pandemic-era appropriations, but "any grants that had already been issued were left undisturbed." Id. at 202. Congress thus "expressed its judgment that spending was needed for both the immediate term and after the pandemic had run its course." Id. at 209.

On March 24, 2025, the Trump administration abruptly announced that it would terminate and cease payments on remaining COVID-19-era public health grants. Id. at 203; see also Compl. ¶ 4. Dallas County alleges that the government "did not engage in any individualized consideration of the affected grants," but "apparently deemed" the grant programs to be COVID-related and "designated them for immediate elimination based on one criterion: their funding derived from COVID-era appropriations acts passed by Congress." Compl. ¶ 46. The day after the announcement, HHS's Director of Communications issued a public statement explaining, "The COVID-19 pandemic is over, and HHS will no longer waste billions of taxpayer dollars responding to a non-existent pandemic that Americans moved on from years ago." Id. ¶ 47. Direct grantees received template letters declaring that their grants had been terminated because "the end of the pandemic provided cause to terminate COVID-related grants and cooperative agreements." Harris County, 786 F. Supp. 3d at 203 (cleaned up); see also Compl. ¶¶ 5, 50. "For grants that went to state pass-through entities, state authorities informed the local recipients of HHS's decision and directed them to pause any spending of grant money." Harris County, 786 F. Supp. 3d at 203 (cleaned up).

Among the grants cancelled on March 24 was an Infectious Disease Control Unit ("IDCU") grant allocated to the Texas Department of State Health Services ("Texas DSHS"), which in turn selected Dallas County as a sub-recipient for the funding. Compl. ¶ 33. The IDCU grant was initially funded by the CARES Act, but supplemental funds came from the CRRSAA, as the grant's performance period was extended and its budget increased several times between

2020 and 2024. Id. ¶¶ 35–37.[1] Dallas County alleges that it used this funding to hire staff for its Public Health Laboratory (including two permanent employees and one temporary employee) and to develop and maintain Laboratory Information System ("LIS") software that "tracks and organizes patient data, specimen details, and test results, helping ensure accuracy, efficiency, and regulatory compliance" in infectious disease monitoring. Id. ¶¶ 39, 41. As a practical matter, the grant operated on a reimbursement basis, meaning that Dallas County "incurred expenses allowed by the terms and conditions of the grant award and contract with Texas DSHS, submitted invoices each month to Texas DSHS, and received reimbursement." Id. ¶ 34. At the time of the mass termination decision, Dallas County had roughly $2.9 million left to spend on its IDCU grant. Id. ¶¶ 36–37.

Funding parameters contemplated that grant activity need not focus exclusively on COVID-19 monitoring. For instance, after the COVID-19 emergency declaration expired in May 2023, a revised statement of work specified that "COVID-funded laboratory surveillance, epidemiology, and informatics personnel may work on other respiratory pathogens and syndromes more broadly . . . as long as COVID-19 testing or surveillance is included in the effort." Id. ¶ 40. What's more, the availability of IDCU grant funding apparently did not hinge in any particular way on the COVID-19 emergency declaration. In July 2024, more than a year after the emergency declaration expired, an amendment to the sub-contract between Dallas County and Texas DSHS extended the grant's end date to July 31, 2026. Id. ¶ 37. And the grant budget increased by significant sums in October 2023 and September 2024—again, well after the end of the COVID-19 emergency period. Id. ¶ 44.

---

[1] The funding was distributed via the CDC's Epidemiology and Laboratory Capacity ("ELC") program, which was established well before COVID-19 and supports projects that help public health agencies prevent and respond to infectious disease outbreaks. Compl. ¶ 36.

The mass grant termination had an immediate impact on Dallas County.  On March 25, 2025, Texas DSHS notified the County that it should "pause" all grant "activities immediately" because it received word that the federal funding that supported the IDCU grant had been "terminated as of March 24, 2025."  Id. ¶ 52.  As a result, Dallas County was forced to cut staff from its PHL team, which has reduced its capacity to detect and monitor emerging infectious diseases.  Id. ¶¶ 57–64; see also Mot. for Prelim. Inj., Declaration of Philip Huang ("Huang Decl.") ¶¶ 14–17.  The complaint also alleges that the termination decision has injected significant uncertainty into the County's public health budgeting, interfering with its ability to plan for and mitigate future disease outbreaks.  Compl. ¶ 63; Huang Decl. ¶ 16.

In the wake of the mass cancellation of COVID-related grants, many state and local governments leapt into action.  One coalition of states sued HHS in the District of Rhode Island, challenging the mass termination decision as unconstitutional and arbitrary and capricious.  On the plaintiffs' motion, the district court in that case preliminarily enjoined the government from implementing or enforcing its March 24 cancellation decision as to the plaintiff states.  See Colorado v. HHS, 788 F. Supp. 3d at 315–16.  Separately, four local governments in states not covered by the Colorado suit—including Harris County, Texas—along with a union representing state and local government employees sued HHS and the CDC in this Court, challenging the termination on similar constitutional and statutory grounds.  The plaintiffs obtained a partial preliminary injunction, preventing HHS and CDC from implementing the March 24 cancellation decision as to the local government plaintiffs and on certain grants.  See Harris County, 786 F. Supp. 3d at 223.

Roughly nine months after the mass termination decision, Dallas County filed the present suit, which contests the rescission on separation of powers, Spending Clause, and *ultra vires*

grounds and brings a slew of APA causes of action (including contrary-to-law and arbitrary-and-capricious claims).  The County, too, moved for a preliminary injunction to enjoin the federal government from implementing the termination decision as to the IDCU grant.  In response, the government moved to dismiss the complaint.  While briefing was ongoing, the government moved to stay the case pending the D.C. Circuit's *en banc* resolution of Climate United Fund—which seems poised to address both Tucker Act jurisdictional issues that have arisen repeatedly in recent grant termination cases and constitutional merits issues regarding the executive's power to refuse to spend Congressionally-appropriated funds.[2]  The Court directed the parties to finish briefing the pending motion to dismiss and motion for preliminary injunction and then held a hearing on these two motions, along with the motion to stay.  All three motions are ripe for adjudication.

## II.    Legal Standards

Dallas County has moved for a preliminary injunction, "an extraordinary remedy" which is "never awarded as of right."  Winter v. Nat. Res. Def. Council, 555 U.S. 7, 24 (2008).  To secure such an injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Id. at 20.  "The movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." Abdullah v. Obama, 753 F.3d 193, 197 (D.C. Cir. 2014) (cleaned up).

The government has moved to dismiss the case under Fed. R. Civ. P. 12(b)(1) and 12(b)(6).  Under Rule 12(b)(1), the plaintiff "bears the burden of invoking the court's subject matter jurisdiction, including establishing the elements of standing."  Arpaio v. Obama, 797 F.3d

---

[2] The Court stayed dispositive briefing in Harris County for this reason.

11, 19 (D.C. Cir. 2015). "At the pleading stage, plaintiffs are required only to state a plausible claim that each of the standing elements is present." Jibril v. Mayorkas, 20 F.4th 804, 814 (D.C. Cir. 2021) (cleaned up). "Accordingly, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim of standing that is plausible on its face." Id. (cleaned up). "And the court assumes, for purposes of the standing analysis, that plaintiffs will prevail on the merits of their claims." Id. (cleaned up).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "contain sufficient factual matter, accepted as true, to state" a plausible claim for relief. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (cleaned up). A court "must accept all the non-movant's factual allegations as true when reviewing a motion to dismiss" under both Rules 12(b)(1) and 12(b)(6), "but such allegations will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion." Brady Campaign to Prevent Gun Violence v. Ashcroft, 339 F. Supp. 2d 68, 72–73 (D.D.C. 2004) (cleaned up).

Finally, a trial court has broad discretion to hold a case in abeyance. See generally Landis v. N. Am. Co., 299 U.S. 248, 254–55 (1936). "[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, counsel, and for litigants. How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance." Id. As such, "[r]esolving a motion to stay or to hold a matter in abeyance pending the outcome of a related or parallel proceeding turns upon the unique circumstances of the case, and is largely a matter of discretion for the court. A court may grant such a motion if it finds that in the interest of judicial economy and avoiding unnecessary litigation a stay is appropriate." Khadr v. Bush, 587 F. Supp. 2d 225, 229 (D.D.C. 2008) (cleaned up).

### III.  Analysis

This case sits at a procedural crossroads.  Dallas County has moved for preliminary relief, and the government has cross-moved to dismiss the complaint in its entirety.  In the middle of briefing these dueling motions, the government asked the Court to stay proceedings in the case pending the outcome in Climate United Fund.

The Court will first resolve Dallas County's motion for preliminary injunction, ruling that the County has not established irreparable harm, and that the competing equities here do not militate in favor of preliminary relief under the unique circumstances of this case.  The government is not entitled to dismissal at this time, however.  Based on the allegations in the complaint and the current legal landscape, there do not appear to be unsurmountable jurisdictional barriers to the County's APA claims.  And the government does not appear to have moved to dismiss those claims on their merits under Rule 12(b)(6).  Given this state of play, the Court will deny the motion to dismiss in part and strike it in part, without prejudice, for the reasons explained below.  Finally, the Court will grant the government's motion to stay further dispositive motion briefing pending Climate United Fund, which is poised to bear on key jurisdictional and merits issues in this case, in the interest of judicial economy.

### A.  Motion for Preliminary Injunction

The Court begins by addressing Dallas County's pending motion for preliminary injunction.  "The Supreme Court has emphasized that preliminary injunctive relief is never awarded as of right and, as a matter of equitable discretion, it does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits." Kim v. FINRA, 698 F. Supp. 3d 147, 172 (D.D.C. 2023) (cleaned up).  Thus, even if the County has a likelihood of

8

success on one or more of its claims, it cannot obtain preliminary relief unless it also carries its burden of demonstrating irreparable harm and a favorable balance of the equities.

The irreparable harm prong of the preliminary injunction analysis is no walk in the park. The D.C. Circuit "has set a high standard" for demonstrating irreparable harm. Chaplaincy of Full Gospel Churches v. England, 454 F.3d 290, 297 (D.C. Cir. 2006). A movant's injury must "be both certain and great," and "actual and not theoretical." Id. (cleaned up). It must also be imminent and beyond remediation without the Court's intervention. Id.

On the available record, the Court cannot say that Dallas County has established irreparable harm because the evidence of such harm associated with the termination of the IDCU grant, in particular, remains vague. A movant for preliminary relief "cannot simply make 'broad conclusory statements' about the existence of harm." Aviles-Wynkoop v. Neal, 978 F. Supp. 2d 15, 21 (D.D.C. 2013). "Rather, she must submit competent evidence into the record that would permit the Court to assess whether she, in fact, faces" such harm. Id. (cleaned up). Here, the County has submitted a sworn declaration averring that "funding cuts" have led to the loss of five positions in the Public Health Laboratory, which amounts to a "50% reduction" in the LIS program staff. Huang Decl. ¶ 15. The loss in staff has in turn led to a delay in LIS "modernization" and "limit[ed]" the County's ability to "expand testing and maintain rapid turnaround times" in a manner that facilitates monitoring of infectious disease outbreak. Id.

The Court does not mean to diminish the import of these losses, which surely lessen the County's ability to monitor and prevent infectious disease outbreaks. The principal trouble, however, is that the declarant's representations do not pinpoint precisely *which* funding cuts were responsible for which of the identified harms, an ambiguity made more confusing by the County's simultaneous discussion of another COVID-related grant—the Health Disparities

9

Grant—that was also terminated abruptly on March 24 but whose termination the County does not here challenge. Id. ¶ 10. If the IDCU grant funded the work of only two permanent employees, for instance, see id. ¶ 14, it is unclear to the Court how the termination of the grant led to the loss of five positions on the LIS program staff.

Moreover, there is a disconnect between assertions in the County's briefs and the sworn declaration that leaves the Court uncertain as to the extent of the Public Health Laboratory's present operations. The County represents in its briefing that "Dallas County does not have the financial means of keeping its programs running, and it has been forced to terminate programs that benefit the public[.]" Mot. for Prelim. Inj. at 28. By contrast, its declaration suggests that the Public Health Laboratory and LIS program were in operation before receipt of the IDCU grant and continue to operate today, albeit at reduced capacity due to generalized "funding cuts." It is thus not clear (as it was in Harris County, for instance) that the loss of federal funding has "threaten[ed] the very existence of the recipient's operations," 786 F. Supp. 3d at 219 (cleaned up), especially when the remaining funds on the grant amount to less than one percent of the county's health department budget, see Compl. ¶ 35 (explaining that the total IDCU grant amount of $15,760,022 constituted five percent of the county's health department budget). Given the plaintiff's burden to demonstrate irreparable harm, which must be both "certain" and "great," the Court cannot connect the missing dots on its behalf.

In addition, Dallas County waited for the better part of a year after the mass termination decision to file suit in this case, which is another factor that distinguishes it from the local government plaintiffs in Harris County. To be clear, "a delay in filing" alone "is not a proper basis for denial" of emergency relief. Gordon v. Holder, 632 F.3d 722, 724 (D.C. Cir. 2011). And a delay in filing may be understandable when the "effects" of the challenged action "are

10

more acutely felt" as time goes on.  Fed. Ed. Ass'n v. Trump, 795 F. Supp. 3d 74, 100 (D.D.C. 2025).  However, such a delay may nevertheless "support a conclusion that the plaintiff cannot satisfy the irreparable harm prong."  Gordon, 632 F.3d at 725.

Here, Dallas County's tardiness in bringing the present suit detracts from its showing of irreparable harm.  The County attributes its delay in filing not to feeling the effects of the challenged action more acutely over time, or to some event or circumstance out of its control, but instead to bureaucratic delays, difficulty in securing local counsel, and the legal complexity of the matter.  See Pl.'s Reply in Supp. of Mot. for Prelim. Inj. ("Pl.'s Reply") at 35–36.  While understandable, these are run-of-the-mill hurdles that many litigants face when they prepare to file suit in an unfamiliar jurisdiction and strike the Court as surmountable had the asserted harm been as exigent and irremediable as the County suggests.

At this preliminary stage, the Court is convinced that Dallas County has suffered harm as a direct result of the government's mass termination decision.  However, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a preliminary injunction are not enough" to satisfy the irreparable harm prong.  Clevinger v. Advocacy Holdings, Inc., 134 F.4th 1230, 1234 (D.C. Cir. 2025) (cleaned up).  Dallas County has not made the requisite showing that a preliminary injunction of the March 24 mass termination decision is warranted to stave off irreparable harm, as did its peer local governments in the Harris County litigation.[3]

---

[3] To the extent Dallas County suggests that the structural constitutional injury inflicted by the government's separation-of-powers violation qualifies as a standalone irreparable harm justifying the issuance of a preliminary injunction, Compl. ¶ 59, that suggestion would seem to be foreclosed by D.C. Circuit precedent.  See Alpine Securities Corp. v. FINRA, 121 F.4th 1314, 1333–37 (D.C. Cir. 2024).

The balance of equities here also does not militate in favor of granting an injunction under present circumstances. The precedents specifically relevant to various dimensions of this case—*e.g.*, the availability of constitutional and *ultra vires* claims, the potential jurisdictional obstacle of the Tucker Act—are in relative flux. Although the County has identified tangible harms that have befallen it as a result of the government's mass termination decision, those harms are not so irremediable as to outweigh the potential risk of erroneously ordering the government to pay grant funds at a time when the D.C. Circuit is poised to opine on key jurisdictional and merits questions that likely bear directly on the case. And again, the County's failure to "act[] with alacrity" when its peers mobilized quickly in the wake of the government's grant terminations "counsel[s] against granting preliminary injunctive relief," as the Court weighs the equities. Kim, 698 F. Supp. 3d at 170–71.

To sum up, the Court will deny Dallas County's motion for a preliminary injunction, both because the County has failed to demonstrate irreparable harm and because the unique balance of equities at this juncture do not weigh in its favor.

B.  Motion to Dismiss

In response to Dallas County's motion for preliminary relief, the government has cross-moved to dismiss the case in its entirety. Dismissal at this time would be premature. At least under currently binding law, the government's jurisdictional attacks on the County's APA claims fall short. And from what the Court can gather, the government has not formally moved to dismiss the APA claims under Rule 12(b)(6). As to the County's constitutional and *ultra vires* claims, the Court will reserve a ruling until the resolution of Climate United Fund. So in the interest of judicial economy and in light of the Court's decision to stay further dispositive motion

12

briefing in this case, see infra Section III.C, the government's motion to dismiss will be denied in part and struck in part without prejudice.

### 1. Standing

First things first, the Court confirms that Dallas County has standing to challenge the mass grant termination decision. Article III standing has three elements: injury-in-fact, causation, and redressability. Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992).

An injury-in-fact must be concrete, particularized, and actual or imminent, rather than speculative. FDA v. All. for Hippocratic Med., 602 U.S. 367, 381 (2024). The government does not even try to suggest that Dallas County has failed to demonstrate an Article III injury, and for good reason. Assuming the County is right on the merits, the federal government has unlawfully retracted funding that the County receives by way of a pass-through recipient (the state of Texas), thereby reducing the local government's capacity to prevent and monitor infectious disease outbreaks. Compl. ¶¶ 57–64. The unexpected nature of the decision has also created budget uncertainty for the County and hampered its ability to plan for future public health initiatives. Id. ¶ 63.[4] Even if the irreparable nature of the harm is questionable, see supra, there is little question that the County has experienced an Article III injury.

The government does contest the latter two elements of standing. The causation element requires a plaintiff to establish that its "injury likely was caused or likely will be caused by the defendant's conduct." All. for Hippocratic Med., 602 U.S. at 382. The government suggests that its conduct has not caused Dallas County's injury, see Mot. to Dismiss at 7–8, because the

---

[4] Dallas County also suggests that the government's mass termination of COVID public health funds "for cause" may affect its ability to secure future CDC and HHS grant funding. See Compl. ¶¶ 54, 58. However, it is not clear to the Court why Dallas County, as a sub-grantee rather than a direct grantee, would be penalized for the termination of the direct grant to which it was not a party.

13

County is a sub-recipient of COVID-era funds, and the CARES and CRRSAA monies in question passed through the Texas DSHS before making their way to the County. But it is abundantly clear that Texas terminated the IDCU grant due to the federal government's decision to cancel COVID grants *en masse*: The state told the County to stop grant activities immediately after it received word that the relevant federal funding was "terminated as of March 24, 2025." Compl. ¶ 6; Mot. for Prelim. Inj., Ex. I (March 25, 2025 correspondence from Texas DSHS regarding grant termination). The government points to no other reason for the IDCU grant's termination. The causation element of Article III standing is thus satisfied.

Redressability is a tad trickier. The redressability inquiry asks whether the plaintiff's injury will likely be remediated by judicial relief. See TransUnion LLC v. Ramirez, 594 U.S. 413, 423 (2021). Causation and redressability are "often flip sides of the same coin" because "enjoining [a challenged] action or awarding damages for the action will typically redress" the injury in question. All. for Hippocratic Med., 602 U.S. at 381. However, "[r]edressability can still pose an independent bar in some cases." Id. at 381 n.1. "The additional redressability requirement generally serves to ensure that there is a sufficient relationship between the judicial relief requested and the injury suffered." Diamond Alt. Energy, LLC v. EPA, 606 U.S. 100, 112 (2025) (cleaned up).

When a plaintiff is not the direct object of government action, redressability may "depend on how . . . third parties not before the court will act in response to the government [action] or judicial relief." Id. In such cases, the Supreme Court has instructed courts to consider whether "third parties will likely react to the government [action] or judicial relief in predictable ways that will likely cause or redress the plaintiff's injury." Id. (cleaned up). That calculus may involve "commonsense economic inferences" about third-party conduct. Id. at 120. A plaintiff's

theory of standing falters where it rests on pure speculation or "guesswork as to how independent decisionmakers will exercise their judgment." Murthy v. Missouri, 603 U.S. 43, 57 (2024) (cleaned up).

Dallas County's injury is redressable. As the government underscores, the County is not in contractual privity with the federal government. See Gov't Reply in Supp. of Mot. to Dismiss ("Gov't Reply") at 5. But it is entirely commonsensical to infer that, if the Court deems the government's conduct unlawful and vacates the mass termination decision, Texas will continue to serve as a pass-through for any federal funds that are incidentally reinstated, as it did each time the original IDCU grant was extended and supplemented. What's more, the government can identify nothing aside from its own conduct that led to the termination of Dallas County's sub-grant. The Court thus lacks any sensible basis to conclude that Texas may have some entirely independent ground for refusing to accept the remainder of the IDCU grant.

To shed further light on the redressability analysis, the parties point the Court to the Harris County case, in which some of the terminated grants at issue were awarded directly to local government recipients and others, as here, were funneled through the state of Texas. In Harris County, this Court preliminarily enjoined the government from "enforcing or otherwise giving effect to the March 2025 terminations of any grants issued directly or indirectly" to the local government plaintiffs in the case, at least under the COVID-related statutes whose appropriations had by that point expired. See No. 25-cv-1275 (CRC), ECF No. 32 at 1. As it turns out, according to correspondence appended to later filings in Harris County, there has been some delay in restoring the pass-through grants because the federal government has refused to compensate the Texas DSHS for certain administrative costs. See id. at ECF No. 56, Exs. A–C. Far from demonstrating that Texas presents a third-party obstacle to redressability, recent

developments in <u>Harris County</u> imply that Texas is willing to serve as a pass-through for terminated grant funding, so long as the federal government holds up its end of the cost-sharing bargain, or, alternatively, the localities in question agree to bear all or some of the administrative costs.  Government counsel appeared to concede this point at the motions hearing.  <u>See, e.g.,</u> Mots. Hrg. Rough Tr. at 31:20–22 (counsel acknowledging that "Texas may be willing to work in concert with the . . . local polity, as well as the federal [,] to redress [the County's] injury").

The government also seemed to suggest at the hearing that the impending expiration of the IDCU grant performance period on July 31, 2026 undermines redressability.  <u>See</u> Mots. Hrg. Rough Tr. at 31:19–32:6.  To the extent counsel intended to make such an argument, it is unavailing.  For one thing, Dallas County principally seeks a vacatur of the government's allegedly unlawful administrative decision.  That vacatur is not performance period-dependent and holds independent legal value for the County.  <u>See</u> Pl.'s Reply at 19.  For another, in a post-hearing supplemental brief, the government represented that the prime grant to Texas expires in July *2027*, not 2026.  Notice of Suppl. Info. ¶ 3.  It also stated that "*absent* a reinstatement, re-obligation, or court order," Dallas County's sub-grant could not be extended past the July 2026 performance period end date.  <u>Id.</u> ¶ 5(b) (emphasis added).  The brief does not meaningfully clarify whether a court order declaring the March 24, 2025 rescission unlawful could eventually result in the reinstatement of Dallas County's IDCU grant in some form.  But the Court is left with no reason to think that the end of the performance period for the County's sub-award precludes meaningful judicial relief and thus thwarts Article III standing.

To sum up, assuming that Dallas County is right on the merits of its claims, as the Court must at this juncture, it has suffered an injury-in-fact that was caused by the federal government's March 24, 2025 mass grant termination decision and would likely be redressed by

the vacatur of that decision, notwithstanding its indirect relationship with the grantor agencies. The Court therefore declines to dismiss Dallas County's claims for lack of standing.

2. *Tucker Act Jurisdiction*

That leads us to a second threshold inquiry: Does the Tucker Act divest this Court of jurisdiction over the County's APA causes of action? The answer appears to be no, at least under controlling D.C. Circuit authority.

As a general matter, the federal government enjoys sovereign immunity from a suit to which it has not consented. The APA "generally waives [that] immunity" where a suit seeks relief other than money damages. Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak, 567 U.S. 209, 215 (2012) (quoting 5 U.S.C. § 702). Critically, though, "[t]he APA's waiver of sovereign immunity does not apply 'if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.'" Dep't of Ed. v. Cal., 604 U.S. 650, 651 (2025) (quoting 5 U.S.C. § 702).

The Tucker Act affords the United States Court of Federal Claims ("CFC") jurisdiction "to render judgment upon any claim against the United States founded . . . upon any express or implied contract with the United States[.]" 28 U.S.C. § 1491(a)(1). The Act "confer[s] *exclusive* jurisdiction over breach of contract claims against the United States seeking more than $10,000 in damages on the" CFC, thereby "impliedly forbid[ding] contract claims against the Government from being brought in the district court under the waiver in the APA." Crowley Gov't Servs., Inc. v. GSA, 38 F.4th 1099, 1106 (D.C. Cir. 2022) (cleaned up) (emphasis added); see also Dep't of Ed., 604 U.S. at 651 ("[T]he APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money[.]'" (quoting Great-West Life & Annuity Ins. Co. v. Knudson, 534 U.S. 204, 212 (2002)).

17

The question presented squarely in this case, which is not present in most other grant termination cases that have trickled through the federal courts in recent months, is whether a *third party* that concededly lacks contractual privity with the federal government can be shunted to the CFC when that party challenges the government's grant-related conduct as unlawful.  The D.C. Circuit has not tackled this question head-on, nor has the Supreme Court.  But the Federal Circuit, for its (important) part, has made clear that "[t]o maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the government."  Cienega Gardens v. United States, 194 F.3d 1231, 1239 (Fed. Cir. 1998) (quoting Ranson v. United States, 900 F.2d 242, 244 (Fed. Cir. 1990)).  "In other words, there must be privity of contract between the plaintiff and the United States" to bring a Tucker Act claim in the CFC, id., save a few exceptions to this general rule, see, e.g. JGB Enters., Inc. v. United States, 497 F.3d 1259, 1261 (Fed. Cir. 2007) (explaining that a "third party beneficiary" to a contract, whose rights are "direct, not merely derivative" of the contract, may be able to sue to recover in the CFC); but see Pac. Gas & Elec. Co. v. United States, 838 F.3d 1341, 1361 (Fed. Cir. 2016) (cleaned up) (explaining that the "requirements to demonstrate third-party beneficiary status are stringent" and difficult to satisfy).

Here, the government has not just conceded, but *emphasized* that Dallas County is not in contractual privity with the pertinent federal agencies.  See Gov't Reply at 5.  And it has not invoked any doctrinal exception to the privity requirement.  Cf. Teton Hist. Aviation Found. v. DOD, 686 F. Supp. 2d 75 (D.D.C. 2010) (denying a motion to dismiss a subcontractor's APA claim due to lack of privity between subcontractor and federal agency, as well as agency's failure to invoke any exception to privity requirement).  When pressed at the motions hearing on whether the privity requirement undermined its Tucker Act channeling argument, the

government had no meaningful rejoinder.  See Mots. Hrg. Rough Tr. at 33:25–34:10 (counsel noting that he had "no authority" to contradict the privity requirement established in Federal Circuit precedent and following up that he could not furnish "any additional case law or authority regarding the implication of a subcontractor whose grant was terminated and their ability to seek recourse . . . in the [CFC]").

If Dallas County is not in contractual privity with the federal government and no exception to the privity requirement applies, as appear to be the case here, then the County would seem to be boxed out of the CFC.  As a result, a longstanding D.C. Circuit principle kicks in: "There cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act."  Tootle v. Sec'y of Navy, 446 F.3d 167, 177 (D.C. Cir. 2006); see also id. at 176 ("We categorically reject the suggestion that a federal district court can be deprived of jurisdiction by the Tucker Act when no jurisdiction lies in the Court of Federal Claims."); Maryland Dep't of Hum. Res. v. HHS, 763 F.2d 1441, 1450 n.5 (D.C. Cir. 1985) ("[R]elief under the APA is not precluded by the Tucker Act unless, at a minimum, a remedy is actually available under the Tucker Act.").[5]

Admittedly, Tucker Act jurisprudence has evolved rapidly over the last year or so, and if recent history is any indication, it will continue to do so.  Again, the Supreme Court and D.C. Circuit have yet to expressly weigh in on the particular doctrinal wrinkle presented here. Nevertheless, a growing chorus of courts has ruled that a lack of contractual privity between a plaintiff and the federal government undermines Tucker Act channeling.  See, e.g., Cmty. Legal Servs. in E. Palo Alto v. HHS, 137 F.4th 932, 938–39 (9th Cir. 2025) ("Subcontractors, who

---

[5] The Court does not understand any recent Supreme Court or D.C. Circuit Tucker Act rulings to disturb the longstanding Tootle principle.

have not entered into contracts with the Government, generally have no right to sue under the Tucker Act, and the Court of Federal Claims has no jurisdiction to hear their suit."); see also Cmty. Legal Servs. in E. Palo Alto v. HHS, 155 F.4th 1099, 1100–07 (Mem) (9th Cir. 2025) (statement respecting denial of rehearing en banc); Am. Ass'n of Univ. Profs. v. Trump, 815 F. Supp. 3d 907, 957 (N.D. Cal. 2025) ("The Tucker Act is inapplicable for the additional reason that Plaintiffs cannot bring a breach of contract claim as non-parties to the grant agreements at issue."); New Jersey v. DOT, No. 26-cv-939 (JAV), 2026 WL 1863847, at *17 (S.D.N.Y. June 29, 2026) ("[B]ecause the States [as non-contracting third parties] cannot bring an action in the Court of Federal Claims under the Tucker Act, the Tucker Act cannot serve to divest this Court of jurisdiction[,]" and "[n]othing in the Tucker Act evinces a deliberate and considered congressional choice to divest federal district courts over claims for regulatory violations brought by non-contracting third parties[.]"); Brighton Park Neighborhood Council v. McMahon, No. 25-cv-4523 (SLS), 2026 WL 1707623, at *17 (D.D.C. June 12, 2026) (concluding with "little difficulty" that subgrantee plaintiffs' claims can proceed in district court because "Section 702 does not bar APA claims when the underlying grievance cannot be brought under another statute, like the Tucker Act," and subgrantee plaintiffs were "not in contractual privity" with defendants and thus could not "bring their claims in the [CFC]"); NAACP v. United States, No. 25-cv-965 (JRR), 2026 WL 1265450, at *23 (D. Md. May 8, 2026) ("Because Plaintiffs are not parties to the underlying contracts, the court is not persuaded the Tucker Act bars its consideration of their claims.").

Future developments in Tucker Act jurisprudence may require the Court to reconsider the foregoing analysis. But at least for now, the Tucker Act does not appear to divest it of jurisdiction over Dallas County's APA claims.

20

### 3.  *Tying Up Loose Ends*

Having considered the threshold obstacles to Dallas County's APA claim, the Court pivots to the merits and identifies a curious lacuna in the government's motion to dismiss. Though the government moves for dismissal under Rules 12(b)(1) and 12(b)(6), it does *not* argue that the County's complaint fails to state APA claims on their merits.  See Mot. to Dismiss at 19–21 (contending that "Plaintiff's Constitutional and Ultra Vires Claims Fail as a Matter of Law," but not independently arguing that the *APA* claims fail on Rule 12(b)(6) grounds).  The Court will thus construe the government as having moved to dismiss the County's APA claims under Rule 12(b)(1) only.[6]  Because the government has not persuaded the Court of any jurisdictional barriers to the County's APA claims at this time, the Rule 12(b)(1) motion must be denied.

As a result, the case will live on as to Counts IV, V, and VI of the complaint (*i.e.*, Dallas County's APA claims).  And because the Court will stay further dispositive motion briefing until the Climate United Fund decision is issued, see infra, the Court exercises its docket-managerial discretion to strike the government's Rule 12(b)(1) and (b)(6) motions to dismiss Counts I, II, and III (*i.e.*, Dallas County's constitutional and *ultra vires* claims) without prejudice.  Once the Climate United Fund decision is handed down, the government is at liberty to file or renew motions to dismiss any claims affected by the decision.  Alternatively, the parties may opt to proceed straight to summary judgment briefing, if warranted.

---

[6] If the government did, in fact, intend to move to dismiss the APA claims under Rule 12(b)(6), the Court could not grant such a motion because the government did not engage the APA claims on their merits in even "the most skeletal way."  Al-Tamimi v. Adelson, 916 F.3d 1, 6 (D.C. Cir. 2019) (citation omitted); see also Herbert v. Nat'l Acad. of Sci., 974 F.2d 192, 196 (D.C. Cir. 1992) (courts generally do not consider arguments "ignored or left undeveloped by counsel in the first round of briefing").

C.  Motion to Stay

The last pending motion for the Court's resolution is the government's motion to stay dispositive motion briefing in this case pending the resolution of *en banc* review in Climate United Fund.  While the Court appreciates Dallas County's interest in having the legality of the mass grant termination decision adjudicated as soon as possible, the Court agrees with the government that a temporary stay is appropriate under the particular circumstances of this case.

The D.C. Circuit's *en banc* case involves both freestanding separation-of-powers and APA claims related to the termination of federal grants whose window for re-obligation has closed.  The disposition of the case will likely affect the viability of Dallas County's constitutional claims.  It also may bear on whether the Tucker Act channels grant-related claims like Dallas County's to the CFC.  To be sure, the outcome in Climate United Fund seems unlikely to hinge entirely on the sub-grantee status of certain plaintiffs; the third-party privity issue was not ventilated in the panel proceedings, nor was it a serious focus of the *en banc* briefing.  However, because the privity issue was addressed in the sub-grantee plaintiffs' answering brief and then again by the government on reply, the D.C. Circuit may address it in some fashion.  And if the Circuit chooses not to distinguish between grantees and sub-grantees for Tucker Act channeling purposes, such an elision may perhaps be telling in itself.  In any event, the Court finds it prudent and efficient to adjudicate any further dispositive motion in this case—which could entail a final determination on key jurisdictional and/or merits issues—once the Circuit has spoken on the relevant questions.

As things stand, the Court's interest in judicial economy outweighs the County's solicitudes about a temporary stay in dispositive motion briefing.  Cf. Belize Soc. Dev. Ltd. v. Gov't of Belize, 668 F.3d 724, 732–33 (D.C. Cir. 2012) (explaining the importance of balancing

the court's interest in judicial economy against possible hardship to the parties).  Oral argument in Climate United Fund took place several months ago, so a resolution should be on the horizon. The County's concern that a stay runs down the clock on its ability to spend the IDCU grant is a fair one, but the force of that argument is somewhat lessened by the County's lengthy delay in filing this lawsuit.  In any case, the Court reiterates that, according to the government's post-hearing supplemental brief, the prime grant to Texas expires in July 2027.  Notice of Suppl. Info. ¶ 3.  The government's supplemental brief implies that a court order could have the effect of extending the IDCU spending deadline through that date, if Dallas County ultimately prevails in this case.  Notice of Suppl. Info. ¶ 5(b).  Should any basis arise for questioning the government's representations about continued funding availability, either party may file a notice with the Court and, if necessary, move to lift the temporary stay.

In closing, the Court emphasizes that this ruling should not be taken to suggest that *any* case in this jurisdiction that remotely implicates federal grants is appropriately stayed pending the Circuit's resolution of marquee cases.  The calculus on a motion to stay is very much circumstance-dependent.  As in Harris County, however, the facts and circumstances in *this* case warrant a temporary postponement in adjudication, given how closely the case resembles Climate United Fund and the risk of rendering a final decision in the case without the benefit of the Circuit's imminently binding guidance.  In other words, staying dispositive motion briefing pending the Circuit's decision strikes the Court as a fitting way to balance the interests of efficient case resolution, hardship to the parties, and judicial economy against the backdrop of a dynamic jurisprudential landscape.  Cf. Landis, 299 U.S. at 254; Belize Soc. Dev. Ltd., 668 F.3d at 732–33; Khadr, 587 F. Supp. 2d at 229.

**IV.    Conclusion**

For the foregoing reasons, the Court will DENY Plaintiff's Motion for a Preliminary Injunction; DENY in part and STRIKE in part without prejudice Defendants' Motion to Dismiss; and GRANT Defendants' Motion to Stay.  A separate Order shall accompany this Opinion.

 

CHRISTOPHER R. COOPER
United States District Judge

Date:  July 23, 2026